Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---------------------------------------------------------

SHERRY JAMES as Special Administrator

of the Estate of MALCOLM JAMES, deceased,

                    Plaintiffs,

                    vs.                    Case No. 22-CV-344

RACINE COUNTY SHERIFF'S

DEPARTMENT, SHERIFF

CHRISTOPHER SCHMALING,

SGT. JUSTIN BRANDS, SGT ERLINDA

RODRIGUEZ, OFFICER JONATHAN KOSKI,

OFFICER ADRIAN PAYNE, OFFICER JOSUE

DAVALOS-ALONSO, OFFICER MICHAEL SAULYS,

OFFICER CRISTAIN BRINDIS, OFFICER JUSTIN

GAUDES, MEnD CORRECTIONAL CARE, PLLC, and

CRYSTAL KRISTIANSEN,

                    Defendants.

---------------------------------------------------------

        Remote ZOOM Deposition of LLOYD BIGGS, R.N.

                Tuesday, April 1st, 2025

                9:35 a.m. - 5:22 p.m.

            appearing remotely from Denton, Texas

                    Job No. 185261

Stenographically Reported by Rosanne E. Pezze, RPR/CRR

                Certified Realtime Reporter

Page 2

Remote ZOOM Deposition of LLOYD BIGGS, R.N., a witness in the above-entitled action, taken at the instance of the Defendants, pursuant to the Federal Rules of Civil Procedure, pursuant to Notice, before Rosanne E. Pezze, RPR/CRR, Certified Realtime Reporter and Notary Public, State of Wisconsin, appearing remotely from Denton, Texas, on the 1st day of April, 2025, commencing at 9:35 a.m. and concluding at 5:22 p.m.

A P P E A R A N C E S:

        O'CONNOR LAW FIRM, by

            Mr. Jeffrey D. Naffziger, via Zoom

            100 South Wacker Drive, Suite 350

            Chicago, Illinois  60606

            312-906-7609

            firm@koconnorlaw.com

            Appeared on behalf of the Plaintiffs.

        OTJEN LAW FIRM, S.C., by

            Mr. Jason J. Franckowiak, via Zoom

            20935 Swenson Drive, Suite 310

            Waukesha, Wisconsin  53186-2057

            262-777-2222

            jfranckowiak@otjen.com

            Appeared on behalf of Defendants MEnD

            Correctional, PLLC and Crystal Kristiansen.

Page 3

A P P E A R A N C E S (continued):

        CRIVELLO, NICHOLS & HALL, S.C., by

            Mr. Steven C. McGaver, via Zoom

            710 North Plankinton Avenue, Suite 500

            Milwaukee, Wisconsin  53203

            414-290-7533

            smcgaver@crivellolaw.com

            Appeared on behalf of Defendants Racine

            County Sheriff's Department, et al.

Page 4

                    I N D E X

EXAMINATION                                          PAGE

By Mr. Franckowiak. . . . . . . . . . . .     5
By Mr. Naffziger. . . . . . . . . . . . .   .313


                    E X H I B I T S

EXHIBIT NO.                                  PAGE NUMBER

Exhibit 1   Notice of Deposition. . . . . . . .  .17
Exhibit 2   Current Curriculum Vitae. . . . . .  18
Exhibit 3   Case list. . . . . . . . . . . . .   29
Exhibit 4   Fee Schedule. . . . . . . . . . . .  39
Exhibit 5   Invoices. . . . . . . . . . . . . .  .41
Exhibit 6   Expert Witness Retention Agreement. . .102
Exhibit 7   Board of Medical Practice Findings of Fact,
            Conclusions, and Final Order. . . .  107
Exhibit 8   11/5/21 report of Dr. Neuman. . . .  .111
Exhibit 9   Dr. Ross Expert Report. . . . . . .  .115
Exhibit 10  DA Hanson letter. . . . . . . . .  .119
Exhibit 11  5/30/24 Biggs report. . . . . . .  . 123
Exhibit 12  First Supplemental Biggs Report, 11/11/24.123
Exhibit 13  Second Supplemental Biggs Report, 1/2/25. 123
Exhibit 14  Standards for Health Services in Jails.  .126
Exhibit 15  NIH Prone Restraint Cardiac Arrest. . .  127
Exhibit 16  Third Supplemental Biggs Report, 3/31/25.  15
Exhibit 17  CMS Medical Screening. . . . . . .  161
Exhibit 18  Mental Health Clinical Contact/Monitoring.169
Exhibit 19  Mental Health Clinical Contact/Monitoring.174

   (Original exhibits attached to Original transcript;
            copies of exhibits are attached.)


                    R E Q U E S T S

                        (None.)

EXHIBIT

2

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #126F
California Firm Registration #179
LEXITAS

Case 2:22-cv-00344-PP   Filed 06/05/25   Page 1 of 82   Document 121-2



Page 5

TRANSCRIPT OF PROCEEDINGS

LLOYD BIGGS, R.N., having been first duly sworn remotely on oath, was examined and testified as follows:

E X A M I N A T I O N

BY MR. FRANCKOWIAK:

Q   Good morning.

Could you state your name for the record, please?

A   My name is Lloyd Biggs.

Q   Okay.  Mr. Biggs, my name is Jason Franckowiak. I'm counsel for a couple of the defendants, MEnD Correctional Care and Nurse Kristiansen.  I'll probably be asking all or most of the questions here today.

You've given depositions before in the past; is that true?

A   I have.

Q   Okay.  How many depositions, roughly, have you given in the course of your career?

A   You know, three depositions, and I testified in court once.

Q   Okay.  I'm sure you probably had some conversations about some of the ground rules. First of all, obviously, this is by Zoom, so if

Page 6

you -- certainly, if you have any problems hearing me or understanding, or we have any issues with the audio, please just let me know.  We'll certainly try to correct that.

Can you hear me okay as I speak right now?

A   Sounds good.

Q   Okay.  Fantastic.  Certainly, if you can just answer with a yes or a no answer or a verbal answer as opposed to a shake or a nod of your head, obviously we do have a court reporter taking down everything we say; it will help us get a good transcript.  Certainly, if I ask a question that doesn't make any sense, please let me know.  I'll try to rephrase it.  It does happen from time to time.  If you do answer a question, I will assume that -- that you understood what I was asking. Sound fair?

A   Sounds fair.

Q   All right.  We'll probably be here a little while. We have a fair amount to go through.  Certainly, I'll go as fast as I can through it, but if we need to take a break at any time, and we can certainly do it periodically as we go today, just let us know and we can take a break.  Okay?

Page 7

A   You bet.

Q   All right.  You've been retained to offer opinions as an expert nurse on behalf of plaintiffs in a lawsuit filed in federal court in the state of Wisconsin in this matter; is that accurate?

A   That is correct.

Q   Have you been provided a copy of the complaint in this case?

A   Yes.

Q   Okay.  What's your understanding as to the parties involved in this lawsuit, as you sit here today?

A   It's Mr. James, and it's against the Racine Sheriff's Department and -- and Nurse Kristiansen --

Q   Okay.

A   -- representative of Mr. James.

Q   Okay.  And what's your understanding, as you sit here today, of the allegations that are being made in the complaint against each of those defendants?

A   To go through all of those at this point in time.

Q   Well, do you have an understanding as to generally -- not what's written in the complaint, but as to the allegations that are being made, what each of these individuals allegedly did?

A   As far as Nurse Kristiansen, it's -- she

Page 8

intentionally did not act as a reasonable nurse would in her treatment in response to Mr. James when he was -- became unresponsive when Custody pulled him over.

Additionally, it's -- Mr. James' treatment throughout his time in the jail as far as his -- he had some obvious mental health problems, and he was banging his head, and as the solution, he was repeatedly put into a restraint chair.  But in order to get him into that restraint chair, he was pepper sprayed and tased repeatedly, and was put in the chair, came back out, hit his head, again was banging his head, put back in the chair numerous times.

Q   Okay.  You said that Nurse Kristiansen intentionally did not act as a reasonable nurse.

What is your definition of "intentionally"?

A   That is --

MR. NAFFZIGER:  I'll object to -- sorry, Lloyd.  I'll be objecting from time to time --

THE WITNESS:  Sure.

MR. NAFFZIGER:  -- and with the time lag of Zoom, I may interrupt you, and I don't mean to.

Objection.  Form.  Foundation.

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.  Nevada Registration #126F
California Firm Registration #179

Case 2:22-cv-00344-PP   Filed 05/05/26   Page 2 of 82   Document 121-2



Go ahead and answer.

A  It is what she -- it's the decision that she made. That was her intent was to not perform the duties of a normal registered nurse.

BY MR. FRANCKOWIAK:

Q  Okay.  So it's your opinion or you intend to testify that she intentionally did not care for Mr. James in the appropriate manner?

A  Well, and the reason being is that she -- she is a registered nurse.  She went to school.  She passed her NCLEX exam.  She had experience as a nurse. And she expressed knowledge of what a nurse should have done or normally would do, but she did not perform those duties.

Q  Okay.  As you sit here today, are you able to tell me what it was that she expressed that a nurse would do but that she did not do?

A  Well, first of all, when she responded, it was the custody officers that made the suggestion after he was not responding that she utilize a sternal rub. They also made the suggestion to her that she get the pulse oximeter to check his blood oxygen, which also would show a pulse, and they also directed her that we should get the AED.  Those are things that a normal nurse would know and

would initiate, but yet, it was the custody officers that initiated them by suggesting that she do those things.

Q  Um-hmm.  And that is your basis for stating that she intentionally did not act as a reasonable nurse would do?

A  Well, additionally, when -- we'll discuss this further in a little while, of course.  But when Mr. James was being held over in the extreme position that he was, the bent-over position, and, of course, this is especially dangerous for a very heavy individual, being that because of the extra adipose tissue that's in the abdominal area, when they're bent over in this position, the diaphragm cannot lower to breathe in, and she was aware that this could cause physical asphyxiation.  I believe in her deposition she said, well, yes, based upon anatomy.

        But yet, she did not tell the officers that this was a dangerous position and that they shouldn't be doing this.

Q  Okay.  And those are the reasons that you believe she did not act as a reasonable nurse intentionally?

A  Because she knew these things.

Q  Um-hmm.

A  And she did not act.

Q  Do you believe she failed to act as a reasonable nurse would have acted in those circumstances?

A  Absolutely, I do.

Q  You are not contending that you could read her mind.  True?

A  Of course not.

Q  You are not contending that you can understand what her thought process was.  True?

A  I don't know exactly what her thought process was, no.

Q  And obviously, this is a fairly obvious question, but you were not there and she was.  True?

A  I was not.  I only viewed the video, which I'm sure we all have or --

Q  Okay.  And in terms of the opinions you're giving in this case, you were provided with some information or documentation which has indicated -- or you've set forth those things in your various reports.  True?

A  That I was provided with -- you're referring to besides the video that -- all the other documentation that is listed has been reviewed? Of course.

Q  Correct.  Okay.  So you've seen the complaint, I think you said.  True?

A  Yes.

Q  And you've seen at least one video.  True?

A  Yes.  Actually two, yes.

Q  Okay.  And you've also seen transcripts of numerous depositions given by parties in this case.  True?

A  That is correct.

Q  And you've seen medical records in this case as well?

A  Yes.

Q  And you've seen some discovery answers as well, too?

A  Yes, uh-huh.

Q  Okay.  And those -- having those things in your possession allowed you to offer your opinions in this case based on what you've read in those documents.  True?

A  That is correct.

Q  Okay.  And we can agree, obviously, all of those materials that you had, those were materials that certainly Nurse Kristiansen did not have on the evening of June 1st, 2021.  True?

A  Yes.

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #126F
California Firm Registration #179

Case 2:22-cv-00344-PP   Filed 03/03/26   Page 3 of 82   Document 121-2

Page 13

Q    You're familiar with the term "hindsight bias"?

A    I guess it's similar to "armchair quarterback;" is that correct, would you imagine?

Q    Sure. Are you able to define "hindsight bias"?

A    I think those are kind of synonymous. They're kind of synonyms.

Q    Okay. For all --

A    Well, of course, you know, anyone, when they look back, and, you know, we're not there at the time, you know, you may form a slightly different opinion ever so slightly, yes.

Q    Um-hmm. Because you obviously have the events and a full accounting of the events years after the fact, so you have the advantage of knowing exactly what happened, whereas the person involved in the events did not have that knowledge at the time. True?

A    Well, when you look at all of this information, of course not.

Q    Okay. Which, obviously, you had in reviewing this case over Ms. Kristiansen because she was dealing with the events at the time without the knowledge that you had reviewing them years later. True?

A    That is correct.

Q    That's a significant advantage that you had in

Page 14

reviewing this case over what she had. True?

MR. NAFFZIGER: Objection. Form. You can answer.

A    Well, I guess --

MR. NAFFZIGER: And I'm sorry, court reporter -- Ms. Court Reporter, did you get my objection? Sorry.

THE STENOGRAPHER: Yes.

MR. NAFFZIGER: Awesome. Okay. Go ahead and answer, Lloyd. Sorry.

A    I suppose it's more revealing.

BY MR. FRANCKOWIAK:

Q    Have you ever testified as an expert in the state of Wisconsin before?

A    No.

Q    Have you ever practiced nursing in the state of Wisconsin?

A    No.

Q    Have you ever been to the state of Wisconsin?

A    I have not.

Q    Okay. The first deposition exhibit that we've marked is a copy of your Notice of Deposition duces tecum. I guess before we start, I understand I did forward a number of exhibits. I

Page 15

believe there's a total of maybe 19 of them. Have you received them, and do you have those available for reference as we go along today?

A    You know, what I did is I brought them up on the big screen on my other computer. It looks like I have 1 through 15, and then I also recently received -- let's see. I think it's exhibit -- well, I downloaded it here. I have it as a PDF. It's the one that was titled "CMS Medical Screening." It's the screening form.

Q    Okay.

A    So that's what I have available.

Q    Exhibit 16, I think, was a copy of the report or updated report that we received yesterday for the first time. I believe it was your fourth report in this case. Do you have a copy of that one available to you?

A    You know, I don't have it on the screen, but I do have it on paper.

Q    Okay. Well, as we -- when we get to that, obviously, as long as you can reference it and understand what I'm talking about, we will have that one marked as Exhibit No. 16.

Page 16

And the other document that were recently provided were 17, 18, and 19, which were excerpts from the medical record from the jail. Do you have those?

A    No. I have the -- no. I have --

MR. NAFFZIGER: Jason, I'll forward it to him now by e-mail. I'll just forward your e-mail to the expert right now, and he'll be able to pull it up. Right, Lloyd?

THE WITNESS: I should be able to. I just don't want to lose what I have.

MR. NAFFZIGER: Yeah.

THE WITNESS: If you send it in PDF, that would be great, rather than -- if it can come in that form. Then I can --

MR. NAFFZIGER: They're PDFs. I just sent them.

THE WITNESS: Okay. Okay. Let's see what I can get here.

BY MR. FRANCKOWIAK:

Q    Okay. I may be referencing those exhibits a bit later on, so if we -- as long as you -- or if you have availability of the medical records, you could probably find them in there as well.



A You know, I don't have those currently.

Q Okay. Well, if those come through, I'll ask you again when I reference those Exhibits 17 through 19.

In terms of Exhibit No. 1, which is your Notice of Deposition, on Page 2, there's a number of categories of documents. Read through those and let me know if you have, in fact, produced, to your knowledge, all of the documents you have that would meet those descriptions.

A (Witness complies.) Okay. Hang on a second. Let's get back to it.

And which exhibit was this?

Q Exhibit No. 1. It's your Notice of Deposition.

A Okay.

Q Do you see the list of six different categories of materials?

A Yes.

Q Okay. Have you produced everything in your possession that would meet those descriptions?

A Well, as far as the -- I did submit a list of past cases. I had to supplement what was in my original report because there had been additional ones since that.

A complete copy of materials,

they're all listed on each opinion paper related to that.

Copy of all billings, I myself did not do that. I thought that someone at the firm was going to.

I also submitted to the firm a copy of a current CV and all the materials relating -- (reading). Okay. Yes. And "no exhibits provided by plaintiff counsel," then it's for prior deposition. Okay.

Q Okay. So you have produced those to your knowledge.

You don't have anything in your file that you used in this case or anything that meets those categories that you have not produced?

A Nothing beyond that, no.

Q Okay. Exhibit No. 2 we've marked is a copy of your curriculum vitae.

Do you have that in front of you?

A I can -- yeah, let's see. I think I have one. Okay, sir.

Q Okay. Is Exhibit No. 2 a most recent and up-to-date copy of your curriculum vitae?

A Let me just get right back there to it. Yes, um-hmm.

Q Okay. So that is a correct and updated copy of your CV?

A Yes.

Q All right. It is on letterhead that looks like it's titled LVB Correctional Healthcare Consulting. True?

A That's correct.

Q Okay. And looks like under professional experience, from 2018 to the present, it indicates that you are the sole proprietor of LVB Correctional Healthcare Consulting. True?

A That is correct.

Q What is LVB Correctional Healthcare Consulting?

A It's just that. It's expert witness business.

Q Okay.

A Directly what I've done in this case.

Q Okay. And since 2018, that has been -- is that like a corporation or a service corporation?

A No, no, no. It's a sole proprietorship. It's not an ALCC -- it's an LLC.

Q Okay. Are you the sole owner?

A Yes.

Q Do you have any employees?

A No.

Q Okay. There's also a website at the top of the CV

that's www.CorrectionalHealthExpert.com; is that accurate?

A Yes, um-hmm.

Q And is that you're -- a website that advertises your services as an expert?

A It is.

Q How long have you had that website?

A That's been just about 2018 to present.

Q Okay. And do you consider that website an advertisement for your services?

A I do. I don't advertise otherwise. Initially, I did with a, you know, service, but I haven't for years.

Q Okay. What was the service you used to advertise with?

A It was SEAK, S-E-A-K.

Q When's the last time you advertised with SEAK?

A You know what? Probably five -- can't tell you exactly. Probably about five years ago.

Q Okay. Are you able to tell me how many cases you've received as an expert through your website?

A I've received -- I may have had some referrals through SEAK, so to separate the two, I really couldn't do that. But 15, 15 cases. The list that I provided, I didn't list this case. It only

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #126F
California Firm Registration #179

Page 21

has 14.

Q   Okay.  And we will talk about that, but you did produce a list of cases which has 14.

Is that list of cases an entire list of all the cases you've reviewed over the course of your term as an expert?

A   That's the entire list.

Q   Okay.  And what, if any, is the role of LVB Correctional Healthcare Consulting?  What does it do?

A   It provides analysis and opinions in regards to correctional healthcare issues.

Q   Okay.  I see it says, "providing professional expertise in consulting, research analysis, and documentation."

What services does it provide in terms of consulting?

A   What I have done in -- in the past, especially with ICFIIDs, the consulting would be doing an analysis, and these are individuals that weren't really familiar with the Federal Codes of Regulations related to those facilities in operating those facilities, and so I actually would educate those individuals so they could utilize those legally.

Page 22

Q   Okay.  And what type of entities do you typically consult on?

A   Typically, jails and prisons, but also intermediate care facilities for the intellectually disabled, but much less so.  There's only a couple of those throughout the years.  But I have a lot of experience.  My previous employment --

Q   Okay.

A   -- with those type of facilities, in addition to correctional healthcare.

Q   You also do research, or you advertise you do research.  What research do you do?

A   Well, when you speak of research, you know, different states have, you know, different -- different regulations, and there may be, you know, some instances to where you may have to look at some physiological process, or you might look at National Institute for Health references, which there is one in this case, of course.  I think it's one of your exhibits that you put up there also.  So things of that nature.

Q   Okay.  Did you review or research any regulations in terms of corrections for the state of Wisconsin for purposes of this case?

Page 23

A   You know, what I did look at specifically was the -- as far as mental health patients being placed in emergency restraints, which it calls for emergency restraints, you can put an individual in there for an hour, but after an hour, you do need to get a physician's order for that restraint.  And then once again, in 24 hours, orders would have to be renewed for that physician.  They are only good for 24 hours.  And that's really kind of what you see in many states.

Q   And what regulation is this?

A   You know what?  If you want to give me a little bit of time, I can take a look.  I don't -- hold on a second.  You're going to have to bear with me.

It could be -- you know what?  And I just penciled this in real quick.  I think it's 51.61, in parentheses three 1s after it.  And I -- anyway, I believe that's what it was, but if you really want me to look that up, I certainly can see exactly what the code was.

Q   I didn't see that you mentioned that particular code or reference at all in any of your reports.  True?

A   No, I didn't.  I just -- matter of fact, I just

Page 24

looked that up fairly recently.

Q   Okay.  So that is not a basis for any of your reports, or you did not --

A   You know what?

Q   -- you did not use it to give your opinions on that section?

A   You know what?  I apologize for talking over you.

No.  Not, it is not.

Q   And in terms of other research that you've done, have you done any other research at all other than that on any regulations, statutes, anything else applying to correctional healthcare or medicine in Wisconsin?

A   Not specific to the state of Wisconsin.

Q   Okay.  Anything not specific to the state?

A   Well, of course, I mentioned the National Commission on Correctional Health Care.

Q   Okay.  Anything else?

A   That's pretty much it.

Q   Okay.  And we will talk about that a little as we go along.

Your services also indicate that you provide analysis.

What do you mean by "analysis"?

A   Well, an analysis needs to be performed before the

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
California Firm Registration #179

LEXITAS

opinion is written.

Q   Okay.

A   So it's just taking all of the data and performing the analysis, putting it all together to come up with the result.  It seems self-explanatory, but I guess, basically, that's what it is.

Q   So when you say "analysis," it's essentially part and parcel of your expert work, you just analyze materials provided to you by a party or attorney, and you utilize that analysis to come up with what you term as your opinion?

A   And it's also based on my knowledge and experience, of course.

Q   Okay.  How about documentation, what kind of documentation do you do or services do you offer in terms of documentation?

A   Well, that would be the opinion papers that you have.

Q   Okay.  So when you're talking, obviously, on your CV about documentation, that, again, is part of your expert work; it's not something separate, some sort of consulting that you do to educate people or consult on documentation?

A   Right.

Q   Okay.  It looks like from 20 -- 2006 to June of

2022, you were with the California Department of Public Health, health facilities evaluator nurse; is that accurate?

A   That is correct.

Q   Okay.  Since June of 2022, what have you been doing?

A   I retired in June of 2022, and this is the only work that I perform, so it's part-time.

Q   Okay.  So since 2022, for approximately the last two to three years or so, you've been part-time as an expert, and that's been your, basically, only professional work?

A   That is correct.

Q   Okay.  Can you tell me about how many hours you spend on your correctional healthcare consulting today per week?

A   Per week, it would be -- okay.  Every now -- let's see.  Let's -- I would say instead of per week, let's go per year, and that would probably be about two and a half to three months as a full-time, what you would, you know, consider a full-time position, perhaps 40 hours a week.  And that would be, you know, like in a year's time.

Q   So I just want to understand that, I guess.

        So it would be the equivalent --

A   It's not a daily -- it's not a daily occurrence throughout the year.

Q   Okay.  It comes in spurts?

A   That is correct.

Q   All right.  It's not something where you can say, I spent 20 hours a week or five hours a week, or you might spend 40 hours one week and then you might not spend any time for a period of weeks after that?

A   That is correct.

Q   Okay.  Of those 14 cases that are -- that you've identified, are they all -- or how many of them are still active?

A   Probably four.

Q   Okay.  Have you reviewed or has your expert business picked up in recent years, or has it been relatively constant since you started the business?

A   You know, it's picked up quite a bit in recent years, the past three years, I guess.

Q   If someone comes to you with a case, have you ever turned the case down, determined that you would not be qualified, for example, to handle that case?

A   No, not that I was not qualified, but just where I

could not take the position in good conscience for that particular side of the case.

Q   Okay.  And what -- explain that a little bit.

A   In other words, I could not be defense attorney and defend a individual that I knew was guilty.  In other words, I have to deal with the truth in conscience.

Q   All right.  Well, how do you know the facts of the case then if you don't -- haven't reviewed the facts?

A   Well, you know, I do find it very helpful to look at the filed complaint.  I hesitate to take on a case until I see that.  Of course, sometimes the verbiage is rather dramatic, but I haven't really come across any filed complaints where there were things that were not true, that were fabricated.  So you can get a pretty good idea taking a look at that.

Q   Okay.  So in terms of deciding what cases you were comfortable with or that you will take, you rely to a significant extent upon the allegations of the complaint in a given case, assuming those allegations are correct, and that tells you enough about whether or not you're likely to be able to take the case?

Case 2:22-cv-00344-APP   Filed 08/05/25   Page 7 of 82   Document 121-2

Page 29

A  Well, to a certain degree, that is a factor. I mean, you know, getting additional information, you know, speaking to the attorney, you know, it's a combination.

Q  Okay. And there's never been any of the cases that you've been approached with where you've indicated: I'm sorry. That lies outside of the scope of my knowledge or expertise. I wouldn't be able to help you on that?

A  No, no. Not in that respect.

Q  Okay. In terms of the cases you've handled as an expert, are they primarily criminal or civil?

A  Civil.

Q  Okay. In other words, cause of action filed seeking the collection of money damages?

A  Yes.

Q  Okay. Primarily state or federal?

A  You know, it's, I guess, primarily more so federal than state. If I look -- yeah.

Q  Okay. Have you ever, in any cases you've reviewed, taken on a case on behalf of a defendant?

A  Yes.

Q  Are you able to -- we've marked as Exhibit No. 3 a list of cases, and there's 14 cases on there.

Page 30

Are you able to identify for me which ones you have taken on behalf of a defendant?

A  Yes. That would be if you look at No. 11, No. 12, No. 13 and 14, 6, and 7.

Q  Did you say 6 and 7?

A  Yes.

Q  Okay. So it looks like in No. 6 there, you were retained and took the case on behalf of Pottawatomie County, Iowa?

A  That is correct.

Q  Okay. And No. 7 on behalf of several individuals at Armor Correctional Health Services?

A  Yes, um-hmm.

Q  And No. 11, Wellpath, LLC and GEO Corrections and Detention, LLC, you're expert on behalf of those entities?

A  Yes, um-hmm.

Q  No. 12, you're an expert on behalf of the State of Nebraska?

A  Yes.

Q  No. 13, expert on behalf of an entity known as LaSalle?

A  Yes, um-hmm.

Q  And what is LaSalle?

Page 31

A  It was a organization similar to MEnD. It's a correctional healthcare -- they provide correctional healthcare.

Q  Okay. And then finally, No. 14, you are an expert on behalf of Kaufman, K-A-U-F-M-A-N, County, Texas and Southern Health Partners, Inc. True?

A  Yes, uh-huh.

Q  What is Southern Health Partners, Inc.?

A  That is the same type of organization.

Q  Okay. A correctional -- a private correctional healthcare entity?

A  Yes, uh-huh.

Q  Okay. How about GEO Corrections and Detention, LLC, is that the same thing, a private correctional healthcare entity?

A  Yes. You know, in that case, one organization, it's left the facility. They never really used them, and the other one took over, so that's why they're both listed there.

Q  And in each of those instances, have you given a deposition in each of those cases?

A  I have not because they're fairly current. In 13, I have not. In 14, I'll tell you -- let's see. And I did -- as far as the depos for defense, that would just be the one with Pallo. Let's see.

Page 32

Where's the number on that thing? Yeah, let me get back to the big screen here.

So actually, deposition in defense was only one, although one was in court for the Pottawatomie. That was testimony in court for defense.

Q  So that was just court testimony you gave?

A  It was, yes, uh-huh.

Q  Okay. Have you ever given any deposition testimony on behalf of defendant?

A  Yes, and that would be -- Pallo was the -- was the name. Let me see.

You want me to find the number for you?

Q  Yes.

A  Oh, I'm sorry. No, no, no. It's Paula Popp is -- is the -- not Pallo. Popp, which is No. 7.

Q  Okay. That's Paula, P-A-U-L-A, Popp --

A  Yes.

Q  -- P-O-P-P?

A  Yes.

Q  Okay. You have given a deposition on behalf of the defense in that case?

A  Yes, um-hmm.

Q  But none of the other cases?

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #126F
California Firm Registration #179



Case 2:22-cv-00344-PP   Filed 05/05/26   Page 8 of 82   Document 121-2

A    Not for the defense, no.

Q    Okay.  And in that case, what did that case involve, that Armor Correctional Healthcare Services case?

A    That particular case, it was burns that this individual received that she thought were not treated effectively and properly.

Q    Okay.  And you've testified on the standard of care applicable to a corrections healthcare nurse?

A    Well, that one was -- was not testimony in court.  It was on the deposition, yes, and so in that way, yes.

Q    So your opinions on that case were that the defendant nurse complied with the standard of care?

A    Yes.

Q    Okay.  And in all of the other cases, were you -- also on No. 6, No. 11, 12 and 13 and 14, were those all cases in which you have also testified to the nursing standard of care?

A    No, no.  Those are still pending, 13 and 14.

Q    Okay.  In terms of those, all those cases, whether you've given testimony or not, have you developed opinions in those cases on the issue of the nursing standard of care?

A    Yes, uh-huh.

Q    And your opinion in each of those cases is that the nurse involved met the standard of care?

A    Well, the ones that were -- not in 13 and 14.  I'm -- they're -- I'm not to that point yet.  I haven't -- I've given my results verbally to the attorney, but I have not written the opinion paper yet.

Q    Okay.  Your opinions verbally, at this point, are that you believe the -- a nurse who was a defendant in those cases or whose care is being challenged in those cases met the standard of care?

A    Yes, that is correct.

Q    Okay.  Do you keep copies of your deposition transcripts or reports offered in other cases?

A    You know what?  It's interesting that in only one of the recent cases have I received my own transcript to, you know, confirm its authenticity that exactly, you know, what I said or correct any type of grammatical errors that are in it.  So I don't -- that's the only one that I have of my deposition, if that's what you're referring to.

Q    And which case is that?

A    Are you -- that one -- Hold on one second here.

That is -- that would be Pallo, No. -- No. 5.

Q    Okay.  And you were -- you gave a deposition in that case on behalf of a plaintiff?

A    I'm sorry?

Q    You gave a deposition in that case on behalf of a plaintiff?

A    Oh, for Pallo?

Q    Yes.

A    Yes, uh-huh, that is correct.

Q    All of the cases listed on Exhibit No. 3, your list of cases, are those all correctional healthcare cases, or are there any that are not correctional cases?

A    No.  Pallo was not correctional.  And there should be another -- No. 3 was not correctional, Matthew Eterovich.

Q    Okay.

A    Those were intellectually disabled individuals.

Q    Is that the only case that you've dealt with on behalf of a disabled individual or an intellectually disabled individual?

A    No, those -- those two cases.

Q    Okay.

A    And I -- I will say, I don't know if it's really that relative, but I -- in the past in working for

the California Department of Public Health, I did write citations for civil money penalties with violations of regulations for intermediate care facilities for the developmentally disabled.  So I don't know if that's really what you're asking, but that was in a slightly different capacity.

Q    Okay.  These 14 cases or 15, including this one, is that the total universe of cases that you have consulted on, or is this only a list of cases in which you've developed an opinion or written a report?

A    If you add this one, then in all 15, yes.

Q    Okay.  So these are not just cases in which you've offered testimony of some sort, this is actually an entire list of the entire universe of cases that you've ever consulted on as an expert?

A    Yes.  That is correct.

Q    Okay.  Has there ever been a case that you've been approached to look at that you did not take?

A    There have, yes.

Q    How many?

A    And I've referred to before, when we look at speaking to -- speaking to the attorney and also looking, you know, at the complaint, there are some that I've decided that it's just -- no, I

can't do that in good conscience --

Q Okay.

A -- as I stated previously.

Q And how many of those cases have you turned down?

A Maybe two.

Q And were they -- who approached you in each of those cases, a plaintiff or a defendant?

A It was a defendant.

Q Okay. And you decided that you could not take those cases based strictly upon the allegations in the complaint?

A Well, not just basically on allegations of the complaint, also getting a little more background from the attorney. So like I said before, it's in combination between the two.

Q Okay. So if I look at the 14 cases listed on Exhibit No. 3, plus this one, which is a total of 15, and then there were two other cases over the course of your career that you did not take, so you've been asked to consult 17 different times over the course of your career as an expert?

A I'm not sure where you came up with the 17 --

Q Yeah.

A -- when we mentioned there was 15 in total, total universe.

Q Right. There were 15 in total universe, but you also said that there were two occasions that you --

A Yeah.

Q -- you were approached and you decided not to take the case?

A Yes.

Q So those two cases would not appear on Exhibit 3?

A Right.

Q So we would add those to the 15 -- or we would add those to the 14 on Exhibit 3, plus this one, which makes 15, plus those other two that you were approached about that you did not take, total 17?

A Right.

Q And 17 then would be the total number of cases that you have ever been asked to look at, 15 of which you agreed to take?

A That is correct.

Q Have you ever previously testified as an expert in a case involving the use of a restraint chair in a jail or prison facility?

A I have not.

Q Have you ever testified as an expert in a case prior to this one in which the alleged cause of death was asphyxiation?

A No.

Q We've marked as Exhibit No. 4 a copy of your fee schedule.

Do you have a copy of that in front of you?

A I do.

Q Okay. And can you confirm that Exhibit No. 4 is indeed a true and correct copy of your fee schedule?

A Hold on just one second because I have lost them. Okay.

I don't know why that times out. Yes, I have it.

Q Okay. So is that accurate then in terms of the fees that are specified there?

A It is, uh-huh.

Q Okay. When I look at your list of cases marked as Exhibit No. 3, I think you said that there may be four cases that are currently ongoing.

Would those be all of the cases that are designated with 2024 dates?

A Yes. Oh, wait a minute. No. Also one -- are you -- you're -- you know, I'm so sorry.

Did you say defense cases?

Q Oh, any cases.

I'd like to know, of those 14 cases listed there, how many of them are ongoing today?

A No. There's three '24, and one '23.

Q Okay. I have four 2024 cases listed and one 20 -- and several 2023 cases.

Which of the 2023 and which of the 2024 cases are ongoing?

A No. 14 is ongoing.

Q Um-hmm.

A So is No. 13. No. 12 is still ongoing, as is No. 11. Yes, uh-huh.

Q Okay. And then how many of the 2023 cases are still ongoing, if any?

A That would just be No. 10.

Q Okay. So it looks like on there, there's a total of five total cases on Exhibit 3 that are ongoing, plus the current one, which would make a total of six cases ongoing?

A That sounds correct, yes.

Q And all the rest of the cases listed on Exhibit No. 3 would be cases that are closed and over?

A Should be. Yes, that is correct.

Q Have you ever served as an expert witness in the past or in any other case other than this one for the O'Connor Law Firm in Chicago, the one that

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F California Firm Registration #179

Page 41

retained you in this case?

A   No. This is the first time with this firm.

Q   Okay. Do you have any understanding, as you sit here today, as to how the lawyers from the O'Connor firm got your name?

A   You know what? It must have been just off my website because I was not currently using any other source, so that's what I would imagine.

Q   Okay. We marked as Exhibit No. 5 a couple of pages of what I understand to be invoices.

Do you have Exhibit 5 in front of you?

A   Coming up. It's up. Uh-huh.

Q   Okay. Exhibit No. 5, I believe, consists of about four pages, and it looks like four different invoices.

The first one is dated November 11th, 2024; is that true?

A   Yes.

Q   Okay. Page 1. It looks like then Page 2 of Exhibit No. 5 has one that's dated May 1st of 2024?

A   Yes.

Q   Okay. And then Page 3 of Exhibit No. 5 has one that's dated January 3rd of 2025?

Page 42

A   Um-hmm, yes.

Q   And then the last page of Exhibit No. 3 [sic] has another invoice that's dated February 13th of 2025?

A   Yes.

Q   As you sit here today, are you able to confirm for me whether or not these four pages of Exhibit No. 5 constitute the total universe of invoices that you have issued in this case up to the present date?

A   Well, what is not shown here -- that's the invoices that I have issued, yes. The original retainer would not have an invoice. It's in the agreement.

Q   And the original retainer would have been applied toward the work?

A   3,750, yes, uh-huh.

Q   Okay.

A   But then, of course, it is applied, you know, to the future time.

Q   Okay. So if I were then to total up each of these four pages of invoices, that would give me a pretty fair accounting in terms of how much you have charged for your work, at least up to date on this case?

Page 43

A   That is correct.

Q   And because this is your -- or consulting is your only professional work since 2022, would it be fair for me to assume then that 100 percent of your yearly income is derived from your professional work as an expert witness?

A   That is incorrect.

Q   Okay. What percentage of your income currently is derived from your work as an expert versus other sources?

A   That would probably be in the neighborhood of 15, 15 percent.

Q   What would be 15 percent?

A   From expert witness of the total income that I receive.

Q   Okay. What equals the other 85 percent?

A   I have a pension from the State of California and also social security.

Q   Okay. In terms of your income from professional services, 100 percent of the professional services you provide, income derived from professional services comes from your work as a expert?

A   Yes.

Q   Okay. The 85 percent of your total income that is not due to professional services is your pension

Page 44

and social security?

A   That is correct.

Q   Okay. All right. I want to go back to your CV, if we could, which is Exhibit No. 2. Has your education on, looks like, starting at the bottom of Page 1 and going on to Page 2.

1979, Bachelor of Science business administration.

You have a BA or a business administration degree, Bachelor of Science?

A   Yes. I was an accountant for a foundation company for six years.

Q   Okay. And then in 1993, you obtained an associate degree in nursing from Mt. San Antonio College in Walnut, California. True?

A   That is correct.

Q   And how -- tell me a little bit about that training.

In terms of getting the associate degree, what kind of training did that involve?

A   It's a two-year program, which includes classwork; study; live classes; clinical experience in the hospital, in OR, emergency rooms, et cetera.

Q   Okay. In terms of nursing education, now, obviously, you said the associate degree in

Case 2:22-cv-00544-JFH   Filed 05/09/25   Page 11 of 82   Document 121-2

LEXITAS

nursing is a two-year degree.

To your knowledge, is there also a four-year degree for nursing?

A    You know, you can even go to a Ph.D. in nursing. And what I have found is really beyond the two-year degree and passing the NCLEX, it's almost up to the individual what additional clinical knowledge and experience that they receive. That's why I did not see any value in the bachelor's degree.

And it's really very interesting when you look at bachelor's degrees. Also, there were individuals that -- my wife used to run a home health agency. She would get students from private universities that have bachelor degrees that were very deficient in actual clinical knowledge and especially clinical hands-on experience.

So I found no great value in the bachelor's degree.

Q    Okay. Well, I guess that was my question was simply whether or not there is a four-year degree as opposed to a two-year degree. And the answer --

A    Like I said, you can also get a master's in

certain areas, and there's also some type of Ph.D. that some universities offer.

Q    Okay. Two-year nursing degree is an associate degree. True?

A    That is correct.

Q    And a four-year nursing degree is a bachelor's degree in nursing. True?

A    Correct.

Q    And then a master's degree would be the next step beyond that.

What kind of training is taken, in your understanding, to get a master's degree?

A    It's usually a one-year program.

Q    Okay. And what type of training is done for a Ph.D., if you have that understanding?

A    You know, I've really come across very few individuals that have such a degree, and so I really can't -- I really can't speak to it.

Q    Okay. And you're familiar with nurses who are qualified as advanced practice nurse prescribers or providers?

A    Sure. There's nurse practitioner, yes, uh-huh.

Q    And do you have an understanding of what level of training or education those individuals have?

A    Yes, uh-huh.

Q    Okay. What's that?

A    Well, it's -- it's beyond -- usually, you have to have a bachelor's to do that, but it's like a master's-level program.

Q    Okay. Would it be fair then for me to assume that your CV contains a full explanation in terms of the extent of your education?

A    The extent of formal education.

Q    Okay. For example, you do not have a bachelor's degree in nursing?

A    I think we already covered that, sir. I do not.

Q    Okay. You do not have a master's degree in nursing?

A    We covered that also. I do not.

Q    You are not an advanced practice nurse prescriber?

A    That is correct. That was a consideration at one point in time, but I did not pursue it.

Q    Now I want to just talk a little bit about additional qualifications, if we could, and some of these questions, obviously, may be self-explanatory, but I need to ask them for the record.

Based upon your CV, would it be fair for me to assume you are not a doctor or an M.D.?

A    That is correct.

Q    You have never been to medical school?

A    Correct.

Q    You are not a pathologist?

A    That is correct.

Q    You are not a pulmonologist?

A    I am not.

Q    You would not qualify as a -- education, training, or experience as a pharmacist?

A    That is true.

Q    You would not qualify as a pharmacologist?

A    True also.

Q    You have never served as a physician for any correctional healthcare provider. True?

A    That is true.

Q    Okay. You do not have any education, training, or experience as a psychiatrist?

A    True.

Q    All right. You do not have any education, training, or experience as a psychologist?

A    That is true also.

Q    You do not have any education, experience, or training as a psychiatric social worker?

A    That is true.

Q    Okay. Do you have any formal education or

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
California Firm Registration #179

Case 2:22-cv-00944-PP    Filed 05/05/25    Page 12 of 82    Document #121-2

training or degree or certification in any area of mental healthcare?

A   No, not a degree.  But as far as experience go, I have, while working for the California Department of Public Health, surveyed the state mental health hospitals in addition to private acute care hospitals as far as regulations from the Centers for Medicare & Medicaid for certification, and also investigated complaints.  But as far as the -- that's been the experience in mental health.

Q   Do you have any formal certifications, education, or training which would qualify you to render mental healthcare to a patient population?

A   I do not.

Q   Do you have any experience rendering care to patients as a mental healthcare provider?

A   I do not.

Q   Have you ever personally rendered mental healthcare services to an inmate population in either jail or prison?

A   No, not mental health.

Q   Okay.  As a nurse, you would not make medical diagnoses.  True?

A   That is correct.

Q   Okay.  As a nurse, you would not be qualified to make a medical determination in terms of offering an opinion, for example, on a patient's cause of death.  True?

A   That is correct.

Q   As a nurse, you do not prescribe medications.  True?

A   This is true.

Q   Okay.  As a nurse with an associate's degree in nursing, you do not have any formal training in the field of pharmacy.  True?

A   Well, that is a component of that degree, though, pharmacology, so that was included in that education.

Q   As a nurse, you are not certified or permitted to prescribe medications to a patient?

A   That is correct.

Q   What is the extent of your education -- formal education and training in the field of pharmacy or pharmacology?

A   It would be only what was covered in that degree that I referred to just previously.

Q   Okay.  Are you able to quantify for me exactly what that involved or what portion of that two-year degree was spent on pharmacy or

pharmacology training?

A   It was one class in one semester.

Q   Okay.  Would it be accurate for me to state that physicians prescribe medications and nurses administer medications?

A   That is correct.  But, of course, every nurse is required to know what the medication is and potential side effects and provide education to the individual about that medication.

Q   Would it be fair to state that physicians enter orders for patient care and nurses implement those orders?

A   That is -- that is true.

Q   You do not have any formal education, training, or experience in making psychiatric or mental health diagnoses.  True?

A   I am not allowed to diagnose, that is correct.

Q   Only a mental healthcare practitioner who has the requisite education, training, and experience in the field would be qualified to make psychiatric or mental health diagnoses.  True?

A   I think that is correct.

Q   You would not be qualified to render mental healthcare in terms of therapy or the provision of medications to patients.  True?

A   What was the medication portion, sir?  Sir, would you repeat that, please?

Q   Sure.  You would not be qualified to render mental healthcare in terms of providing therapy or providing medications, mental healthcare medications or --

A   Not prescribing medications, yes --

Q   Okay.

A   -- providing they would be administered.

Q   Okay.  And that's the distinction between administering medications and prescribing them.
      Obviously, a physician would need to prescribe the medication, but once prescribed, the nurse can administer that medication to a patient population?

A   That is correct.

Q   Okay.  You do not have any training or education in determining the appropriate medications to prescribe to a given patient in terms of mental health disorders.  True?

A   To make the actual decision, no.  That is true.

Q   You do not have any education or training in determining the effectiveness or potential effectiveness of a given psychiatric medication in the treatment of a given psychiatric illness.

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

Case 2:22-cv-00544-PP   Filed 06/09/25   Page 13 of 82   Document #121-2

LEXITAS

Page 53

True?

A  Well, not necessarily, because with, you know, psych medications, there are certain outcomes that are expected and certain side effects, and the side effects need to be monitored and recorded.

Q  Okay. You do not have the education or training in determining the effectiveness of a psychiatric medication to be prescribed to a patient in treatment for a given psychiatric illness?

A  Well, you can collect data for the physician to review.

Q  And ultimately, it is the physician who is qualified to analyze that data, determine the effectiveness or in effectiveness of the medication, decide whether or not that medication is appropriate to prescribe to that given patient. True?

A  And that is correct.

Q  That is not a decision that you would make as a nurse in terms of analyzing the data and then determining whether or not a given medication is appropriate or inappropriate for a given patient in a given psychiatric illness. True?

A  Well, I mean, you could do that, but you -- not legally. I guess, only in your own mind, and

Page 54

perhaps speak to the physician as to -- as to your opinion.

Q  Okay. And the physician, obviously, is the decision-maker who's legally able to make that decision as opposed to a nurse?

A  That is correct.

Q  You would not have any training or education in determining or explaining the indications versus the contraindications of any given psychotropic medication or a given mental healthcare diagnosis. True?

A  Sir, one more time, please.

Q  Sure. You would not have any education or formal education or training in determining the indications versus the contraindications of any given psychotropic medication for a given mental health disorder?

A  I -- okay. I will say yes, that is correct.

Q  Have you ever been employed in a psychiatric hospital?

A  I've only surveyed them.

Q  Okay. We'll talk about that in a little bit, but when you say you've surveyed them, what do you mean by that?

A  That would be certification surveys for the

Page 55

Centers for Medicare & Medicaid to determine if they meet the conditions of participation to receive federal funding.

Additionally, I also did surveys for the state for Title 22, state regulations to make sure that they adhered to those separate regulations also, and would conduct complaint investigations for both federal and state regulations.

Q  Okay. Have you ever been employed as a healthcare provider in a psychiatric clinic?

A  I have not.

Q  Have you ever been employed in any capacity in which you diagnosed mental health conditions or rendered mental healthcare to inmate patients in either a jail or prison facility?

A  Repeat the first part of that, sir, because I have treated -- repeat it one more time, please.

Q  Sure. Let me break it down, in effect.

Have you ever been employed in any capacity in which you've diagnosed mental health conditions to inmate patients in a jail or prison facility?

A  Diagnosed, no.

Q  Have you ever been employed in any capacity in

Page 56

which you rendered mental healthcare to inmate patients in a jail or prison facility?

A  Yes, that is correct. When I worked at the California Institute For Men, on occasion, I would work in the primary unit and also in the psych step-down unit. And, you know, that would be administering medication, talking to the inmates, gathering data, information for the physician or psychiatrist to make additional determinations about treatment.

Q  Okay. That's what I wanted to drill down to a little bit.

When I say "rendering mental healthcare," you worked with patients, or on a psychiatric unit, administering medications that were prescribed by a physician. True?

A  Yes, that is correct.

Q  And you gathered data and spoke to the inmates in order to gather information to report to the treating clinicians or physicians in order for them to make a diagnosis. True?

A  That is correct.

Q  Okay. You did not yourself prescribe medications to those inmates nor make treatment decisions based upon your personal analysis of any data.

888-893-3767   Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
www.lexitaslegal.com                     California Firm Registration #179                     LEXITAS

Page 57

True?

A    Yes, that is correct.  It would be the physician.

Q    Okay.  Looking at your --

MR. NAFFZIGER:  Do you -- oh, Jason, sorry to interrupt you.

Do you mind if we take a five-minute break at this point?

MR. FRANCKOWIAK:  No, that's fine.  Why don't we take five.

MR. NAFFZIGER:  Thank you so much.

MR. FRANCKOWIAK:  Okay.  Back in five.

(Brief recess taken from 10:45 a.m. to 10:55 a.m.)

MR. FRANCKOWIAK:  Okay.  We'll go back on the record.

BY MR. FRANCKOWIAK:

Q    Mr. Biggs, we took a short break there, and I want to go back talking a little bit about your job history, again contained on Page No. 1 of Exhibit No. 2, which is your curriculum vitae.

It looks like your very first job as a nurse from 1993 to 1994 was at the Pomona Valley Hospital Medical Center as a critical care, telemetry, and medical-surgical unit and intensive care unit nurse.  True?

Page 58

A    That is correct.

Q    All right.  That would not have been -- that would not have been a position in which you would have been involved in correctional nursing.  True?

A    That is true.

Q    Okay.  Your next job then would be from 1994 to 2000 with the California Department of Corrections and Rehabilitation; is that true?

A    Yes.

Q    Okay.  And that would have been your employer, the California Department of Corrections and Rehab?

A    Yes.

Q    And your job would have been direct nursing care provided to inmate patients.  True?

A    That is correct.

Q    And that was at the California Institute for Men in Chino, California?

A    Yes.

Q    Is that a prison or a jail?

A    Prison.

Q    Okay.  So those would be all individuals who have been convicted and sentenced to the prison system in California.

And is that one institution, or is that multiple institutions?

Page 59

A    That is one institution, and they had three different yards, you know, different levels of custody; also a reception center.  So there were some individuals that just came in and that may have been sent to other facilities.

Q    Okay.  And when you say direct nursing care to inmate patients, can you give me some idea of what that means?

A    That's -- it's bedside nursing.

Q    Okay.  Were there -- like, was there a --

(Crosstalk.)

A    -- IVs, pull IVs.  Every procedure.

(Court reporter asked for clarification.)

A    Everything that is included in that.  That's drawing blood, that's inserting IVs for IV fluids, doing the complete physical assessment, everything that's included in bedside nursing.

BY MR. FRANCKOWIAK:

Q    Okay.  Would there be like an internal health services unit or something like that at that prison?

A    They actually had a hospital, a licensed hospital within the prison.  That's where I spent most of my time.  I did spend one year in central

Page 60

receiving.  I was head of the HIV intake.

At that time they had a separate unit for HIV patients, although initially, they were required to go there.  Then, of course, that was changed towards voluntary, but they wanted to go there because they had extra perks.

So I was -- most of my time was spent in the hospital itself, but I did spend one year as head of the individuals that come in to the facility that were HIV-positive.

Q    Okay.  And this was an entire hospital, like a certified hospital that was attached to the prison facility?

A    We had an emergency room and we also performed surgery.

Q    Okay.  So when an inmate would be admitted to the hospital, there was no reason ever to send them off campus, for example, to go to a private hospital off campus because they had an actual hospital on campus?

A    They did.  There was limited -- you know, even limited chemotherapy that was provided there.

Q    Okay.  So were there ever instances during your six years there where inmates were actually sent off campus to a private hospital, or were they

Case 2:22-cv-00944-FPI    Filed 05/09/25    Page 15 of 82    Document #121-2

Page 61

always treated at the on-campus hospital?

A It was usually on campus, on-campus hospitals.

Q Okay. And it would not have been part of your job duties, for example, to make a determination as to whether an individual patient should be sent off of the -- off of the campus to a private healthcare provider. True?

A No. Since we had an emergency room ourselves, no one was really sent out to an emergency room. Perhaps there may be some occasion where there was some special treatments. We didn't provide hemodialysis, so inmates would have to be transferred out temporarily for part of the day for hemodialysis and then would come back.

Q Did you have, like, for example, physicians who also worked in that hospital with you?

A Oh, yes.

Q And were those physicians also employed by the Department of Corrections?

A Yes, they were.

Q Okay. And then in terms of when a decision needed to be made, for example, if indeed a patient would need to be referred off campus for whatever reason, be it hemodialysis or anything, that would have been a decision that would have been made by

Page 62

one of the physicians as opposed to a nurse. True?

A That is correct.

Q Okay. That would not be part of your job responsibility to make a determination as to whether an individual needed care that could not be rendered on the campus of the prison hospital. True?

A You could only make a suggestion.

Q Okay. And you don't remember there ever being an occasion where during your six years there where you would have been the one making the decision or making the determination as to whether an individual needed to be referred to an off-campus facility. True?

A That is correct.

Q In terms of mental healthcare or psychiatric care, did the hospital also provide that?

A Yes. I stated that before, that there were two units there. There was the max unit for individuals that are -- had some pretty serious acute problems, and also a separate step-down unit.

Q Okay. So individuals who had mental health issues or psychiatric issues could also be treated on

Page 63

campus at that facility?

A Yes, uh-huh.

Q And would the situation be equal there? If for some reason a decision needed to be made whether an individual needed to be treated or sent off-site for psychiatric or mental health treatment, that would be a decision made by the doctor as opposed to the nurse?

A That is correct.

Q And would it be fair for me to assume that in your six years at that facility, you would not have been involved in any instances where you would be charged with making the decision as to whether or not an individual needed to be sent off campus to a private hospital to receive mental health or psychiatric care?

A That is correct.

Q Do you remember, were there any instances, in your recollection, during those six years where inmates did have to be sent off campus for mental health or psychiatric care?

A No.

Q In those six years that you were there, in every instance that you can recall, individuals were able to be treated right there on campus by the

Page 64

providers who were there in the hospital?

A Well, like I said, yes, it was a hospital with those two psychiatric units, yes, uh-huh.

Q Okay. The next job that you had looks like from 2000 to 2006 was California Department of Public Health, health facilities evaluator nurse, San Bernardino County, California. What is a health facilities evaluator nurse?

A Health facilities evaluator nurse, I've touched on this briefly before. What we do, the state actually had a contract with the feds or the nurse for Medicare and Medicaid to perform certification surveys. And as I mentioned, sometimes there would be initial survey for a new hospital. Oftentimes it was a annual survey to ensure that they are in line with the -- all the conditions of participation to receive federal funding. There was also a licensing function of a number of those different facilities where we issued the license, and then we would do annual, or every two years at the most, surveys to make sure they still meet all the regulations related to the licensure which would be Title 22 for that particular type of facility.

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

We were also involved in a number of, as I mentioned previously, the complaint investigations for those -- for those facilities.

Q   And if they failed --

A   You know, besides -- I also mentioned this before. Based upon that information, it may be dependent on the type of facility. We could pull their funding, their federal funding, different types of facilities such as the ICFIIDs. If they violated major regulations, then you would write a citation for civil money penalties, and that would go before an administrative law judge if they decided to take it that far if they wanted to, you know, disagree with it. So that was my experience in court previously is just defending those citations.

Q   Okay. And in terms of surveys and complaint investigations, which are both listed under that job, surveys, as I understand, the way you've indicated, there are certain rules and regulations in order for a facility like a hospital to receive, say, Medicare or Medicaid funding or payment for Medicare or Medicaid, and those requirements under federal law have to be met by the facility or they're not eligible to receive

payments from Medicare and Medicaid.

Is that basically what the survey meant or --

A   That's right. Those are in Appendix A of the State Operations Manual and Code of Federal Regulations that they needed to adhere to, yes, under those, right.

Q   Okay. And you were part of the state public health, but you had a contract with the federal government to help them to administer those Medicare/Medicaid programs?

A   That is not to administer the programs but to ensure they meet the conditions of participation in patient care to receive the federal funding.

Q   When you talk about the conditions of participation, what kind of things are you talking about there? Like, financial issues or something like that?

A   You know, more so than that. We're talking about patients' rights, we're talking about surgical services, we're talking about medical records, we're talking about physical plant, we're talking -- there's a number of -- of issues regarded directly to patient care. There's quite a few. And, you know, that's just for that type

of facility also. That's just the acute care facility. We also did skilled nursing facilities with a totally separate, you know, set of regulations.

The prisons that I surveyed -- well, this is a little bit later on, but those were state only. There were no federal regulations. It was just Title 22.

Q   Okay. And I guess my next question, you probably kind of led into then, this job between 2000 and 2006 with the California Department of Public Health, those were conducting surveys and complaint investigations on private sector facilities. True?

A   Right. Right.

Q   Okay.

A   Until 2006, yes, that is correct.

Q   Private hospitals, private nursing homes, and private care facilities for the intellectually disabled?

A   That is correct.

Q   Okay. And when you talk about care facilities, private care facilities for the intellectually disabled, what are we talking about? Are those hospitals? Are those groups homes? What are

those?

A   The private homes were group homes, usually six-bed residential homes.

Q   Okay. And that's where a special -- for example, I think we call them community-based residential facilities, or things of that nature.

That's what that was as opposed to a large 30-bed or for a 100-bed hospital?

A   That is correct. Subsequent to that, I did survey those large state hospitals for the ICFIIDs. But those are the small, yes, six-bed residential facilities, uh-huh.

Q   Okay. And in terms of intellectually disabled, what type of patients were those? Like, what would qualify as someone who was intellectually disabled?

A   You know, there's all different levels. They used to use the term "mental retardation," but, of course, you know, for political correctness, that changed as time goes on.

So that maybe -- maybe that gives you a better idea, different levels of --

Q   Okay. So we have -- if I can draw a distinction, intellectually disabled is someone who has an intellectual disability, perhaps a developmental

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
California Firm Registration #179

Case 2:22-cv-00944-FP    Filed 06/03/25    Page 17 of 82    Document #121-2

Q disability or something like that, as opposed to someone who's been diagnosed with, for example, a psychiatric illness?

A Yes. And when you go to "developmentally disabled," that was the term used subsequent to "mental retardation," and then they changed that to "intellectual disabilities," yep.

Q And in that job between 2000 and 2006, for example, you were not involved with doing surveys or complaint investigations of facilities that provided psychiatric or mental healthcare?

A No. No, I actually did private facilities.

Q As part of acute care hospital, that category?

A There were stand-alones also, acute care hospitals.

Q When you say stand-alone acute care hospitals --

A It's not part of a large hospital. It's not a unit. It's just a separate building, separate organization, and that's what it is.

Q Okay. And this job between 2000 and 2006, this was not a job that required you to render bedside nursing care. True?

A That is correct, although it required me to observe others providing that care.

Q Okay. In terms of your job, in this job, were

there other -- for example, were there physicians who would comment on physician matters, or was it all nurses, or were there some other specialists that were part of your unit or your job?

A Part of the job in the acute care hospitals was to review the physicians' credentialing process to make sure that it was done properly. And if I had a complaint investigation, I very often had to interview physicians.

Q Okay. And then who was the decision-maker? Was there like a decision-making body in that job for determining, you know, what decisions were made as to the outcome of a surveyor a complaint investigation?

A Are you referring to certification, or are you referring to state or --

Q Well --

A If it was a federal certification survey, CMS, The Centers for Medicare and Medicaid, had to agree with your opinion.

Q Okay. So you were kind of the boots-on-the-ground collecting information, doing investigation, gathering records, talking to people in the facility, and then someone with CMS would make a decision as to whether or not the information you

gathered was sufficient to meet the standard required by a complaint or a survey violation?

A Well, actually, we made that determination and then ran it by them.

Q Okay.

A They could overrule that if -- if they decided you don't have enough to take all these conditions out.

Q Okay.

A Or they could be in complete agreement, yep.

Q Okay.

A That's what we're -- that's what we're going to do.

Q And the guiding principles by which you were operating then were the rules and regulations applicable to Medicare and Medicaid because your role was to determine whether or not those facilities were in compliance with those rules?

A Right. The written report is specific to each Code of Federal Regulations of those regulations that they violated and did not meet. So you don't write -- you don't -- we didn't write the attaboys. Lots of time you want to say "good job," but, we -- you know, we -- that was not our position.

Q Okay.

A So it was only problematic things that were written.

Q And the goal was if there were survey violations or things, then the goal was to bring them -- either sanction the facility or bring them into compliance with the Medicare/Medicaid regulations?

A That is correct. But, of course, with the state function, I actually was a team leader where we had to pull their license. We actually closed that hospital, which is rather unusual. But that is another function, you know, where the license was actually lifted.

As a matter of fact, that particular case -- you know, when there are serious violations, you can call immediate jeopardy, which when they're violating these regulations, it's a 23-day path to decertification. And we couldn't even wait 23 days. This place was so bad, we had to close it. We had to actually pull their license. It's like, we're not waiting.

It was really fascinating, but anyway.

Q Okay. And now, this last job on here, 2006 to

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

June of 2022, that would be the last position you had prior to your retirement. True?

A That is correct.

Q And that was with the California Department of Public Health, health facilities evaluator nurse, state facilities unit.

Did I read that correctly?

A Yes.

Q So it looks like it's the same type of position, but now you're with the state of California state facilities unit?

A It is the same type, but that is correct. So now instead of the small-house ICFIIDs, it was the large ones. It also included the state mental hospitals which are very, very large facilities, and it also included all of the state prisons.

Q Okay. And again, survey and complaint investigations, now instead of CMS or Medicare/Medicaid, you were trying to determine compliance with -- I think you said Chapter 22 [sic] of the State California Regulations?

A Yeah, they called it Title 22. Yes.

Q What is Title 22?

A It is that. It's just state regulations to run all these different facilities. It's for their

initial licensure and to continue operating. And a lot of them are pretty much in line with federal regulations, to be honest with you. There's a fair amount of duplication.

Q Okay. And the goal there would be to determine whether or not those particular prison facilities were in compliance with Title 22 from California, state of California?

A That's correct.

Q Okay. Now, it says, "Rehabilitation, correctional treatment centers, acute care hospitals, and long-term medical intermediate care facilities for the intellectually disabled and mental health facilities."

Are those all Department of Corrections facilities or private facilities?

A No. No, those are all state facilities.

Q Okay. State-owned.

So they might be state-owned, but not having to do with the Department of Corrections, or are they all Department of Corrections facilities?

A No. Only the prisons were part of Department of Corrections.

Q Okay. So there were intermediate care facilities

for the intellectually disabled that were related to the prison system?

A No, sir.

Q Okay. What did you do --

A I'm not sure where the confusion lies here. The only -- all of those -- none of those facilities had anything to do with the prisons.

Q Okay. So this was not state facilities --

A It was a state facility, but these are all owned by the State of California.

Q Okay. And some of those were correction and rehabilitation correctional treatment centers?

A That is correct. Those are within the prisons, yes.

Q Okay. So this job in 2006 to June of 2022 did not really involve correctional healthcare except to the extent that some of the facilities you might have been investigating were part of the Department of Corrections?

A No. It definitely would entail correctional healthcare. Those are the regulations. These are the treatment centers.

Q That's what I'm trying to get to because you have on this -- on this little section here, you said you were a survey and complaint investigation in

the California Department of Corrections and Rehabilitation --

A Separate from everything else, those are the prisons within that, yes.

Q Okay. And then --

MR. NAFFZIGER: Let him finish his question before you answer. Okay?

A I'm sorry. Go ahead. I'm sorry.

MR. NAFFZIGER: You're fine.

BY MR. FRANCKOWIAK:

Q In addition, it also says, "Acute care hospitals and long-term medical intermediate care facilities for the intellectually disabled."

So acute care hospitals, and long-term medical intermediate care facilities for the intellectually disabled, and mental health facilities, those might be state-owned facilities that are not part of the prison system?

A Yes. Yes, that is correct.

Q And that's what I was attempting to try to determine. It was not strictly, I guess, medical care facilities in the prison context that this job entailed.

It involved any state-owned facilities including those -- some that were in

Case 2:22-cv-00544-PP   Filed 06/09/25   Page 19 of 82   Document #121-2

the prison system, some that were not?

A　That is correct.

Q　Okay.  In terms of mental health facilities, what was the role of the California Department of Public Health and your role as a health facilities evaluator nurse?

A　It was the same thing as far as surveys and complaint investigations for the large, state-run mental health facilities.  There's one in Napa, California.  There's one in Patton which is only forensics, and there was Metropolitan State Hospital and a couple others way up north, but I usually concentrated on just those three.

Q　Okay.  And who or what was the decision-making body for this role?  For example, when you would gather the information, did you have to report it to someone and then they would make the determination as to whether or not there was a violation of a Title 22, or how did that work?

A　That is correct, because most of these facilities were not certified or -- actually, one of them had just a single unit where CMS would be involved that was certified.  So you'd just send that to -- you know, up the chain of command, depending how serious it is, you know, supervisor, and then

district manager, and et cetera.

Q　Okay.  And your role then, as I understand it, in this job from 2006 to June of 2022 as the health facilities evaluator nurse, would have been once again to be the boots-on-the-ground, collect information, records, interview people, and then report to whatever the chain of command was, who would then make a decision based upon the information that you gathered?

A　Right.  Right.  And that report, once again, would consist of, you know, the specific regulation violations.

Q　Okay.  And this again was -- Title 22 was the -- would have been the overarching document under which -- or rules that you would have been working, the goal being to determine whether or not these individuals were in compliance with California Title 22?

A　That is correct.

Q　Okay.  And this job between 2006 and June of 2022, would I be fair in assuming that that job did not involve the provision by you of bedside nursing care?

A　Yes.  That is correct.

Q　Okay.

A　Only observation --

Q　Okay.  So the last --

A　-- of providing that care.

Q　The last time you provided bedside nursing care, at least according to your CV, would have been when you left the California Department of Corrections or Rehabilitation in 2000 to take the job as health facilities evaluator nurse in 2000?

A　That would be true for the most part.  What I did not put in my CV is I did work part-time as a school nurse at a boarding school in Claremont, California, and that would -- that provided direct care.

Q　A school nurse.

And what years did you serve as a school nurse?

A　You know what?  That would have been about from 2014 to 2017.

Q　And is there any reason --

A　It was part-time.  It's like just -- just every now and then on a -- you know, on a weekend.

Q　Okay.  Is there any reason why you did not include that on your CV?

A　I didn't think it was relevant.

Q　Okay.  Had nothing to do with correctional

healthcare?

A　It did not, no.

Q　And it was just a private boarding school?

A　That's correct, yes.

Q　Okay.  You did not need to make any nursing decisions, for example, on, I guess, referring individuals for psychiatric care during your three years in that job?

A　No.

Q　Okay.  Your professional certifications are listed on Page 2 of your CV.

What is a certified correctional healthcare professional?

A　That is an individual that studied courses by the National Commission on Correctional Health Care and then took an examination for that certification.  The first one listed is a general certification, the CCHP, and then the second certification is specific to, it concentrated on nursing, the CCHP-RN.

Q　Okay.  What type of training or, I guess, activity is required in order to become certified in these two areas?

A　You know, what they did require is that you had experience working in a jail or a prison, either

Case 2:22-cv-00544-PP　Filed 06/09/25　Page 20 of 82　Document #121-2

currently or in the past, and then there's a number of materials. There are some online courses that you can participate in. Most is independent study, and then you take the examination for certification. To maintain that certification each year, you need to take a number of continuing education courses then.

Q  Okay. What was the certifying body for the certified correctional healthcare professional?

A  The National Commission on Correctional Health Care, NCCHC. This is -- this is what Dr. Leonard mentioned in his agreement with the jail as the golden standard --

Q  Okay.

A  -- for care in correctional facilities. He mentioned that organization. As a matter of fact, he was certified as a CCHPP, which means physician. You can see that he signed that on his name on the death evaluation that was done.

Q  And that is obviously different than the RN, because RN is specifically for nurses, and physicians would have a different certification?

A  Right. For the additional certification beyond the general.

Q  When you say part of the certification for that to

become a certified correctional healthcare professional is experience with the jail or prison facility, your -- your experience with a jail or prison facility would have been relative to the job that you had as a registered nurse in Chino between '94 and 2000?

A  That is correct, but also the -- what I referred to, the surveys of those prisons in California.

Q  As part of your job as a health facilities evaluator nurse between 2006 and 2022?

A  Yes.

Q  Okay. And as we talked a little earlier, though, in terms of your actual provision of nursing healthcare, your experience as in a correctional field of correctional nursing where you were actually providing care to patients, that would have been limited to your stint between '94 and 2000?

A  As far as what we have referred to as bedside care, yes. And as I mentioned before, it would be the observation of the care provided by other nurses in the state prisons and one of the major jails in Los Angeles.

Q  Okay. The National Commission on Correctional Health Care, is that a separate certification

beyond those that you've already talked about?

A  Which other ones are you referring to, sir, the other ones I've already talked about?

Q  I'm looking at professional certifications and affiliations on Page 2.

A  Yes.

Q  The first one is a Certified Correctional Healthcare Professional?

A  Yes.

Q  The second one is Certified Correctional Healthcare Professional - Registered Nurse. The third one is National Commission on Correctional Health Care.

What is that, that third one? Is it different?

A  That is -- that is the governing body that provides those certifications up above.

Q  Okay. So it is not a separate certification, it's the governing body --

A  It's the governing body, yes, that provides --

Q  -- that provides --

A  -- that certification, yes.

Q  All right. What is the American Jail Association?

A  You know, it is -- it's an association that has a number of seminars throughout the nation. And I

will say that it deals with some healthcare, not to a great degree. It basically deals with the overall operations of jails. However, I do review those organization publications because there's kind of a, you know, spillover between the two if there's anything in there that does pertain to healthcare. So that's why I maintain that, you know, association organization.

Q  Is there any type of requirement, education requirement or certification or testing requirement to be a member or affiliated with the AJA?

A  Just to have worked in a jail.

Q  Okay. Do you have to pay, like, a membership fee or something?

A  Yes, uh-huh.

Q  And do they have journals?

A  It's nominal. They do, uh-huh. Periodical.

Q  Does the National Commission on Correctional Health Care also have journals?

A  Yes, they do.

Q  Does that require a fee to be a member or to be certified by them?

A  Well, no. The fee is what you pay for recertification the following year with your

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

LEXITAS

Case 2:22-cv-00944-FP   Filed 06/06/25   Page 21 of 82   Document 121-2

Page 85

continuing education. It's -- last time, it was $100 a year, annual.

Q   And if I wanted to request a copy of, say, all of the continuing education classes or credits that you have obtained in order to maintain your certification as a CCHP, would you be able to provide that?

A   That would take a little time, but yes, I could. Yes, I do have that data.

Q   Okay.

A   I provide it to them annually, yes.

Q   How many hours of continuing education every year are required to maintain that certification?

A   You know, it's 20 hours, but six hours of those need to be specific to correctional healthcare.

Q   So you don't need to have 20 hours of correctional healthcare continuing education, only six need to be correctional healthcare?

A   Only six. That is their requirement.

Q   Is there any requirement for continuing education in terms of mental healthcare or psychiatric care?

A   No, not specifically.

Q   Okay. What does the --

A   That is optional. I mean, they'll accept that, but they don't specifically require it.

Page 86

Q   Okay. Is there such a thing as a psychiatric nurse as a specialty?

A   There is.

Q   Does that require additional training or certification?

A   Yes, uh-huh.

Q   Okay. You would not qualify as a psychiatric nurse?

A   That is correct.

Q   Whatever -- do you understand, or do you know, as you sit here today, what type of education or training would be required to qualify as a psychiatric nurse?

A   You know, I don't know specifically, you know, what they would have to study for that certification. So I've never looked into it.

Q   Okay. Whatever certification or requirements they have, you're not sure, but you are not a psychiatric nurse?

A   Once again, that is correct.

Q   Okay. What is a psychiatric nurse? What role do they play, if you know, as you sit here today? Where do they work? What do they do? What makes them different from just, say, an associate nurse qualified like yourself?

Page 87

A   You know, they still are not qualified to diagnose, still not qualified to -- as a nurse practitioner to, you know, prescribe medications. They're just a little -- little bit more -- they can't diagnose specific, you know, mental illness processes. They just are a little bit more in tune to the psychiatric milieu, I suppose.

Q   Okay.

A   I haven't worked specifically, you know, with someone designated as a psychiatric nurse.

Q   What is a forensic mental health association?

A   That is an organization that has seminars regarding mental health, and it -- it is forensics, you know, such as what I referred to before, that Patton State Hospital was all inmates with mental health issues that, you know, are not -- really are not suitable to be in the general population of jails and prisons.

Q   Okay. What does it mean --

A   The -- oh, I'm sorry. Go ahead.

Q   What is the Forensic Mental Health Association as opposed to any other mental health association?

A   It's people that have been charged with a criminal offense.

Q   Does it require any type of training or

Page 88

certification or testing or anything to be a part of the Forensic Mental Health Association?

A   No, no. Either just a nurse or a psychologist.

Q   Do you have to be trained in mental healthcare or psychiatric care as a nurse to be --

A   You do not have to be a psychiatric nurse, no.

Q   Any nurse -- some nurse who works in the emergency room could be affiliated with this group?

A   Sure.

Q   Okay. What does it take to be an affiliate of this group? Do you have to join? Do you pay a fee? Anything at all?

A   You pay a fee, and really, the primary advantage is if you do attend any seminars, it would be at a discount, although what's rather unfortunate is they don't have that many online. Most of their seminars are on-location, so it's kind of difficult to attend.

Q   Have you attended any seminars put on by the Forensic Mental Health Association?

A   No.

Q   Okay.

A   I take that back. Years ago -- years ago, I did because it was in Ontario, California, and it was specific to suicide in facilities.

888-893-3767                Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
www.lexitaslegal.com                                California Firm Registration #179

LEXITAS

Page 89

Q   Okay.  So that's the only one you can think of, as you sit here today, in terms of seminar sponsored by the Forensic Mental Health Association that you've attended?

A   That I've attended in person, yeah.  Yeah.

Q   Is there anything else that you derive or -- strike that.

Obviously, you've listed the Forensic Mental Health Association as one of your professional certificates or affiliations.

Is there any reason why you included that here?  Is there any benefit or value you derive from that entity in terms of your work as an expert?

A   Well, most of what -- did we lose you?

Q   I'm here.

A   Oh, okay.

All right.  You know what?  I can't really go beyond that one seminar for suicide, but on occasion, they do have Internet, but I think it was in regards to methadone treatment, but that's about it.

Q   Okay.  So you may have also done an online seminar on methadone treatment from that entity?

A   Yes.  It was quite some time ago.

Page 90

Q   We talked a little bit about the NCCHC and the fact that that's the certifying body for the Certified Correctional Healthcare Professionals.

Does the NCCHC also certify jails or correctional facilities?

A   That is a function that they do perform if it is requested.

Q   Okay.  That was going to be my next question.

So a facility would want or would need to request to be certified by that entity and then -- strike that.

Do you know how that works?  If a facility requests to be certified, do you know what the certification is or what's required by that?

A   My understanding is that more and more jails and prisons are seeking this certification, and it seems to be very similar to what I did for surveys for the California Department of Public Health where they primarily survey to their standards --

Q   Okay.

A   -- to see if those facilities meet those standards, and then they receive that certification.

Q   Now, obviously, the fact that a jail has to

Page 91

request the organization to confer a certification leads me to my next question was, not every jail must be certified by the NCCHC, it is a voluntary thing.  True?

A   That is correct.

Q   Okay.  If a jail wishes to be certified, they approach the NCCHC, and then they have to follow whatever certification requirements are needed, and if they meet those, then the NCCHC will confer that certification on them if they choose to seek it?

A   Yes, uh-huh.

Q   Okay.  Have you ever personally been involved in aiding a facility in becoming NCCHC-certified?

A   I have not, although I know the organization does perform that function, and they were looking for individuals, trying to get more individuals since more and more jails are seeking that and prisons are seeking that sort of certification.

Q   Are you able to tell me, as you sit here today, what percentage of jails throughout the United States are actually voluntarily certified by the NCCHC?

A   I have no idea.

Q   Okay.  Do you know how many jails in the state of

Page 92

Wisconsin are actually certified by the NCCHC?

A   Once again, I do not know.

Q   Okay.  Do you know, as you sit here today, whether less than 50 percent of all jail facilities in the United States are certified by the NCCHC?

A   Sir, I don't know.

Q   Okay.  You would not be able to tell me any percentage, as you sit here today, in terms of the jails in the United States that are actually certified by the NCCHC, whether that be 5 percent, 20 percent, 50 percent, or 80 percent.  True?

A   Again, this is true.

Q   Okay.  Derived from the fact that it is a voluntary certification, obviously, NCCHC certification is not a requirement for jail facilities in the United States.  True?

A   I think we covered that.  That is correct.

Q   Okay.  NCCHC standards therefore are aspirational standards; are they not?

A   Well, what do you mean by "aspirational"?

Q   In other words, they are --

A   Like, it's just a dream that you could meet these?  It's too difficult?  Is that what you're -- I don't really follow you.  Aspirational, like something that you --

Case 2:22-cv-00544-PP   Filed 05/05/25   Page 23 of 82   Document 121-2

Page 93

Q You earlier discussed your job in doing surveys and complaint investigations on behalf of, for example, CMS.

Facilities, if they wanted to participate in CMS, were required to be certified or to follow the CMS regulations. True?

A That's true.

Q Okay. In terms of those jails and facilities throughout the United States, as we've established, they are not required to be certified by the NCCHC. True?

A Again, that is true.

Q Okay. You can run a jail without being or without meeting the NCCHC requirements or standards.

It is not against the law or any certification body to run a jail that is not certified by the NCCHC. True?

A That is true.

Q Okay. So the NCCHC standards are not required, they are not standard; they are aspirational. True?

A They are not required, yes. Not required.

Q Because the NCCHC standards are not universal and not required, they are not or they do not constitute the standard of care applicable to a

Page 94

jail or prison facility. True?

MR. NAFFZIGER: Objection. Form.

You can answer.

A One more time, sir, please.

BY MR. FRANCKOWIAK:

Q Sure. Because the NCCHC standards are not required, and because a jail or prison facility can be run without complying or without being certified by the NCCHC, the NCCHC standards do not constitute the standard of care applicable to prison or jail healthcare. True?

MR. NAFFZIGER: Same objection.

You can answer.

A Well, they are standards that are considered the best standards.

BY MR. FRANCKOWIAK:

Q Well, there's --

A Just like, once again, even Dr. Leonard mentioned them, he called them the gold standards. And as a matter of fact, we know that with his own policies, he used the term "mirror," but he uses many of those standards in his policies and procedures for MEnD, although, unfortunately, all those were not implemented in this particular situation.

Page 95

Q Dr. Leonard does not establish the standard of care applicable to correctional healthcare. True?

MR. NAFFZIGER: Objection. Form.

Answer. You can answer.

A Well, I suppose that's only his opinion.

BY MR. FRANCKOWIAK:

Q Can you define for me the term "standard of care"?

MR. NAFFZIGER: Same objection.

You can answer.

A The standard would be the generally accepted norm, I suppose, is what you would say, so that's what you would expect, in general. That's what you would see most often.

BY MR. FRANCKOWIAK:

Q Okay. So you cannot state that the NCCHC standards established the standard of care for correctional healthcare. True?

A Not --

MR. NAFFZIGER: Objection. Form.

You can answer.

A Not -- not nationwide because it is -- it's not mandatory.

BY MR. FRANCKOWIAK:

Q Okay. And in order to set the standard of care or to set the standard of care for correctional

Page 96

healthcare, it would have to be generally the generally acceptable norm in prison and jail facilities, and because it is not required and is only aspirational, it is not fact. True?

MR. NAFFZIGER: Object to form.

(Court reporter asked for clarification.)

THE WITNESS: So sorry.

A As far as a generally accepted standard, I suppose.

BY MR. FRANCKOWIAK:

Q Okay. So just to put a finer point on it, a jail facility like the Racine County Jail can run a facility within the standard of care without complying with the NCCHC standards. True?

MR. NAFFZIGER: Same objection. You can answer -- sorry -- sorry, Lloyd. Let me just make the objection, buddy, and then you can answer.

Objection. Form.

You can answer.

A I think we've already established that.

BY MR. FRANCKOWIAK:

Q Okay. And the answer is yes?

A Yes.

Q Okay. And a private correctional healthcare

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and DC licensed where required Nevada Registration #116F
California Firm Registration #179
LEXITAS

Case 2:22-cv-00544-JPS Filed 06/09/25 Page 24 of 82 Document #121-2

entity like MEnD can provide correctional healthcare services in a jail facility like the Racine County Jail within the standard of care without complying with the NCCHC standards. True?

A    That is true, but as I stated, they accepted a number of those components of those standards in their policies. Apparently, they thought they were relatively important.

MR. FRANCKOWIAK: Move to strike everything after "yes" as nonresponsive.

BY MR. FRANCKOWIAK:

Q    So I understand and so I have a clean answer to that question, sir, we can agree that MEnD can render or could render healthcare services in a correctional setting in the Racine County Jail in 2021 within the standard of care without complying with the NCCHC standards?

MR. NAFFZIGER: Objection. Form. Asked and answered.

You can answer.

A    That is correct, but they chose to do so in many instances.

MR. FRANCKOWIAK: Move to strike everything after "correct" as nonresponsive.

BY MR. FRANCKOWIAK:

Q    Just because a jail is not certified by the NCCHC does not mean that the jail necessarily or automatically is operating outside of the standard of care in the provision of correctional healthcare services. True?

MR. NAFFZIGER: Objection. Form.

You can answer.

A    That is true. There's a lot of -- a lot of leeway for the individual facilities, which would even make it difficult to determine the standard because, pretty much, they could do whatever they wanted to do.

BY MR. FRANCKOWIAK:

Q    Okay. And just because a correctional healthcare provider is providing care in a jail facility but has not obtained certification by the NCCHC, that does not mean that that provider was not operating within the standard of care in the provision of correctional healthcare services. True?

A    Well, once again, what standard of care are you referring to?

Q    Are you offering opinions in this case that either MEnD or its nurse failed to meet the standard of care?

A    That is correct.

Q    Okay. So you're familiar with the standard of care in the context in which you are offering your opinions. True?

A    Correct.

Q    It is true that neither Nurse Kristiansen or MEnD was operating outside the standard of care simply because they were not operating or -- strike that.

Neither Nurse Kristiansen nor MEnD were required to operate under the standards promulgated by the NCCHC in order to meet the standard of care. True?

A    Well, Nurse Kristiansen was obligated to operate under the standards of nursing care, but in general, yes, that is true. Not under the NCCHC standards, yes.

Q    Okay. If you know, who or what establishes the standard of care applicable to correctional healthcare providers?

A    Well, there is no other governing body. There are two organizations that come up with their own standards, you know, which would be the NCCHC that we're referring to which deals only with correctional healthcare, and then there is the American Commission Correctional Association which

does deal with some issues with correctional healthcare, but really entails the operation of the overall jail.

But you will find oftentimes, such as in the policies with MEnD, where they do utilize extensively the NCCHC standards. And I believe to a certain degree, they have a couple that they refer to the other organizations, so --

Q    You mentioned American --

A    And -- go ahead, sir.

Q    -- American Commission for Correctional Association.

What was that again?

A    Oh, it's -- it's another organization that comes up with -- or that -- it goes -- I guess it's been around for virtually 100 years or so. And they also have some standards that they put out, but once again, very little for healthcare itself. It's basically on the total operation of jails.

Q    We can agree that the standard of care applicable to the provision of correctional healthcare is not established by any group, for example, the NCCHC or this American Commission Group. True?

A    This is -- this is true.

Q    Okay.

Case 2:22-cv-00944-PP    Filed 05/05/25    Page 25 of 82    Document 121-2

Page 101

A   I mean, if you had certification, you know, by NCCHC, that would be, you know, a little different.

Q   Okay.  Can you explain to me how the standard of care applicable to correctional healthcare providers is established or what it is that constitutes the standard of care?

A   The standard of care is what you see in most facilities, and the best standard of care, of course, which you referred to as being aspirational, would be the standards put together by a particular organization such as the NCCHC, which is the primary organization that does that specific to correctional healthcare.

Q   And just so I understand, because we -- I think we kind of mixed some -- I got mixed signals from that last answer.
    Organizations like the NCCHC put out standards, but those standards are not mandatorily required and do not themselves constitute the standard of care.
    You're not saying that.  True?

A   That is correct.

Q   Okay.

A   I would say that would be the best standard of

Page 102

care.

Q   Okay.  And do you know what I mean when I refer to something as "aspirational standard"?

A   Well, we referred to that just a little while ago, and you were mentioning that because it was not required that it is aspirational.
    I believe that was what you were referring to; is that correct?

Q   An aspirational standard is one that could be aspired to but is not required in order to meet the standard of care.

A   Okay.

Q   Do you have any reason to contest that?

A   I will agree with your definition, sir.

Q   Okay.  Can we agree that the NCCHC standards are indeed aspirational standards under that definition?

A   Under that definition --
    MR. NAFFZIGER:  Objection.  Form.
    You can answer.

A   Under that definition, yes.

BY MR. FRANCKOWIAK:

Q   Okay.  Now, we've marked as Exhibit No. 6 a copy of an expert witness retention agreement.
    Do you have that in front of you?

Page 103

A   Well, I'm going to have to bring it up, sir.

Q   Okay.  Do you have it in front of you?

A   Correct.

Q   The document I have, which we've marked as Exhibit No. 6, is a three-page document.
    Is this your document?

A   Let me go through the whole thing.
    It is.

Q   Okay.  Is this a document that you provide to your clients when they retain you so that the parameters of the retainer are understood?

A   Right.  That's the agreement, yes.

Q   Okay.  This is not an agreement, for example, that was presented to you by the O'Connor Law Firm to sign; this was an agreement that you provided to them?

A   That is correct.

Q   Okay.  And what is the purpose of this document?

A   It is the agreement that there's also an appendix that has all my fees that are on there, and it just explains what I plan to -- the services that I plan to provide.

Q   Okay.  On Page 2, subsection 6 is entitled "Duties of Expert."
    Do you have that in front of you?

Page 104

A   I do.

Q   Okay.  It says under that section, "The expert's duties are:  To truthfully represent expert's credentials, to formulate with honesty and due care and truthfully express expert's opinions in those areas (and only those areas) where expert feels qualified to render an opinion and where client has requested an opinion."
    Did I read that correctly?

A   You did.

Q   What, if any, importance does this language hold for you?

A   The importance?

Q   Right.  If any.

A   It -- basically, it just shows that I would give a truthful opinion based upon the analysis.

Q   Why do you limit your testimony to only those areas where you believe you are qualified to opine?

A   Why would I -- why would anyone go to areas where you are not qualified to opine?

Q   You would agree there are areas that you would be unqualified to opine, and you would not -- you would not find it appropriate to offer opinions on those areas?

Case 2:22-cv-00544-TPF    Filed 05/05/25    Page 26 of 82    Document #121-2

Page 105

A   Well, it would be things that are not related.

Q   That are not related to what?

A   To the correctional healthcare analysis.

Q   Okay.  Do you believe that you are qualified to render opinions on all aspects of correctional healthcare?

A   Based upon experience, yes, uh-huh, and -- yes. Education and experience, yes.

Q   Okay.  Are there any areas of correctional healthcare that you believe you would not be qualified to give an opinion?

A   Not correctional healthcare itself.  Naturally, I can give an opinion on a physician, but as a nurse, that might not be, even if it was correct, accepted by the Court.

Q   Okay.  Have you ever testified as an expert on the standard of care applicable to a correctional healthcare physician?

A   Indirectly.  And when I say that, it was in defense of a psychiatrist related to an individual that was decompensating, and not just mentally, but physically because of this decompensation.  So I -- I was in defense of him, but really, it was in regards to, he did not receive the proper information from the nurses in that particular

Page 106

jail.  So I suppose in that respect.
    Does that answer your question?

Q   In that particular instance, in other words, you were testifying that the nurses of whom you are qualified to speak did not provide sufficient information to that doctor?

A   That is -- that is correct.

Q   Okay.

A   I -- I was not -- well, right, the doctor couldn't make the decision because he didn't have the information, so yes.

Q   Do you consider yourself qualified to render opinions on medical diagnoses or mental healthcare diagnoses?

A   Well, by the Court, no.

Q   Okay.  Are you drawing a distinction between "by the Court" and something else?

A   Well, you know, perhaps.  But when you say that I'm not qualified, I guess you're saying -- well, a nurse can have opinions that may be correct about a physician's decision that may be factual and correct.  However, you're not allowed to make that decision for the Court.  They presume that you are not qualified.  So per the Court, I'm not qualified, so --

Page 107

Q   And I guess that's a distinction that I would want to clarify --

A   Right.  But --

Q   -- for the purpose of developing and rendering opinions in this case, you would not be qualified to render opinions on medical or mental health diagnoses that can be accepted by the Court?

A   True, yes.

Q   Okay.  Now, we've marked as Exhibit No. 7 a document.  It's a thick document.  It's a Board of Medical Practice document before the Minnesota Board of Medical Practice.
    Do you have a copy of that document?

A   Let me pull her up.
    Okay.  It's up.

Q   Okay.  You have that document?

A   Yes.

Q   Okay.  Were you provided this document at some point?

A   Yes, I was.

Q   And have you reviewed this document?

A   Yes, I did.

Q   Okay.  When did you review this document?

A   That would have been just a couple of days ago.

Page 108

Q   Okay.  If you reviewed -- received and reviewed this document just a couple of days ago, would it be fair for me to assume that none of your opinions rendered prior to your most recent report, which I received only yesterday, this document, Exhibit No. 7, did not have any bearing upon those opinions?

A   Okay, sir.  You're going to have to repeat that one.

Q   Let me do that.
    Would it be fair to state that this document marked as Exhibit No. 7 had no bearing upon any of the opinions you have set forth in any of your reports prior to the one that I received for the first time yesterday?

A   Yes.  Yes, uh-huh.

Q   Okay.  Did you ask for a copy of this document?

A   I did not ask for it; it was just provided.

Q   Did you ask or do you understand why it was provided to you?

A   I did not ask.

Q   Okay.  Did you rely upon this document for any opinions whatsoever that you hold in this case?

A   The latest -- the latest one, yes, uh-huh.

Q   In what way did you rely upon this document for

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required.  Nevada Registration #116F
California Firm Registration #179

any of your opinions?

A   This one here -- let me look at the document.

Okay.  What this referred to was the opinion in this latest paper regarding MEnD. It refers to discipline to Dr. Leonard where there was a death in a facility where MEnD was taking -- in charge of the healthcare there, and it's in regards to -- apparently, they thought the inmate was faking his illness, and he did succumb to that -- to that illness.

And in his depo, Dr. Leonard stated that he never provided any type of training regarding faking or not faking inmate patients. And I believe that -- well, Nurse Kristiansen did mention that originally she thought that Mr. James was faking because earlier in the day, apparently -- I believe in her depo she said he was playing possum when she took ammonia, smelling salts, and put it under his nose.

And she did make the statement that she never received any type of, you know, training from MEnD related to, you know, faking of inmate patients.

Q   Okay.  And we'll talk about those when we get to that most recent report.

Does this document have anything at all to do with the facts of the incident lawsuit?

MR. NAFFZIGER:  Object to form.

You can answer.

A   With the -- one more time, sir.

BY MR. FRANCKOWIAK:

Q   Sure.  Well, let me break it down a little bit so I'm a little more clear.

Did this document, Exhibit No. 7, ever mention the Racine County Jail?

A   No.  It refers to a previous jail, and it refers to Dr. Leonard, who owned this company, MEnD, and that it was disciplined behind this.  The only reference you could take it all the way is that faking or not faking of inmates, that there was no training provided based upon the history of this event.

Q   And Mr. James is not mentioned anywhere in Exhibit No. 7.  True?

A   Not on this exhibit, no.  No.  Like, it is a different jail, yes.

Q   Okay.  And absolutely nothing contained in Exhibit No. 7 has any relation to any facts or individuals or even the jail that we have in this case?

A   Only indirectly, as I mentioned.

Q   Okay.  The inmate in that case is a completely different person; the state where it occurred is a completely different stated.  True?

A   That is correct.  The organization, health organization was the same, but that is true.

Q   The facts -- the factual background of Exhibit No. 7 is not the same as the current case.  True?

A   True.

Q   Okay.  Exhibit No. 8 we've marked as an exhibit. It's a short report by an individual named Tom Neuman, N-E-U-M-A-N.

Do you have that?

A   Yes, I do.

Q   Okay.  Did you review this document in formulating your opinions?

A   It's been quite some time, but I did review it quite some time ago.

Q   Was this document provided to you before you came to your -- the opinions set forth in your original complaint?

A   Yes.

Q   What role, if any, did this document play in the development of your opinions?

A   Not a lot, sir.

Q   Okay.  Did you ask for a copy of this document to

be provided to you?

A   I did not ask for this document specifically.

Q   Okay.  Do you know Dr. Tom Neuman or know of him?

A   I do not.

Q   Do you have an understanding as to his field of expertise or the work and the studies he has done?

A   You know what?  I don't really recall.  Like I say, it's been quite some time since I reviewed this document.

Q   Okay.  As you sit here today, do you have an understanding as to the role Dr. Neuman played in this case or in Mr. James' situation?

A   Well, he is offering his opinion on the death.

Q   Okay.  And beyond that, you don't have an understanding as to the role he played?

A   I would presume that he is performing duties as an expert; is that correct?  Is it not?

Q   Well, do you have an understanding that he's an expert in this case?

A   I don't know for sure, sir.

Q   Okay.  He's listed as M.D. on the face of this.

Do you have any reason to contest the fact that he is a medical doctor?

A   I -- I wouldn't, you know.

Q   If he is a medical doctor, his training,

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
California Firm Registration #179
Case 2:22-cv-00944-PP   Filed 05/05/25   Page 28 of 82   Document 121-2

LEXITAS

Page 113

obviously, would be different from yours.  True?

A   That is correct.

Q   As you sit here today, do you have an understanding as to what Dr. Neuman concluded in his report?

A   I think we see it here at the bottom.

Q   Okay.  And what is that?  What is his conclusion?

A   Well, his last sentence is -- which does conflict with other physicians, of course, including the pathologist that did the -- it says that it was more likely, and he did say likely that Mr. James was sudden cardiac death, and his cardiac arrest was not due to inadequate ventilation.

So that is his opinion as the most likelihood.

Q   Okay.  Because you are not a doctor, you would agree that you cannot comment or contest his opinion.  True?

A   Oh, I can comment.

Q   Okay.

A   And I can contest.

Q   Let me put it this way.  Yes.

You cannot opine or offer an opinion to a reasonable degree of medical certainty or probability as to whether or not his

Page 114

opinion is accurate.  True?

A   Well, once again, I would refer to most courts.  That would be true, although what I do find very interesting is I was requested in the case with the state of Nebraska to critique the physician's opinion.  And I did mention to them that, well, you know, being a nurse, is this going to hold up in court?

And they said, well, let us worry about that.

And so I did contest a number of the issues that he brought up in that particular case.  But as a general rule, I would not be able to contest anything in court because I am a registered nurse and not a physician.

Q   Okay.  And that is a position you understand to be accurate in this case.

You are not qualified and will not comment or contest Dr. Neuman's opinions on causation.  True?

A   That is most likely what the Court would agree with.

Q   And you do not have any opinions in your written -- or you have no commentary in your written report talking about medical causation.

Page 115

True?

A   Medical causation, no.

Q   Okay.  And you have not offered any opinions in your written report on the cause of death because, as we established earlier, you are not qualified as a nurse to offer medical opinions on the cause of death.  True?

A   That is true.

Q   So to the extent Dr. Neuman is testifying or offering a conclusion or an opinion on cause of death, you are not qualified or able to contest his opinion?

A   I suppose that is true for the Court, yes.

Q   Okay.  You do not mention Dr. Neuman in your report.  True?

A   I saw no need.

Q   Okay.  We've marked as Exhibit No. 9 a copy of a report by a Darrell Ross, Ph.D.

Do you have that in front of you?

A   Yes.

Q   Were you provided this document, and did you review it?

A   Once again, this is going back a little ways here.  I believe so.  Here, let me see it.  Let me take a gander.

Page 116

Q   Do you know if you reviewed this document before you wrote your first report?

A   Sir, you need to give me a minute here.

Q   Sure.

A   Okay.  Coming back to me.  Yes.

And I'm sorry, what's was your -- what was the question you just asked?

Q   Yes.  Did you review -- or can you tell me if you reviewed this report prior to drafting your first report in this case?

A   Before the original, yes.

Q   Okay.  Do you know who Dr. Darrell Ross is?

A   This is the first I've seen of Dr. Darrell Ross.

Q   Do you have any understanding as to his field of expertise or the work or studies done?

A   I don't know about the work and studies that he has done.

Q   Okay.  Do you have an understanding as to the role he played in this incident or this lawsuit?

A   Not beyond giving his opinion.

Q   Okay.  Do you have an understanding, as you sit here today, what his opinion is or what he concluded in his report?

A   Well, it refers to criminal intent.  The officers did not act with any criminal intent or criminal

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

Case 2:22-cv-00944-PP   Filed 05/05/25   Page 29 of 32   Document 121-2

LEXITAS

recklessness, and he also believes not any intentional disregard of the application of using force measures. So I think it's all in his conclusion.

Q Okay. Do you understand that he is an expert in corrections and in the use of force?

A Sir, once again, I was not totally familiar with his qualifications.

Q Okay. You would not hold yourself out as an expert on corrections or the use of force by correctional officers. True?

A That's true.

Q Okay. And you have never offered or rendered expert testimony on the standard of care applicable to correctional officers or on the use of force in a correctional setting. True?

A This is true, too.

Q Okay. You do not hold any opinions in this case relative to corrections officers or the use of force in a correctional setting. True?

A One more time, sir.

Q Sure. You do not hold any opinions relative to the use of force by the correctional officers in this case. True?

A You know, for the standard use of force, I

presume -- I mean, no, I don't in pepper spray or Tasers or anything else to that effect. But the position that Mr. James was held in, I do have an opinion when in his bent-over position, so --

Q We will get to that --

A -- in that aspect.

Q -- during the discussion of your report.

First of all, I just want to establish, you have no personal experience with the use of pepper spray. True?

A I do not.

Q You have no personal experience with the use of an emergency restraint chair. True?

A Not personal experience. I have observed it in large ICFIIDs in mobile restraint chairs, yes. But physical experience, no.

Q You've never been employed or served as a correctional officer in any jail or prison facility?

A Correct.

Q And you have no personal experience with the use, for example, of a spit mask. True?

A No. I've only seen one from a distance on someone.

Q Okay. You have never had any training, for

example, on the subject of subject control or POSC, P-O-S-C?

A No training, no.

Q We've marked as Exhibit No. 10 a copy of a lengthy -- it looks like a letter report dated January 5th, 2022 authored by Patricia J. Hanson, H-A-N-S-O-N, District Attorney for Racine County. Do you have that?

A I do.

Q And did you review this report prior to coming to your opinions in your initial report?

A I did. Excuse me.

Q Did you ask for this document, or was it provided to you --

A No, it was just provided.

Q Okay.

A I'm so sorry to answer so quickly. I know it's rough for the reporter.

Q Did this document play any role in your opinions?

A The only thing -- the only role that -- and it really didn't because it's referring to no criminal charges being brought forth.

Q Okay. As you sit here today, do you know the purpose of this document or what this document is accomplishing or attempting to accomplish?

A Well, I believe that it is saying that they are not going to bring criminal charges --

Q Okay.

A -- based upon the events.

Q Do you have an understanding from reading this report why they were not going to bring criminal charges?

A Well, you know, I would have to read the whole report again to refresh my mind. Once again, that was quite some time ago.

Q Okay. Based upon your review of that report, would it be fair to state that according to the determinations made by District Attorney Hanson, none of the individuals who were involved with Mr. James at the time of his passing on June 1st of 2021 were held to have violated their training on that date?

MR. NAFFZIGER: Objection. Form. Foundation.

You can answer.

A You know, I would imagine -- I would have to read the whole thing again, but I would imagine that that's what it implies, yes.

BY MR. FRANCKOWIAK:

Q Okay. And you would not be able to offer any

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179



Page 121

expert testimony or opinions to the contrary. True?

A That's true.

Q Okay. As a nurse with experience in correctional healthcare, would you expect a correctional healthcare nurse to have any training, understanding, or expertise on the subject of whether a correctional officer has complied with his or her training on the use of force?

A No.

MR. NAFFZIGER: Object to foundation and form.

Sorry. Go ahead. Sorry.

A No.

BY MR. FRANCKOWIAK:

Q Okay. And you yourself as a correctional nurse, I would assume, would not have any understanding as -- or be able to tell me whether or not any correctional officer had complied with his or her training in terms of the use of force. True?

A True.

Q And you would not expect, for example, for the same reasons for Nurse Kristiansen, to have any knowledge or understanding as to whether any of the officers in this case were complying with

Page 122

their respective training on the use of force on June 1st of 2021. True?

A True.

Q Now, I want to talk a little bit about your reports.

MR. FRANCKOWIAK: Maybe this would be not a bad time to take a short break because I do want to talk about your actual opinions in your reports, and that's what we'll be dealing with next.

THE WITNESS: Okay.

MR. NAFFZIGER: Can we do 20 minutes just so I can stuff my face quickly?

MR. FRANCKOWIAK: Yeah, that's fine. I'm fine with that. I got about 12:30 right now. You want to make it like 12:50 or something?

MR. NAFFZIGER: Yeah.

Is that okay, Lloyd?

THE WITNESS: You bet.

MR. NAFFZIGER: And, Rosanne, is that okay also for you?

THE STENOGRAPHER: Yes, that's fine.

MR. NAFFZIGER: Okay. Cool. All right. I'll see you guys in 20.

Page 123

MR. FRANCKOWIAK: All right. We'll be back then.

MR. NAFFZIGER: All right. Bye.

(Brief recess taken from 12:28 p.m. to 12:54 p.m.)

BY MR. FRANCKOWIAK:

Q Let's go back on the record and see if we can plow through the rest of this.

Okay. We're back on the record. I want to talk a little bit about your reports in this case. I have marked a number of them as exhibits.

First of all, the very first report dated May 30th, 2024 has been marked as Exhibit No. 11. Likewise, Exhibit No. 12, we've marked as your second report which is dated November 11th, 2024. And then your third report has been marked as Exhibit No. 13, and that one is dated January 2nd of 2025.

Your most recent report received by me for the first time yesterday has been marked a little out of order. I believe that one's going to be No. 16.

So I'm going to start probably with the first report, Exhibit No. 11.

Page 124

In each of these reports, it appears that you identified the material you reviewed prior to authoring each report; would that be accurate?

A That would be fairly accurate, and the reason being is if you look at the November report, you will not see materials reviewed. The January report shows the materials that were reviewed for that report, and that report is also in the January report. But there's one added portion to the January report that's not in the November, and that's on the second page where it refers to Crystal also violating policy.

So really, the November report is repeated in the January with showing everything that went in that was reviewed for that report, and the only thing not in the November report would be that section on Page 2 which refers to the policy.

Q Okay.

A Makes it a little confusing.

Q So I guess if I look at all of your reports taken together, I should be able to determine overall the material that you reviewed that went into those reports?

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

LEXITAS

Case 2:22-cv-00944-PP Filed 06/09/25 Page 31 of 82 Document 121-2

A   That is absolutely correct.

Q   Okay.  Did you review any materials other than those which are set forth in your reports?

A   No.

Q   Okay.  Exhibit No. 11 is your first report dating back to May 30th of 2024.

What were you asked to do in this case when you were initially retained by plaintiff's counsel?

A   Well, of course, to review the case and to give an opinion.

Q   Okay.  Does the report that we've marked as Exhibit No. 11 set forth the opinions you hold in this case with the exception of those contained in your updated reports?

A   Yes.  Nothing is negated from the original opinion.  The other ones are just supplements to that, just additional, but nothing -- it didn't change the original opinion.

Q   That was going to be my next question.

Is there anything contained in Exhibit No. 11 that you -- by which you no longer agree or by which you no longer stand?

A   No.

Q   Did you have sufficient information available to

you prior to the creation of your first report that you believe allowed you to draft a reliable report?

A   I believe so, yes.

Q   Okay.  Did you ask to be provided with any materials or any documents with which you were not provided?

A   I didn't ask for anything separate from what I was provided with.  I presumed all materials that they had at that point in time, they would have provided to me.

Q   Okay.  Now, when I look at Exhibit No. 11, you do have a section on Page 2 and 3 that talks about materials reviewed, and two of those subcategories there are listed under No. 8 and No. 12.

No. 8 at the top of Page 3 of your report says you reviewed the National Commission on Correctional Health Care Standards for Health Services in Jails, 2018 Edition.

A   Um-hmm, correct.

Q   Did I read that correctly?

A   Yes.  Oh, I'm sorry.  I answered too fast.

Q   Now, we have also marked as Exhibit No. 14 a selection of what I understand to be some standards taken from the NCCHC 2018 Edition, and

would that be accurate if you're looking at Exhibit 14?

A   I have to take a look at 14.

And that is correct, and those are the standards that I cited, yes.

Q   Okay.  And that's what I wanted to clarify.

For our purposes today, it looks like the NCCHC does have a book that contains standards for health services in jails, and you have a selected section taken from that book, the 2018 variety or version, that you have pulled from that book and we have included as Exhibit 14.

Would that be a fair statement of what Exhibit No. 14 is?

A   Well, I got to get on -- let's see -- yes.

Q   Okay.  And then No. 12 on the list of materials that you've reviewed is a document called "National Institutes of Health - Prone Restraint Cardiac Arrest:  A comprehensive review of the scientific literature and an explanation of the physiology, July 2021."

Did I read that correctly?

A   That is correct.

Q   All right.  Now, I've marked as Exhibit No. 15 a two-page document which has this same title, and

it looks to be just a short abstract.

Is that -- is that an accurate statement?

A   It does say "abstract," that is correct.

Q   Okay.  And did you -- did you review this entire article, or did you just look at this abstract?

A   I will say I just looked at the abstract.

Q   Okay.  Was this abstract provided to you, or did you look for it?

A   I sought it.  I sought it out.

Q   Okay.  And so no one referred you to it or gave it to you or anything, you just happened to come across it?

A   I sought it out, yes.

Q   Okay.  What is the -- I guess, what's the value, or why did you seek this document out?

A   Because it refers to -- what it's referring to specifically is prone restraint, and as you see, "Overall, most findings reveal that individuals to physical prone restraint" -- I'm sorry, I'm reading too fast -- sorry -- "experienced a decrease in ventilation and/or cardiac output in prone restraint.  Metabolic acidosis is noted with increased physical activity in resistance-associated cardiac arrest and simulated

Case 2:22-cv-00544-IPJ    Filed 05/05/25    Page 32 of 82    Document #121-2

LEXITAS

Page 129

encounters. A decrease in ventilation and CO can significantly worsen acidosis and hemodynamics."

And this is referring to prone restraint, which would mean facedown on the ground. What I have seen very often in the mental health facilities that I have surveyed and in the ICFIID facilities where individuals also had mental illness and were -- could be violent, for an individual that was very heavy and obese, the doctor would write an order, "no prone restraint," and it's for this particular reason here.

And I start with that in my opinion, and I mention that this -- Mr. James was beyond a prone restraint, that he was, you know, pulled forward into a position where the diaphragm could not lower to take in a breath because there's not room when you're pulled over like that when you have all that adipose tissue in the way.

So the way he was held was not just prone restraint, it was beyond that. The position that he was held in for that -- or, you know, was very likely to and did, you know, present positional asphyxiation.

Q   Okay. And we're going to talk about that. I want to discuss a little more in depth Exhibit No. 15.

Page 130

You said this is an abstract.

What is an abstract, according to your understanding?

A   It's based upon what is brought forward from other studies. It's almost like a -- a summary of the others --

Q   Okay. Is this an actual article --

A   -- with different frames of references.

Q   If you look beyond this abstract, is there an actual article that expands upon what is in this one-page abstract?

A   Like I said, I did not look at the other resources in this.

Q   Is there any reason why you did not look at the actual article rather than just relying on this one-paragraph summary of the abstract?

A   I didn't think it was necessary. It's pretty self-explanatory. It's like the end result.

Q   Okay. And you mentioned prone is on the stomach, facedown?

A   That is correct.

Q   Okay. Did you rely upon this abstract for any of your opinions?

A   I relied on this, as I just stated, and that's in my opinion, that it was beyond the prone position

Page 131

of just being flat on your stomach when he was pulled forward and bent over.

Q   Okay. This article, this abstract it's dealing with, did they deal with or did that article contain any case studies or data involving an individual partially secured in an emergency restraint chair?

A   Not to my knowledge.

Q   Okay. And we can obviously agree that in this case, Mr. James was at no point restrained in a prone position while in that restraint chair?

A   He was in a more extreme position beyond prone as far as being bent over, the pressure that's on the diaphragm. So no, he was not prone.

Q   Okay. And how much pressure was being exerted on his diaphragm?

You can tell me the pounds per square inch if you have that.

A   Well, sir, I really can't tell you that.

Q   How did you measure --

A   I don't think anyone can really tell the exact pounds per square inch. I do believe in one of the reports that there was -- and, of course, this is just an estimation. It would depend on how much, you know, body weight you were actually

Page 132

putting on there, you know, from the three individuals, so I can't say precisely.

Q   In terms of the weight that was being exerted, if any, you can't say that either?

A   Well, it certainly appears like weight was put on if you look at the videos, but I cannot say.

Q   Okay. In terms of objective data, pounds per square inch, weight, you don't have any documents that you can rely upon to support your opinion that his diaphragm was affected in any way?

A   I don't have the pounds per square inch, no.

Q   Okay. Or any weight data or any actual testable hypothesis or numbers that you can rely upon. True?

A   No. The only thing is -- and I don't really recall exactly what they were, but, you know, it was mentioned -- the detective in his report -- the body weight of the individuals that were holding him there, which was -- I don't know. The actual body weight, I think, approached 900 pounds or so.

But, of course, they're not like, you know, standing on him, so all that weight is not on him either. So even his -- you know, his report was an approximation --

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

Case 2:22-cv-00944-FF   Filed 03/09/26   Page 33 of 82   Document #121-2

Q   And you're relying --

A   -- so he could not cite the pounds per square inch, no.

Q   You're relying exclusively upon your review of a video that you watched that showed the events of June 1st, 2021.  True?

A   Well, that's pretty much most of it.

Q   Okay.

A   It's not objective pounds per square inch, yes.

Q   Okay.  And do you have an understanding as to the conclusion of the study that's represented by the abstract in Exhibit No. 15?

A   One more time, sir.

Q   Sure.  Do you have an understanding as to the conclusion of the study that's represented or that's discussed in this abstract exhibit?

A   Yes, uh-huh.

Q   What is the conclusion?

A   Well, the conclusion is that there is a decrease in ventilation, and it even -- of course, it reports -- it goes on to a metabolic acidosis, you know, which occurs when you have that ventilation reduction, the hypoventilation.  And, you know, of course, that acidosis interferes with ATP in each individual cell.  That's what provides energy for

the cells.  So you experience definite damage at the cellular level.

Q   And I note just in reading the last couple sentences of this abstract, it reads as follows: "Given these findings, deaths associated with prone physical restraint are not the direct result of asphyxia, but are due to cardiac arrest secondary to metabolic acidosis compounded by inadequate ventilation and reduced CO2, and as such, the cause of death in these circumstances would be more aptly referred to as prone restraint cardiac arrest as opposed to restraint asphyxia or positional asphyxia."

So obviously, this abstract -- the conclusion of the article that this abstract is talking about indicates that the deaths you're referring to are not actually restraint asphyxia or positional asphyxia deaths at all, are they?

A   What they're referring to is prone restraint, which I was merely showing as a stepping stone to being held over in the extreme position.

Q   Okay.  What data or source do you have to justify extrapolating from this article that deals with prone restraint to the situation we have in this case which involves an individual partially

strapped upright into an ER seat?

A   Merely basic anatomy.

Q   What about the basic anatomy allows you to extrapolate from this abstract to the situation that we actually have in Mr. James' case?

A   Because the position is much more extreme that prevents the diaphragm from lowering, much more so than prone position.

Q   And upon what do you rely for that conclusion, that the diaphragm was prevented from lowering because of an extreme position in which he was on June 1st of 2021?

A   Basic anatomy, once again.  As a -- as a matter of fact, in her deposition, Nurse Kristiansen was asked about this, this position, and if -- you know, if she thought that this could cause positional asphyxiation.  And I think the question was, based upon your training and experience.  And her comment, I believe was, "well, by anatomy, yes."

Q   Um-hmm.  So you're relying upon Nurse Kristiansen as the only source to support your position that in this case, Mr. James' diaphragm was inhibited in some manner from functioning accurately or working properly?

A   Certainly not as the only source, but just another source to demonstrate that you don't need a medical degree and four years of college to understand basic anatomy.  This is what any nurse can understand.

Q   Okay.  And not needing four years of college means a high school graduate could understand that.  True?

A   I'm sorry, sir?

I was referring to the medical school.

Q   You told me this is basic anatomy that's not even required or that would not even be required of someone who has obtained four years of college education.

Did you not just say that?

A   I was referring to the medical school.

MR. NAFFZIGER:  Objection.  Form.

BY MR. FRANCKOWIAK:

Q   You can answer.

A   So I was referring to a medical degree, four-year medical degree.

Q   Okay.

A   It's not necessary to understand this basic anatomy.

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
www.lexitaslegal.com                               California Firm Registration #179


Q   And that's why I want to make sure I understand.

In terms of this basic anatomy, I'd like you to tell me every study, every paper, every article, every piece of evidence upon which you relied for the statement that you've given me, that in some manner, Mr. James' diaphragm was being inhibited in some way by the position in which he found himself on June 1st?

A   Naturally, I can't give you every article, everything I was -- this is just based upon basic anatomy course.  It's that simple.

Q   Okay.

A   There's nothing -- there's nothing really complex about this.

Q   Okay.

A   So to refer to every possible source, I cannot do that.

Q   Okay.  How about any source, anything at all that you relied upon to come to that conclusion?

A   My education in basic anatomy, yes.

Q   Okay.  And you said this was not complicated, it's something that would -- a layperson could understand?

A   Not a layperson, but once -- once it was explained to them and they visualized the anatomy, perhaps

they would be able to understand that.  I would think so, but it would depend on the individual, of course.

Q   Okay.  Were you able to locate any type of articles or written documents or abstracts that actually dealt with ventilatory capacity of an individual who was partially restrained upright in an emergency restraint chair?

A   Upright?  Upright is not the issue.  It's the bent over.

Q   Okay.  Have you come across any articles, or are you able to cite any articles, or did you look at any articles or subjects of any type which dealt with studies of individuals who were -- or where it was studied, the ventilatory capacity of an individual partially secured in a ER seat?

A   No.

Q   Have you looked at any type of articles or found any type of studies at all that would discuss or analyze the ventilatory capacity of an individual, like in this instance of an individual who is leaning forward while partially secured in an ER seat?

A   No.

Q   That's the situation that we have in this case,

though, isn't it?

A   It is.  And I explained about the -- understanding the anatomy, yes.

Q   As you sit here today, do you know if there are any articles or studies that deal with ventilatory capacity of an individual leaning forward while partially secured in an ER seat?

A   I -- not that I know of.

Q   Okay.  We can obviously agree that Mr. James was never prone at any point while he was in the ER seat.  We've already established that.

We can agree that this study would not be congruent with the facts of this case given that he was never prone in that video that you observed.  True?

A   Once again, sir, what I'm showing is this is a stepping stone positionally that also has severe ramifications, and the position he was held in was much more extreme than this.

Q   Okay.  And I guess that's what I want to figure out.

What is it, if anything, can you point me to that would support that statement other than just being a bald statement on your part?

MR. NAFFZIGER:  Object to form.

You can answer.

A   That I have knowledge of right now, no, but I'm sure many people could.

BY MR. FRANCKOWIAK:

Q   Okay.  When you say "many people could," many people could show me or point me to an article or something like that.

What kind of person would I ask in order to find a basis for the statement that you gave me?

A   What kind of person would you ask?

I guess you could try perhaps a nurse or physician.  I don't know if they, you know, had access to that.

Q   Okay.  Is there anything in writing anywhere that would indicate or that would support your condition that this is -- that this article, Exhibit No. 15, is a stepping stone to the situation that we have here, or that is analogous in any way to the situation that we have with Mr. James' case?

A   Not in writing, but it's an obvious conclusion.

Q   Okay.  When you say "it's an obvious conclusion," to whom would it be obvious?

Case 2:22-cv-00944-PP   Filed 05/05/25   Page 35 of 82   Document #121-2

A   It's obvious to me, and it should be to most people.

Q   Okay.  When you say it should be obvious to most people, which would include laypersons?

A   No, not laypersons.  No.

Q   Who would it include then, someone not a layperson, but someone --

A   Someone medically qualified.

Q   In terms of medical qualifications, what kind of person with medical qualifications would this be obvious to?

A   Nurse, doctor.

Q   Okay.  Have you discussed your opinions with any other nurses or doctors in order to determine whether or not this conclusion would, in fact, be obvious to them?

A   That was not necessary, so I did not do that.

Q   Okay.  It is obvious to you, but that's the only person you can state to whom it is obvious.  True?

A   That's the only thing I can state --

        MR. NAFFZIGER:  Objection.  Form.

        Got to let me do my objections.

    Sorry, Lloyd.

        But objection.  Form.

        Go ahead, man.

A   No.

        MR. FRANCKOWIAK:  Did you answer after that?

BY MR. FRANCKOWIAK:

Q   Do I still have you?  Did you answer that question?

A   You know what?  One more time, please.

        MR. FRANCKOWIAK:  Rosanne, could we read that back?  I kind of lost track of where I am.

        THE STENOGRAPHER:  Sure.

        (Question and answer read.)

BY MR. FRANCKOWIAK:

Q   Okay.  I think that answered the question.

        Did you do any review of any articles or treatises beyond the one that we've marked as Exhibit No. 15 that was mentioned in your report?

A   That's all.

Q   Okay.  Now, we talked a little bit about Dr. Neuman's report and Dr. Ross' report.  Those reports do mention a number of studies.

        Did you seek out or review any of the studies conducted, for example, by Dr. Neuman?

A   I did not seek out their studies, no.

Q   Okay.  Did you do any research into any of the

work that Dr. Neuman or his colleagues have done?

A   I did not.

Q   Okay.  Now, Dr. Ross' report contains a number of references in a section at the end that talks about references.

        Did you make any effort to seek out or review any of the articles or the research cited at the end of Ross' report?

A   I did not look at those.

Q   Have you personally done any research of the medical or the legal literature on the subject of restraint chairs?

A   I have not.

Q   Have you reviewed any medical or legal literature on the subject of restraint chairs for your opinions in this case?

A   I have not.

Q   Have you ever authored anything in the medical or legal literature on the topic of restraint chairs?

A   I have not.

Q   Have you ever personally done any type of research on the subject of weight force during prone restraint and respiratory function?

A   On weight force and respiratory function?

Q   Weight force during prone restraint and

respiratory function.

A   No, nothing beyond just this NIH abstract.

Q   Okay.  Have you ever reviewed any literature other than that abstract on this topic in preparation for your opinions in this case?

A   In my opinions regarding?

Q   Any of the opinions that you offered?

A   Asphyxia, positional asphyxia, or what?

Q   Have you reviewed any literature on the topic of weight force during prone restraint and respiratory function in order to come up with any of the opinions that you've rendered in this case?

A   Like I said, nothing beyond this, right.

Q   Have you ever personally authored any papers or studies on the topic of weight force during prone restraint and respiratory function?

A   No.

Q   Have you ever personally engaged in any research on the topic of custody restraint position and positional asphyxia?

A   No.

Q   Have you reviewed any literature on the topic of custody restraint position and positional asphyxia for the purpose of preparing your opinions in this case?

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
California Firm Registration #179

LEXITAS

Case 2:22-cv-00944-PP   Filed 05/05/25   Page 36 of 82   Document 121-2

A   No.

Q   Have you ever authored any papers or studies on the topic of custody restraint position and positional asphyxia at any time?

A   No.

Q   Have you ever personally conducted any research on the topic of the ventilatory effects on human subjects in prolonged hip-flexed, down-restraint position?

A   Nope.

Q   Have you ever reviewed any the documents or medical literature on this topic in preparation for your opinions in this case?

A   And this topic is?

Q   Okay.

A   What topic -- okay.

Q   What medical literature or documents did you review on the topic of the ventilatory effects on human subjects in prolonged hip-flexed, down-restraint position?

A   No, I have not.

Q   Okay.  Have you ever authored any papers or studies on this specific topic?

A   No.

Q   Have you ever personally done any research on the

topic of spit masks or spit socks on human respiration?

A   No.

Q   Have you done any research on that topic in the preparation for your opinions today?

A   No.

Q   Have you written any papers or studies on the topic of spit masks or spit socks on human respiration?

A   No.

Q   Have you ever done any personal research on the topic of the use of OC Spray or the effects of OC Spray on human ventilation?

A   No.

Q   Have you reviewed any literature on that topic in preparation for your opinions in this case?

A   No.

Q   Have you ever written any papers or studies on that topic at any time?

A   No.

Q   Have you ever personally done any research on the topic of applied force during prone restraint?

A   No.

Q   Have you reviewed any literature on the topic of applied force during prone restraint for your

opinions in this case?

A   Nothing beyond this NIH study.

Q   Okay.  Have you ever authored any papers or studies on the topic of applied force during prone restraint?

A   No.

Q   Okay.  Have you ever personally done any studies or research on the topic of the ventilatory and metabolic demands of a human being during aggressive physical restraint?

A   Once again, nothing beyond this NIH abstract.

Q   Have you ever written any papers or studies on the topic at any point in the past?

A   No.

Q   Have you ever personally conducted any studies or experiments on the topic of the effect of prone maximal restraint position with and without weight force on cardiac output and other hemodynamic measures?

A   I have not.

Q   Have you ever reviewed any medical literature on the topic of the effect of prone maximal restraint position with and without weight force on cardiac output and other hemodynamic measures in preparation for your opinions in this case?

A   I have not.

Q   Have you ever written any papers or studies on this topic at any point in your career?

A   No.

Q   Have you ever personally done any studies in the area of the evaluation of the ventilatory effects of a restraint chair on a human subject?

A   No.

Q   Did you review any studies or literature on that topic for the preparation of your opinions in this case?

A   No.

Q   Have you ever authored a paper or studied on the topic of the ventilatory effects of a restraint chair on a human subject?

A   No.

Q   Have you ever performed any research in the areas of psychiatric or mental healthcare provided in a jail setting?

A   Repeat that one more time, sir.

Q   Sure.  Have you ever personally performed any research in the areas of psychiatric or mental healthcare provided in a jail setting?

A   Only in regards to suicidal ideation, and I can't cite the actual source at this point in time.

Case 2:22-cv-00944-PP   Filed 05/05/25   Page 37 of 82   Document #121-2

LEXITAS

Q   Okay.  Was that something -- was that a study or an experiment that you were a writer or a signatory on?

A   No.

Q   So you've never performed any research in the areas of psychiatric or mental health provided in a jail setting.  True?

A   True.

Q   Did you review any literature on the topic of psychiatric or mental healthcare provided in a jail setting for the preparation of your opinions in this case?

A   Not for this case, no.

Q   Okay.  And you've never authored any papers or studies on that topic?

A   No.

Q   Okay.  Have you ever participated or written any studies on the subject of the diagnosing of psychiatric or mental healthcare conditions?

A   No.

Q   Did you review any studies or literature on the topic of diagnosing psychiatric or medical or mental health conditions in the preparation of your opinions in this case?

A   No.

Q   Have you ever been a contributing author on any type of paper or study on this topic at any point in your career?

A   No.

Q   Have you ever personally participated in any research or studies on the efficacy, indications, or contraindications of any psychotropic medication in treatment of a given psychiatric or mental health condition?

A   No.

Q   Did you review any literature or studies on this specific topic in the preparation for your opinions in this case?

A   No.

Q   Have you ever authored or contributed to any type of paper or report on this topic?

A   No.

Q   Have you ever personally participated in any research or study specifically on the topic of the diagnosis of any given mental health disorder?

A   No.

Q   Have you reviewed any research or papers on that topic in preparation for your opinions in this case?

A   No.

Q   Have you ever authored any papers or studies on this particular point?

A   No.

Q   I believe you testified earlier that you have at least some familiarity with restraint chairs used in a correctional setting from having seen them utilized at some point?

A   That was actually not in a correctional setting.  It was in an ICFIID.

Q   And what -- can you explain what that is?

A   Intermediate care facility for the intellectually disabled.  It was an individual that had dual diagnoses, both mental illness and NID, and they used the restraint chair on occasion for this individual.

Q   And you have -- so you've never actually either participated -- well, strike that.  Let me ask that specifically.

Have you ever participated in securing someone in a restraint chair personally?

A   No.

Q   Have you ever even seen the use of a restraint chair in a correctional or jail or prison setting?

A   You know, not in correctional or jail.

Q   Okay.  In a situation where you did see it, it was

in a facility specifically for intellectually disabled individuals, and that chair -- strike that.

How many times did you see a restraint chair used in that setting?

A   It was just one time.

Q   Okay.  And did that chair -- can you describe the appearance of that chair in comparison with the chair that you saw in the video of this particular patient?

A   You know, it seemed very similar, you know, in that it would recline ever so slightly, and the arms and legs were secured, along with the torso, you know, to hold the individual -- hold the individual in there.

Q   Okay.  In that particular chair that you personally saw used, was there a place on the chair or room on the chair, for example, for an individual to have the -- his or her hands cuffed behind them before the arms were strapped to the chair?

A   No.  No, not cuffed.  They were just secured to the side, arms down.

Q   Okay.  Do you -- did you have an understanding as to what the use of that chair was or why it was

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

LEXITAS™

Case 2:22-cv-00544-PP   Filed 06/09/25   Page 38 of 82   Document 121-2

Q used?

A No, of course.

Q What was the use or the purpose of that chair from what you observed?

A It was emergency situation where the individual was very violent, and they put him in that chair both for his protection and staff's protection until he calmed himself.

Q As you sit here today, is it your understanding that that exact purpose was the one that was attempting to be achieved in this case for Mr. James?

A Well, yes, the purpose was to prevent him from banging his own head.

Q Okay. I want to reference briefly Exhibit 14, which is the selection of the standards taken from the NCCHC.

If you could just look at that -- do you have that in front of you?

A Yes.

Q Okay. Looks like the first standard taken from that book is entitled "Health Training for Correctional Officers."

Do you see that?

A I do.

Q Why is it that you selected this particular standard to be included on Exhibit 14?

A Basically, because you wouldn't expect the officers to notify Mental Health of each incident where this individual was banging his head, you know, had to be tased, had to be pepper sprayed to get him into the chair, you know, repeatedly.

And there was no communication to nursing or Mental Health. I suppose nursing was involved to a certain degree once they were in there because there was notification of checks, you know, to make sure the extremities are okay, the circulation is all right, but there was no -- Mental Health never mentioned it, so that's why I brought the -- or was never made -- apprised of each individual situation.

Q So it's your -- just so I understand, it's your understanding from having reviewed the materials in this case that there were a number of occasions, for example, when Mr. James was noted to be, say, hitting his head on the wall or the mirror in his cell. True?

A Yes, uh-huh.

Q Okay. And it's your understanding from the materials you reviewed, that in each of those

occasions, it was not communicated to the mental health providers that this was occurring?

A I cannot come across any evidence that it had been.

Q Okay. So for your understanding, at least based upon your review of the materials, is that the mental health providers who were providing care to Mr. James were never aware of the fact that he was banging his head on the jail cell wall. True?

A I don't know that they were never aware, but it seems like for the number of instances, they didn't reference those in their reports about banging the head.

Q There's nothing that you can point to to conclude that they were ever notified at any point on June 1st or anytime earlier that he had been banging his head. True?

A Yes.

Q Okay. And that's why you included this first standard in this Exhibit No. 14?

A Yes, uh-huh.

Q Okay. So the second standard is "Mental Health Screening and Evaluation" is what it's entitled there.

Did I read that correctly?

A Yes.

Q Okay. And then there's a section called "Compliance Indicators" under that.

Do you see that?

A I'm scrolling.

Yes, um-hmm.

Q Compliance indicators, there's a list of numbered things there. It looks like it's numbered 1 through -- through 8.

Do you see that?

A Yes, uh-huh.

Q It looks like this is taken from Page 96 of that NCCHC manual, at least down on the left side there at the bottom of the page. Do you see that?

A Oh, yes, uh-huh.

Q Okay. So under No. 1 there, it says, "Mental health screening is performed as soon as possible, but no later than 14 calendar days after admission."

Did I read that correctly?

A That's correct.

Q Okay. So under the NCCHC -- NCCHC standards, which we've already established are not representative of the standard of care, a mental health screening can be performed permissibly

888-893-3767    Lexitas operates in all 50 states and is licensed where required. Nevada Registration# 116F
www.lexitaslegal.com             California Firm Registration #179          LEXITAS

Case 2:22-cv-00544-PP   Filed 05/05/25   Page 39 of 82   Document 121-2

anytime between day 1 and day 14 after an inmate's admission to a facility. True?

A   That is correct, but again, when you -- when you mention these standards, these standards and the other organization I mentioned before, these are the only written standards for health facilities.

I know you call it, you know, aspirational, but this is all that you will -- you will find as far as written standards go.

Q   Um-hmm. And certainly, a mental health or a correctional health provider or a jail don't need to look at or rely on any written standards because there is no written standard that is required of them. True?

A   Well, for best practices, they should, and -- but as far as any particular law or regulation, they have a little bit more free reign, yes.

Q   So at least according to this first standard here, a mental health screening could be performed in compliance with this standard all the way up until, say, day 13 of -- of any --

A   Right. Oh, so sorry. I didn't mean to speak over.

Q   Sure.

A   Yes, this is true, but what this refers to is a

more in-depth standard. For any initial screening, there is always, you know, the basic -- basic evaluation, you know, for emergencies for mental health.

Q   Okay.

A   So what this refers to is the more in-depth, right, mental health evaluation assessment.

Q   So if indeed Mr. James had had a mental health screening at any time up to day 14, this standard would have been met?

A   Yes.

Q   Okay. And then we go down, and it looks like under No. 6 it says as follows: "Mental health evaluations of patients with positive screens should be completed within 30 days or sooner if clinically indicated."

Did I read that correctly?

A   Indeed.

Q   Okay. So a mental health evaluation of a patient who has screened positive for some sort of mental health issue can be completed and still be consistent with the standard if done anytime within the first 30 days after admission to the facility?

A   Let's take another look, shall we?

Let's see exactly. I didn't follow you reading along.

Which -- which is -- where is the section you're referring to, specifically?

Q   No. 6, it says, "Mental health evaluations of patients with positive screens should be completed within 30 days or sooner if clinically indicated."

A   Yes, uh-huh.

Q   Okay. Good.

A   Yeah.

Q   So that under No. 1, a mental health screen can be performed at any time within 14 days, and then a mental health evaluation of a patient who screened positive can then be completed at any time within 30 days of admission to the facility?

A   Right, within more in-depth, right, right.

Q   Okay.

A   But, you know, it's a little -- it's a little redundant. I mean, there's mental health screening when they come in. I mean, that's part of their initial screening.

Q   You know --

A   You know, this is a little bit more in-depth, and then if there is a problem, they really go into the 30 days, yes.

Q   Okay. Okay. So how many days in total was Mr. James in the Racine County Jail between the time of his admission to the jail and the time of his passing?

A   Oh, let's see.

When did he come in, on the 29th? And then it was June 1st, I guess?

Q   Okay. So it looks like perhaps five days or so, four to five days he was in the jail in total?

A   Yes.

Q   Okay. So even if no mental health screening had been done during the entire time he was there, this particular standard of the NCCHC would not even have been violated because the facility was not under a requirement to do a mental health screening or an evaluation of a positive screen within the first five days. True?

A   Give it to me one more time, sir. Repeat that, please.

Q   Sure. Even if we were to assume that no mental health screening was done for Mr. James or no mental health evaluation was carried out for him, neither the jail nor MEnD would have been inconsistent or in violation of this policy because this particular standard does not require

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

a health screening or a health evaluation within the first five days of a patient's stay.

A   I suppose in that respect, sir, yes.

Q   Okay.  Okay.  Now in this case, he actually did receive some screening, Mr. James did, and was seen by Mental Health.  True?

A   Yes, he was screened twice with the recommendation of talk therapy, which was never instituted and really couldn't be instituted when you look at his behavior.  But you would expect Mental Health, which they actually -- I think on the second one, the second mental health report, it actually -- there was a box checked to -- I forgot the actual terminology, but basically to get ahold of physician for psychiatric medication or a referral.  That was done on the second one, although it also included talk therapy with that referral.

Q   I'd like to reference Exhibit No. 17, if you could.  If you're able to pull that one up.  That's the one that we provided a copy today.

A   Oh, 17.  Hang on.

Q   Yeah, the five-page document?

A   Okay.

Q   And do you have it?  Does yours contain five

pages?

A   Yes.

Q   Okay.  Now, this was taken from the chart for Mr. James from his medical records.  It's entitled "CMS Medical Screening" at the top there.  Do you see that?

A   I do.

Q   And it's got a -- it's got like a sheriff -- Racine County Sheriff's little symbol there on the top left on Page 1.  Do you see that?

A   Yes.  Yes.

Q   And then if I look down on Page 5 of this, there's an inmate signature line that bears the signature which appears to be that of Mr. James, and it's dated 5/29/2021 at 0338 in the morning.

A   Um-hmm.

Q   Is that accurate?

A   I see it, uh-huh.

Q   Did you happen to review -- in part of your review of the medical records, did you happen to review this screening?

A   You know, it would have been quite some time ago, but it does look familiar.

Q   Okay.  It looks like there's a number of various

screening questions.  Is it your understanding that a number of questions were put to Mr. James and he gave answers to those questions when he was initially being admitted to the jail?

A   Right.  This is the initial screening, yes.

Q   Okay.  Okay.  And when we look at the bottom of Page 2, there's a section Roman Numeral II, "Mental Health Screening."  Do you see that?

A   I do.

Q   Okay.  Now, do you have any reason to believe that the answers Mr. James were giving were not true and accurate, at least as they appeared to him on the day he was giving them?

MR. NAFFZIGER:  Objection.  Foundation.
You can answer.

A   At least as they appeared to who?

BY MR. FRANCKOWIAK:

Q   Do you have any reason to believe that he was not giving true and accurate answers or that he was deliberately lying to the questioners who were asking these questions to him?

A   Well, only upon additional review where he has been in this jail with mental illness problems

repeatedly before and also looking at his -- you know, he had just been to the hospital, and obviously, you know, he admitted that he was suicidal and was under suicidal watch.  So I don't think he was being truthful in this No. 11.

Q   Okay.  Okay.  In your experience, does a healthcare provider or a correctional healthcare provider often have to rely upon the accuracy and the truthfulness of the inmate that they're attempting to help?

A   Well, in the initial screening, yes.  And especially if they've never been there before.

Q   Okay.  And certainly, it does not do the inmate any favor if he is not being forthcoming to the healthcare provider because it might affect their ability to offer him the appropriate care or accommodations if he's not being truthful.  True?

A   That's true, although I did say they did have him on suicide watch, so they were aware that he had some problems here.

Q   Okay.  And in terms of his problems, there was some concern that he might -- he might commit suicide, so he was placed on suicide watch.

A   That's true.

Q   Is that your understanding?

A Yes.

Q Okay. Okay. Now, under -- at the bottom of Page 2 of Document No. -- or Exhibit No. 17, it looks like section A there under mental health screening reads as follows: "Have you had any past mental health treatment? If yes, please explain what type of treatment, and who is your mental health professional."

And the box is checked for "no."

Do you see that?

A I do see that.

Q So when he was screened, of course, he told the screening questioner that he had no past mental health treatment and he was not under treatment with any mental health practitioner. True?

A That's what he said, yes.

Q Have you been able to identify any mental health treater at any point with whom he was treating at any point in the past?

A There was notations in the hospital documentation, yes.

Q Okay. Are you able to indicate or name that individual or indicate why he was being treated or for what -- or for what purpose he was being treated?

A I know that he was taking -- in the hospital, it said medication for, I do believe, depression and anxiety. I would have to take a look to confirm that, but I -- that's what I do recall.

Q Okay. And beyond depression and anxiety, you don't recall him taking any other medication or having any other type of mental health diagnoses that preexisted his stay in the jail in 2021?

A Well, like I said, he has been in this jail previously, and there was notations of mental health problems.

Q And what mental health problems of which there were -- there was any history from this jail previously?

A Sir, I -- I don't recall.

Q Okay. Do you recall, as you sit here today, seeing any diagnosis for this man on any previous visit to this jail or at any hospital encounter other than a diagnosis of depression?

A I did not.

Q Okay. So as you sit here today, you are not aware that he had ever been diagnosed by a clinician with any type of mental health condition other than perhaps depression?

A This is true.

Q When we look at subpart B on the top of Page 3, the next question posed to Mr. James was: "Have you recently seen a mental health professional? If yes, when and where?"

The box for "no" is checked.

Do you see that?

A Yes.

Q Okay. So he was indicating to the screener that he had not recently seen a mental health professional, and he did not identify anyone or indicate that he had recently been seen at any given point in time that was close to the date of his admission to the jail. True?

A Correct.

Q Okay. The next question says, "Have you recently been hospitalized for this problem? If yes, when and where? How many times?"

The box for that, again, is checked "no."

Do you see that?

A Yes.

Q Okay. And did you notice in your review of the records any point -- at any time in his life, for the 27 years of his life, that he had ever been hospitalized for any type of mental health or

psychiatric issue?

A I did not.

Q Okay. Now, it does look like he did have a history or medical records that you were able to review going back several years. True?

A Yes, uh-huh.

Q Okay. Based upon your review of that -- those records, would it be fair to state that when he felt he needed to see a doctor or to obtain medical care, he knew where to do it and was not shy of obtaining that care to the extent needed?

A That's the way it appears.

Q Okay. And at no time did any of his providers ever diagnose him or hospitalize him for any type of mental health disorder. True?

A Not that I saw.

Q Okay. And then it looks like question D there, it says, "What medication do you take for this mental health problem, and when did you take the medication last?"

The notation under that question is "none."

Did I read that correctly?

A Yes, uh-huh.

Q Okay. So he told the questioners then upon his

888-893-3767 Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
www.lexitaslegal.com California Firm Registration #179

Case 2:22-cv-00944-PP Filed 05/05/25 Page 42 of 82 Document 121-2



admission to the jail that he was, in fact, taking no medications for a mental health problem, and he could not indicate when he last took such medication. True?

A   That's true.

Q   Okay. Finally, the last question there is, "Do you currently reside at a group home," and his answer is "no."

I assume you did not see anything from the records you reviewed that would indicate that that is not an accurate statement?

A   That's correct.

Q   Okay. Now, we talked a little bit about the last two records that I was going to reference before we go back to your report, and that is Exhibit 18 and Exhibit 19. Both of them are one-page documents. I'd like to look at 18 briefly, if we could.

A   Give me a second here.

Okay. I've lost it. Now I'm going to have to go back for a second.

MR. NAFFZIGER:  What was the number again, Jason?

MR. FRANCKOWIAK:  Sure.  This is Exhibit No. 18.  It's a one-page document entitled "Mental

Health Clinical Context/Monitoring."

MR. NAFFZIGER:  I got it.

A   Okay. That's in a different e-mail. Give me one second here.

Okay. I have 18.

BY MR. FRANCKOWIAK:

Q   Okay. You have it in front of you. This is a one-page document. This one is dated 5/29/21. And I think you mentioned briefly in your testimony this document a little bit earlier.

This was a time -- the first time that he was seen by a mental health professional at the jail. True?

A   Yes. Yes.

Q   Okay. And this is seen by a mental health professional by the name of Melissa Olsen, O-L-S-E-N. And again, it looks like this was on perhaps the morning of 5/29/21 at 8:55 a.m. And there's some notations, written notations there.

Do you see that?

A   Yes.

Q   Okay. There's also some -- under mental status, there's a number of things there that are circled.

For example, appearance, motor activity, and speech are all circled "normal."

True?

A   Yes.

Q   And consciousness orientation, he was alert and fully oriented. True?

A   Yes.

Q   Okay. And it looks like his memory was normal, his attention and focus was good, his thought form was linear and goal-directed. His thought content was no abnormalities, and perception, once again, no abnormalities.

Do you see that?

A   I do.

Q   Okay. And then we look under the relevant history, inmate's reported concerns, and there's some handwriting there about a conversation that this health provider had with Mr. James that day.

And we go down a couple of sentences, and it's down on the little right-side section there. It says, "Denies specific trigger" -- it looks like "mechanism leading to his attempt, but rather a buildup of things." Then the next line says, "Denies any mental health treatment or meds."

Do you see that?

A   I do.

Q   Okay. So at the time he was first seen on May 29th by a mental health provider by one of MEnD's mental health providers, he was denying any type of mental health treatment or any medications. True?

A   That is true.

Q   Okay. Now, as a diagnostic impression there at the bottom, pending further evaluation, current depression is depression -- or current treatment or diagnosis is depression.

Do you see that?

A   That was the impression, yes.

Q   Okay. And there's no other, I guess, diagnosis, in fact, other than depression.

Do you see that?

A   Yes.

Q   Okay. And that's consistent with your recollection of the rest of his records in which none of the clinicians who saw him during the first 27 years of his life had diagnosed him with any type of mental health condition other than depression?

A   Yes.

Q   And he was certainly on suicide watch, at least in part, because of suicidal ideation and depression?

Case 2:22-cv-00544-PP Filed 06/05/25 Page 43 of 82 Document #121-2

Page 173

A   Yes.  I don't know if it's in this statement here where he denied suicide and then he made a quote and says, "You know what?  Yeah, I was."

But yes, that is correct.

Q   In either event, they took him seriously, and the jail and the MEnD made sure that he was on suicide precautions in order to protect him --

A   Right.

Q   -- from potential suicidality.  True?

A   Yes.

Q   And certainly, that's reasonable, and you don't have any criticisms of that?

A   No.  Absolutely not.

Q   Okay.  Do you know what day of the week May 29th was?

A   I don't recall.

Q   Okay.  Do you know what days of the week there was a mental health practitioner available to see patients at the jail in 2021?

A   I don't know that either.  I just -- I was a little curious about their schedule because it says for both of them, just next follow-up is the next clinic day, whatever -- I guess it must be a scheduled day, clinic day.

Q   Okay.

Page 174

A   That was the question that I had, but I don't know.

Q   And when you reviewed the case, you were not aware of what that means, "next clinic day"?

A   No.

Q   Okay.  I will represent to you that May 29th of 2021 was a Saturday, so this event, this encounter in Exhibit No. 18 occurred on a Saturday morning.

Do you have any -- or when you looked at this case, initially reviewed this case, were you aware that Monday, May  20 -- or May 31st was, in fact, Memorial Day of 2021?

A   No.

Q   Okay.  So that Monday was, in fact, Memorial Day, which, of course, is a national holiday.

Were you aware when you reviewed this case that the next clinic day after the 29th would be Tuesday, June 1st, owing to the fact that the 30th was a Sunday and the 31st was a national holiday?

A   I did not.

Q   Okay.  And, in fact, the next time that he was seen on the next clinic day was the encounter that is memorialized in Exhibit No. 19.

Do you have No. 19 in front of you?

Page 175

A   You're going to have to give me a second here.  Okay.  Yes.

Q   Okay.  Exhibit No. 19 is also entitled "Mental Health Clinical Contact/Monitoring," and this appears to be the second time that he was seen by a mental health professional during his time in the jail in 2021.  True?

A   Yes.

Q   Okay.  And this one, it looks like you mention this one in your report as well.  It looks like there is a line through the mental status section.

Do you see that?

A   Yes.

Q   And there is a notation there, "refused."  In other words, apparently, he refused to be cooperative with the mental health treater who was attempting to meet with him that day.

Any reason to doubt that?

A   No.

Q   Okay.  It says under relevant history there, "This is a follow-up due to" -- I believe that is "suicidal ideation status."

"Inmate seen at cell front due to security concerns.  Inmate remains sitting on the bunk with head down and refused to answer any

Page 176

questions."

Do you have any reason to doubt that he was, in fact, refusing to answer questions or otherwise cooperate with this assessment?

A   No.

Q   Okay.  And then at the bottom, there's a little follow-up notation there.  It says, "Next follow-up would be the next clinic day."

Did I read that correctly?

A   Yes.

Q   Okay.  And if this is Tuesday, June 1st, the next clinic day would be Wednesday, June 2nd.

Do you have any reason to doubt that that would be accurate?

A   I presume if they have clinic every day, I guess that's it.

Q   Okay.  Okay.  And then under that it says, "Supportive talk therapy."  That's a box that's checked.  And then there is another box checked, "Referred to medical provider for medication consideration."

A   Right.

Q   Do you see the box checked there?

A   Yes, I referred to that earlier.

Q   And then there's handwritten in parentheses there,

888-893-3767   Lexitas operates in all 50 states and is licensed where required   Nevada Registration #116F
www.lexitaslegal.com                                     California Firm Registration #179

"Already on list for provider."

Do you understand what that means?

A   Well, I presume that when they -- I really don't know, just that box is checked that they already put him on the list, or it could mean the individual from the floor put him on the list or perhaps one of the nurses decided, "Hey.  You know what?  I think this guy needs something going on here."

They put him on the list, so I can't tell for sure.  But I don't know.

Q   Do you have any understanding as to when the provider was scheduled to see him?

A   I do not.

Q   Okay.  Based upon this notation, however, we know that he had been identified as someone who could and would be seeing the provider, whenever that provider was next -- had the ability to see him?

A   Right.

Q   Okay.  Obviously, however, June 1st of 2021 was the date when Mr. James passed away and thus never had an opportunity to see a provider.  True?

A   Yes.

Q   Okay.  So we can tell at least from Exhibit No. 19 that, in fact, he was being seen and followed

regularly on clinic days, and that he had been identified and was scheduled to see a provider; he just never -- or did not live long enough to see that provider.  True?

A   That's the way it looks, uh-huh.

Q   Okay.  Certainly, there's no evidence that you could see in this case that MEnD or any of its mental healthcare providers were in any way ignoring his mental health needs or not attempting to meet those needs.  True?

A   It doesn't seem that way.

Q   Okay.  And, in fact, I would assume there's also no indication that you've seen from these records that any of MEnD's nurses were not attempting to offer him whatever he needed or to deal with any of his medical or mental health needs.  True?

A   Not that I saw.

Q   Okay.  There's nothing that you saw from the notations about the mental healthcare to indicate that any given mental healthcare providers or that anyone associated with MEnD had any -- bore any ill will toward Mr. James or did not have his best interests in mind?

A   No.

MR. NAFFZIGER:  Object to foundation.

You can answer.

A   I suppose not.

BY MR. FRANCKOWIAK:

Q   Okay.  Now, I want to return, if I could, to Exhibit No. 14.  This goes back to those NCCHC standards.

A   You're going to have to give me a second here because I have to get back there.  When I pulled out to go here, I've lost that one.

Q   Sure.

A   So I would have downloaded all these if I had them a little bit sooner, but I'm going to the e-mails to bring them up.  And -- okay.

Q   Okay.  We left off on page96 there, which is under that second standard in Exhibit No. 14.

Are you back there?

A   What's the title, or what's the number?

Q   Page 96 at the bottom left-hand corner there.

A   You're on Exhibit 14?

Q   Yes, um-hmm, the NCCHC standards?

A   On page 96, I have seven pages.  I'm a little confused.

Q   Okay.  Yeah, though, this is --

A   You're referring to the page number actually on the --

Q   On the document itself.

A   On the documents.

Q   Right.  So this is the standard entitled "Mental Health Screening and Evaluation."

A   Okay.

Q   Okay.  It's the second standard in Exhibit No. 14.

A   All right.

Q   Okay.  And we've already talked about the Compliance Indicator No. 1 and No. 6.  Under 2, it states as follows:  "Mental health screening may be conducted by qualified mental health professionals or qualified healthcare professionals who have received documented training."

Did I read that correctly?

A   Yes.

Q   Okay.  And then on the next page, there's a definition section, and it actually defines the term "qualified mental health professionals."

Do you see that?

A   I do.

Q   Okay.  And the definition for this standard, qualified mental health professionals, "includes psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who, by

Lexitas operates in all 50 states and is licensed where required Nevada Registration #106F
California Firm Registration #179

LEXITAS

their education, credentials, and experience, are permitted by law to evaluate and care for the mental health needs of patients."

Did I read that correctly?

A   Yes.

Q   Okay.  So only someone who meets that definition of qualified mental health provider under this standard would be the ones who would do a medical or a mental health screening under this standard. True?

A   True.

Q   Okay.  And I think we can establish or we have established that you, as a nurse, would not meet the definition under this standard of qualified mental health professional.  True?

A   True.

THE STENOGRAPHER:  I'm sorry.  Did you say "true"?

A   I did.  Sorry.  Sorry if I'm talking over --

BY MR. FRANCKOWIAK:

Q   Is that a true statement?

A   Yes.

Q   Okay.  Okay.  Finally, the last -- the third and final section of Exhibit No. 14, the last standard is called "Restraint and Seclusion."

Do you see that?

A   I do.

Q   Okay.  And it looks like there's a section there called "Compliance Indicators," and then there are two different sections, No. 1 and No. 2 there.

The first one says, "With regard to clinically ordered restraint and seclusion," and No. 2 says, "with regard to custody-ordered restraints."

Do you see that?

A   Yes.

Q   And then it looks like for the purpose of this case, is it your understanding that Mr. James was ordered placed in the restraint chair, that was a custody decision rather than a healthcare decision.  True?

A   Yes.

Q   Okay.  Now, based upon your review of the materials in this case, is it your understanding that typically when an individual was placed in the restraint chair that the nursing staff would come by to check the straps, for example, to make sure that the straps were not too tight, things of that nature?

A   Correct.

Q   Okay.  And all of the witnesses have testified so far that that duty to check the straps and to check the inmate begins at the point where the inmate is completely secured in the chair.

Do you have any reason to doubt that?

A   Nope.

Q   Okay.  In fact, for security purposes and safety purposes, it would be required that the inmate be fully secured before the nursing staff was able to have access to be able to check those straps. True?

A   Yes.

Q   Okay.  In this particular case, at any time on the evening of June 1st of 2021, based upon what you saw on the video, obviously, Mr. James was at no time fully secured in the restraint chair.  True?

A   Yes, that is true.

Q   For instance, they never --

A   At that -- yes, on that date -- okay.

Q   For instance, they never had an opportunity to fully secure his arms and his upper body because they --

A   Right.

Q   -- were not able to get that far because they had

to remove the barb from his back.  True?

A   Yes.

Q   So we would agree that there was never a point in time on June 1st of 2021 in which Nurse Kristiansen could have or should have done any type of, I guess, checking on his straps because he was never fully strapped in?

A   Checking on the straps?

Q   Yes.

A   No.

Q   Okay.  My statement is correct, there was never a point in time where she was able to do that because he was never fully restrained?

A   Right.

Q   Okay.  If you look on the final page of Exhibit No. 14, there's a little discussion section there.

Do you see that?

A   I do.

Q   Okay.  And it says, "When clinically ordered restraint or seclusion is used, it should be employed for the shortest time possible in keeping with current community practice.  Inmates are not restrained in an unnatural position, e.g., hog-tied, facedown, or spread-eagle."

Did I read that correctly?

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
www.lexitaslegal.com                                                 California Firm Registration #179

Page 185

A    Yes.

Q    Okay.  And we can agree in this case, Mr. James was never secured in one of those positions, either hog-tied, facedown or spread-eagle.  True?

A    Not that I saw.

Q    Okay.  And there's nothing in your report to indicate any criticism in terms of the duration with which he was secured on June 1st in that chair.

Would it be fair for me to assume you hold no such opinions?

A    For the duration prior to the bent-over position, yeah, I agree with that --

(Multiple speakers.)

BY MR. FRANCKOWIAK:

Q    Okay.

A    -- until that point in time.

Q    You hold no opinions, for example, that he was secured in the chair or partially secured in the chair for a period of time that was unacceptably long or anything like that?

A    Not when he was almost upright.

Q    Okay.  When we look under there, it says, "Examples of custody-ordered restraints include," and do you see that under No. 8?

Page 186

"Emergency restraint chair, a chair designed to transport a subject while restraining the arms, legs, shoulders and chest."

Did I read that correctly?

A    Indeed.

Q    Okay.  And so at least according to the NCCHC standards, certainly the use of an emergency restraint chair was contemplated and was identified as an example of a reasonable custody-ordered restraint.  True?

A    Oh, there's no issue there, yes.

Q    Okay.  All right.  Now, I want to talk about your report, but before we really dive into that report, I want to just make sure I understand about the opinions you do not hold as well as the opinions that you do.

A    Well, okay, but let me just -- let me just say the reason that I included that particular standard, if you do look at my report, we're looking at 1F where patients are not restrained in a position that could jeopardize their health.

And 2C, "When health staff note use of restraints that may be jeopardizing an inmate's condition, this is communicated to Custody immediately."

Page 187

That was the reason that I included that.

Q    Okay.  And we will certainly be discussing those opinions as we go along.

You will not be offering any opinions on the standard of care applicable to the actions of any correctional officer in this case.  True?

A    One more time, sir.

Q    You will not be offering any opinions on the standard of care applicable to the actions of any correctional officer in this case.  True?

A    True.

Q    You will not be offering any standard of care opinions relative to the cause of Mr. James' death.  True?

A    Not the -- true.  Perhaps contributing -- anyway, yes.

Q    You will not be offering any opinions as to any medical diagnoses that Mr. James had beyond those that are preexisting and set forth in his medical records?

A    This is true.

Q    Okay.  You will not be rendering any expert opinions into the standard of care applicable to

Page 188

any mental healthcare provider?

A    True.

Q    You will not be rendering any opinions relative to the standard of care applicable to a correctional medicine provider in the provision of mental health treatment?

A    True.

Q    You will not be rendering any opinions on the pharmacology of psychotropic medications?

A    True again.

Q    Okay.  You will not be offering any opinions on the appropriateness, the indications, or the contraindications for any given psychotropic medication in the treatment of a specified mental health disorder?

A    True.

Q    Okay.  Now, we'll talk about your report.

In preparation for your initial report, did you have an opportunity to read Mr. James' hospital and jail medical records?

A    Yes, I did.

Q    Are you able to identify for me every medical condition with which he had been diagnosed as of April 29th of 2021?

A    Off the top of my head, no.

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

Case 2:22-cv-00544-PP   Filed 05/05/25   Page 47 of 82   Document 121-2

Page 189

Q   Okay.  And the same question for every mental health condition that he had been diagnosed with up to May 29th of 2021:  I believe we've already discussed that, and you were not able to identify any such condition other than perhaps depression.

A   True.

Q   Okay.  Are you able to identify for me, as you sit here today, any medications, if any, that Mr. James was taking as of May 29th of 2021 for any condition?

A   That I could identify or could not identify?  I'm sorry, sir.  How did you state that?

Q   Sure.  As you sit here today, are you able to identify any medications that he was taking as of May 29th, 2021?

A   No.

Q   Okay.  Okay.  I'm going to ask a series of questions now dealing with your initial report.  We've spent most of the time on your initial report.  I'll just have some follow-up questions on your other report since they're much shorter.  Exhibit No. 11 is the report in question that I'm talking about.

MR. NAFFZIGER:  Jason, do you mind if we take a five-minute break?

Page 190

MR. FRANCKOWIAK:  Yeah, why don't we go ahead and take a five-minute break?

MR. NAFFZIGER:  That would be great.  Thanks, guys.  Be right back.

MR. FRANCKOWIAK:  Back in five.

(Brief recess taken from 2:20 p.m. to 2:28 p.m.)

BY MR. FRANCKOWIAK:

Q   When we last left off, we were about to start talking about Exhibit No. 11, which is your first report.

Do you have a copy of that report that you can reference as we go along?

A   I do.

Q   Okay.  I'd like to go -- just skip forward to page 3 of the report, if we could.  There's a reference there under section Roman Numeral V.  It says, "Summary of document and video review."

Do you see that?

A   Yes.

Q   Okay.  And I guess it starts on May 28 of 2021 when Mr. James was initially picked up by the police department and was taken to a hospital to be assessed.

And do you recall reading that?

Page 191

A   Yes.  Okay.

Q   He was taken to Ascension All Saints - Spring Street Campus, and the reason for his visit at that time was indicated in his records as being for a psychiatric evaluation and for smoke inhalation.

Does that comport with your recollection?

A   Yes, uh-huh.

Q   Okay.  There was some mention in there about the Racine County Crisis Mobile Response Team, and you mention that in paragraph 2 on -- under the section entitled "Summary of Document and Video Review" on page 3.  True?

A   Yes.

Q   Okay.  You indicate on there that "Crisis Mobile, this team is a division of Racine County Health Services with qualified mental health individuals who specialize in providing mobile crisis intervention assessment and referrals."

A   Right.  Apparently, they were in the -- were in the hospital, and they were told, you know what, he's going to jail.

And so that was the extent of their interaction there.

Page 192

Q   Where did you get this information in terms of what the Racine County Crisis Mobile Response Team was?

A   You know what?  I had to find that online, and that was under their -- their website.  That's what it said they do.

Q   And on that website, it indicated that "Crisis staff will assist in developing response plans to provide information and resources to meet an individual's service needs."

Is that something that you saw?

A   I believe so, yes.

Q   Okay.  Do you have any information in terms of what type of response plan or what type of information and resources would be provided by this crisis response team?

A   Do I have any idea, specifically?

Q   Right.

A   Specifically, no.

Q   Okay.  Do you have any understanding as to whether or not this Racine County Crisis Mobile Response Team had any type of relationship with any actual treatment facility such that they had the authority or the ability to obtain inpatient treatment for an individual, even if they wanted

888-893-3767                    Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
www.lexitaslegal.com                                California Firm Registration #179

LEXITAS

to?

A   I was under the impression they do not have a facility themselves, but they would try to find an appropriate bed --

(Court reporter asked for clarification.)

A   Bed, a facility.  A bed in a facility.

BY MR. FRANCKOWIAK:

Q   And how do you come to that understanding?

A   You know what?  That was reading about their website.  That's just my understanding.

Q   Okay.  So really all you have to go on is what's in the website?  And it was your --

A   That's correct.

Q   All right.  Your assumption, from what you read on the website, is that they may be able to find a bed for someone?

A   Yes, um-hmm.

Q   Okay.  Did you actually indicate or did you actually see any indication on the website that said they have the resources or ability to find a bed for someone in an inpatient unit?

A   You know what?  I think that I do, but I won't say for sure.  This also was quite a while back.

Q   Okay.  As you sit here today, do you have an

understanding as to what types of mental health facilities or inpatient facilities were even available in the Racine County area in May of 2021?

A   I do not.  I did not research that.

Q   Do you have any understanding, as you sit here today, in terms of whether or not there were any available beds in any type of psychiatric facility in Racine County on May 28th, 29th, or 30th of 2021?

A   No.

Q   Okay.  But even if someone had wanted to obtain an inpatient treatment bed for Mr. James, you would not be able to tell me whether they would even have the ability to have done so under any circumstances while he was in the jail.  True?

A   I would -- like I say, I don't know about the availability, and the jail would have to be in agreement to get it.

Q   I want to flip ahead to Page 4 of your report.  The first full paragraph begins with the line, "After his current jail admission on May 29th, 2021."

Do you see that paragraph?

A   I do, uh-huh.

Q   At the very end of that paragraph, you're talking about the note that we went over.  I believe it was Exhibit 18 from the mental healthcare professional who saw Mr. James on the 29th.

Is that indeed what you're talking about in that character -- in that paragraph?

A   That's what it looks like, towards the end there, right, which we just looked at and referencing talk therapy, and --

Q   Okay.

A   Right.  That's what we saw.

Q   Okay.  And the last line there of that paragraph reads as follows:  "She made no mention of his mental health problems from his last jail admission on October 2nd of 2020."

A   Yes.

Q   What mental health problems are you referencing there in that sentence?

A   You know what?  He had mental health problems also in 2019; the specific ones, I'm afraid I do not recall.  But there was -- he did have a visit to the jail in October, and there were -- there was reference to mental health problems, so -- but I do not recall the specifics.

Q   Okay.  And as we've already discussed, the only

preexisting diagnosis that you've been able to identify for me was depression.  True?

A   Yes.

Q   Okay.  You're not mentioning or not referencing anything other than that in that sentence at the end of that paragraph; fair to state?

A   Right.  Correct.

Q   Okay.  The next paragraph down talks about May 29th of 2021 at approximately 2:15 p.m.

Do you see that?

A   I do.

Q   Okay.  This looks like there's a little quote there or something.  It says -- a narrative note that wrote in quotes, "Prior to encounter with patient, correctional officer warned writer patient is currently going through a mental breakdown," closed quotes.

Did I read that correctly?

A   That was the quote, yes.

Q   Okay.  You're not able to identify the correctional officer who supposedly made that statement, I assume?

A   No, that's just a quote that the nurse wrote.  That is a quote.  That's what he -- those are his words.

Case 2:22-cv-00544-PP    Filed 06/09/25    Page 49 of 82    Document 121-2

 

Q   Okay.  That's a quote that was apparently taken from some unnamed correctional officer.  True?

A   I suppose, yes.

Q   Okay.  And you can't identify that particular officer from that note, I assume.  True?

A   I cannot.

Q   Okay.  And because you cannot identify that correctional officer, I assume it would be fair for me to assume that you cannot or you do not know whether that officer had any type of medical or mental health training to be able to diagnose a, quote, "mental breakdown," closed quotes.  True?

A   Well, yeah, that's not an official diagnosis that a psychological professional would make anyway, yes.

Q   And, in fact, if this quote is attributable to a correctional officer, we don't have any indication that correctional officer has any type of background to be able to make any sort of mental health determination or diagnosis.  True?

A   This is true.

Q   So we can't really make any judgments based upon that because we do not know if there's any actual medical or mental health or psychiatric basis

underlying that layperson's statement.  True?

A   I suppose that's true.

Q   When we go down to that next paragraph, it's the one that starts "May 29th, 2021 at approximately 5:30."  Do you see that?

A   Yes.

Q   This is again referencing, it looks like, one instance where Mr. James was hitting his head against a mirror in his cell.

A   Um-hmm.

Q   And it looks like the last sentence of this paragraph reads, "There was no evidence that custody personnel communicated this self-injurious behavior to mental health personnel."
    Did I read that correctly?

A   That's correct.

Q   Okay.  According to this report, it looks like this appears to be the very first instance where supposedly Mr. James was hitting his head against the mirror in his wall?

A   I -- I guess it is, yes.  I believe so, uh-huh.

Q   As I understand it then, your sentence at the end, that there was no evidence that custody personnel had communicated this behavior to mental health personnel, is because you didn't see anything to

indicate that any of the mental healthcare providers had been informed of his actions on that day, May 29th?

A   That's why I said no evidence, yes.  There was no documentation, there was no -- yeah, so...

Q   Now, it looks like then at the very end of the next paragraph there, there is a quote from the nurse that says in quotes, "Patient to be sent out and cleared at the hospital due to paranoia and belligerency," end quotes.
    Do you see that?

A   Hang on a second.  Is this still on Page 4?

Q   It goes to the top of Page 5 on my version.

A   Oh, okay.

Q   It's the paragraph that starts at the bottom of Page 4 and then moves over to the top of Page 5.

A   Okay.  That is the quote also, once again, that Velez wrote, yes.

Q   And then it looks like that next sentence indicates that he was transported to Ascension Hospital on the 29th where it was determined he had not sustained serious injuries and was returned to the Racine County Jail; is that correct?

A   That is correct.

Q   Okay.  We can agree it was reasonable to have him sent to the -- to the hospital for them to check him out on the evening of the 29th?

A   Absolutely.

Q   Okay.  And obviously then, healthcare providers outside of the jail, namely those at Ascension Hospital, were able to lay their eyes on him and do an examination of him that evening on the 29th.  True?

A   Yes.

Q   Okay.  And they determined that he had not sustained serious injuries and that he was okay to be returned to the jail that day.

A   Yes.

Q   Now, based upon your experience with hospitals and things like that in your work experience, are you familiar with -- with the federal law known as HIPAA -- or not HIPAA, EMTALA?

A   I'm very well-versed in EMTALA.  I've done many EMTALA surveys, yes.

Q   And obviously, under the EMTALA law, there's a requirement that if an individual shows up in an emergency room, the hospital has a legal duty to assess and stabilize that individual if he or she needs to be stabilized.  True?

Case 2:22-cv-00544-PP    Filed 06/09/25    Page 50 of 82    Document #121-2



Page 201

A  You have to see a physician, yes.

Q  Okay.  So if indeed then the hospital has a duty to assess an individual, and if they are determined in any way not to be stable, the hospital has a duty to either stabilize that person, admit them, or send them to a place where they can be appropriately stabilized.  True?

A  That is the duty, yes.  That is their duty.

Q  Okay.  So if indeed the Ascension Hospital on the evening of the 29th had any -- or noted any reason to believe that he was not stable or safe to be returned to the jail, they would have had a duty to either stabilize him, admit him, or send him to a facility or treatment provider who could accomplish that stabilization.  True?

A  And once again, the duty, yes.

Q  Okay.

A  That's what they -- yes.

Q  Okay.  And they obviously determined, because they sent him back that day, that they did not note any type of medical or mental healthcare condition that would render him unstable or not stabilized that would prevent them from returning him to the jail.  True?

A  Well, that's what they did, yes.

Page 202

Q  Okay.  And you do not advance any criticisms of the hospital in your report.  True?

A  I did not.

Q  Okay.  When we look at the next paragraph down, now it's a reference to May 30th of 2021, once again in the evening.
Do you see that paragraph?

A  I do.

Q  Okay.  And once again at the very end there, it says, and I quote, "Again, there's no evidence that custody personnel communicated this self-injurious behavior to mental health personnel."
Did I read that correctly?

A  Is that at the end of that paragraph?

Q  Yes, um-hmm.

A  Oh, I see it now, yes.  Yes, uh-huh.

Q  Is that, once again, the same thing that you're indicating?
Now, May 30th appears to be the second time when he was noted to be striking his head.

A  Right.

Q  And --

A  What I say is that, yeah, there was no -- no

Page 203

evidence, yes.

Q  Okay.  It looks like then the next paragraph down is talking about late in the evening on May 30th of 2021.
Do you see that paragraph?

A  30th or 31st?

Q  Well, this one still says May 30th, 2021 at approximately 11:15 p.m.
Do you see that paragraph?

A  Oh, okay.  Uh-huh.

Q  Okay.  It looks like he has an encounter with some staff, jail staff, and he was apparently resisting the staff at that time.  And you quote him as saying he continued to say in quotes, "no," closed quotes, and in quotes "get off me," closed quotes.
Do you see that?

A  Yes.

Q  Okay.  Where did you obtain this information that he said those things at this time?

A  I believe that was one of the reports from the custody officers.

Q  Okay.  And then the last sentence there, it says, "There was no evidence that custody staff had communicated to mental health personnel that Mr. James had delusions that custody personnel

Page 204

wanted him to lay on his bunk so he could be sexually violated."
Did I read that correctly?

A  Yes, you did.

Q  Okay.  Now, you quoted him as saying above as follows in quotes, "Get off me, yo.  I'm being sexually harassed, and I don't lay down for nobody."
Once again, are those quotes that you obtained from some sort of report?

A  Yes, uh-huh.

Q  Okay.  And it's your understanding he was making those exclamations to the custody staff?

A  Right.

Q  Okay.  Now, the term "delusions" that you use there, delusions is a medical term, it's a mental health term, and it's a diagnosis; is it not?

A  Well, I tell you what.  It is, yes.

Q  And based upon our previous --

A  But here's -- here's the deal.
Do you think he was being sexually harassed and he was not delusional, that he thought that that was occurring?  When he says, "I'm being sexually harassed.  I don't lay down for nobody," do you think that is a truthful

Case 2:22-cv-00544-TPF   Filed 05/05/25   Page 51 of 82   Document 121-2

Page 205

statement that he really was, Custody was -- it's a belief that he had. So I guess instead of "delusion," you could have said "belief," so -- instead of "delusion," so I will give you that.

Q I guess I'm not in a position, nor I think would anyone be in a position to be able to read Mr. James' mind. But I just want -- all I can deal with is the -- is what's in your report. And you mentioned that he had delusions that custody personnel wanted to sexually assault him. I --

A I will now call that -- I will now call that a belief.

Q Okay.

A Belief.

Q I wanted to understand, because delusion is a medical term, and you would obviously not be qualified to be able to render a medical or mental healthcare provision that he was suffering from the medical condition of delusions. True?

A "Belief" is not a medical term, and that's what I will say now. Delusion is a medical term.

Q Okay.

A Okay.

Q When we look then on May 31st, the last paragraph

Page 206

on Page 5 begins May 31st at approximately 7:08 p.m. Do you see that?

A Yes.

Q Okay. Now, it looks like this is the third time when he was found hitting his head on his cell wall. True?

A Right.

Q Okay. And it looks like we get down to the bottom of that paragraph. I think we're at the top of Page 6 now. And he once again -- you quote him as yelling "Get off me." Do you see that?

A Yes, I do.

Q Okay. And then the very last sentence, once again you mention, "There's no evidence custody personnel contacted mental health personnel." Once again, is that communicating the same thing you've already told me about?

A It's the same thing, right. There was no evidence of that.

Q Okay. Then the next paragraph begins June 1st, 2021 at 2:25. "Mr. James is finally seen for a second time by mental health personnel." Did I read that correctly?

Page 207

A Yes, uh-huh.

Q And as we previously talked about, of course, he was seen that day because that would be the Tuesday after Memorial Day and the next available clinic day after the last time he was seen on Saturday the 29th. True?

A I guess they had Memorial Day off.

Q Now, about halfway through that paragraph, it says, "There was no documentation of the aforementioned problematic psychiatric episodes and incidents with custody staff." Did I read that correctly?

A Yes.

Q Okay.

A And that was in that report, yes.

Q Okay. And then when you used the term "problematic psychiatric episodes," what are you talking about?

A Banging his head, his terminology, his belief that he's being raped by officers, saying "get off me" when there's no one close to him when he was just by himself. So that's what I'm referring to.

Q Okay. And when you say "problematic psychiatric episode," obviously, you're not able to diagnose that these quotes or these issues were, in fact,

Page 208

psychiatric issues because you are not able to make that diagnosis. True?

A That's true. I will change that to "mental health episodes."

Q Okay. And I believe we can agree that the reason there was no documentation of these supposed episodes was because the mental health staff was not aware of them. True?

A I presume so, yes.

Q Okay. The next paragraph begins the explanation of the events of June 1st of 2021, starting at 9:15 p.m. Do you see that?

A I do.

Q Okay. Now, in the middle of that, there's a number of quotes there that are quoting, apparently, statements that Mr. James was apparently making. What is the source of your information for those quotes?

A Once again, it would be the review of the officers' reports, the incident reports.

Q Okay. It looks like you mention on the next paragraph that "The following events were reviewed from recorded Racine County Jail video," and you

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

Case 2:22-cv-00944-PP Filed 05/05/25 Page 52 of 82 Document #121-2

Page 209

mention it's from a copy taken from Adrian Payne who was one of the officers.

A  Yes.

Q  Is it your understanding that this is a body cam video or video that was taken by an officer named Adrian Payne?

A  That is my understanding.

Q  Okay. Was that the video that was provided to you by plaintiff's counsel?

A  Yes.

Q  You mentioned a little earlier that you saw two videos.
    What was the other video?

A  This particular video stopped. The end of it was as the paramedics entered the facility, and it stopped right there, right after they came in the door. I saw another one from -- actually, it was also listed from Adrian Payne that went all the way through further where the paramedics or EMS came in and started CPR themselves. That went much further.

Q  Okay.

A  But I did not have that one at the time of this particular opinion paper. I didn't have the longer one.

Page 210

Q  For the purpose of the rest of your description of what happened that day, are you taking it from the Adrian Payne video as you indicate in your report?

A  Yes.

Q  Okay. From your review of that video, do you recall, as you sit here today, the first time that you noted Nurse Kristiansen to be in the -- any frame of that video?

A  Yes, uh-huh.

Q  When was that? When was the first sighting of her?

A  You mean the timing in the video, like where it's -- is that what you're referring to?

Q  Well, I mean --

A  The video and the time that it -- because these two videos, they are slightly different, but I don't know that I mention the exact timing in the video of the occurrence.
    So is that what you're looking for?

Q  Well, understandably, you probably couldn't give me the specific citation at 58 minutes and 31 seconds.

A  Right.

Q  I'm asking more along the lines of in the flow of events, do you recall when the first time she

Page 211

appeared on the screen was?

A  Yes. She was in the background of the video, over -- looks like over by the medication cart. And Custody called her, said Medical, you know, come on over.

Q  Okay. When was this?

A  Once again, I don't -- I don't recall the time. I would have to try to look on here to see what time it was.

Q  Are you referencing the point in time after it was suspected that Mr. James had become unresponsive?

A  No. It's when -- it's before that when they were trying to take out the -- the barbs from the Tasers.

Q  Okay. So there was a period of time on the videos that shows, obviously, the removal of Mr. James from his cell and the initial securing -- partial securing of him into the ER seat, and you saw that part of the video?

A  Yes, uh-huh.

Q  And Nurse Kristiansen was not present in any of those videos. True?

A  No.

Q  Okay. She did not, according to your observation, take part in the removal of Mr. James from the

Page 212

cell or strapping him into the chair. True?

A  True.

Q  Okay. And it looks like then, as you mention in your report, he was taken in that chair and he was taken to a shower room where he was offered a shower.
    In lieu of that, his face was wiped to remove any excess OC Spray?

A  Yes.

Q  Okay. And that was a reasonable and appropriate thing to do for him?

A  Absolutely, yes.

Q  Okay. And then they wheel him out in the chair partially secured, and now he's in the holding area, and then there's some attention given to those barbs in his back and that's where you first see a Ms. Kristiansen appear. True?

A  Yes.

Q  Okay. You mention on the top of Page 7 of your report, Nurse Kristiansen appears to look at the barbs and attempts to try to remove them and makes the determination that she cannot remove them or she does not believe she can remove them.

A  Yeah.

Q  Is that your recollection?

A   Yes.

Q   Okay.  In fact, you quote her as saying, "I don't want to have a problem pulling them out."
Is that something you recall hearing?

A   Um-hmm, yes.

Q   Okay.  And obviously, she does not end up -- she's not the one that ends up removing these barbs.  True?

A   That is correct.

Q   Okay.  Now there's no contention in your report that there's any reason for her to have any type of training in the removal of Taser barbs.  That is not something that typically a correctional nurse would have experience with.  True?

A   Well, it's really interesting because you really would expect the jail to have trained her with -- or all of their staff with the actual device that takes them out ever so easily.  Even of all the custody officers apparently weren't familiar with that device either.  I guess not everyone had received that training.  But it is very unfortunate that the jail did not train her and all the officers in that removal since they used the Tasers, you know, in the jail.

Q   Did you happen to review any of the testimony in which it was indicated that that was a very new tool and that not everybody had been issued a tool yet?

A   I don't recall that, but I knew that some people were not familiar with it, of course.

Q   Okay.

A   There was only one individual that had one in his pocket -- or their pocket.

Q   In the course of your career as a nurse in a correctional setting where you were actually rendering bedside care, did you ever have occasion to be required to remove a Taser barb?

A   I've never been in a facility that used Tasers within the facility.

Q   Okay.  Okay.  In any event, she determined she could not do it, and she indicates she didn't want to -- or strike that.
You've reviewed her testimony as well, true, from her deposition?

A   Yes, uh-huh.

Q   Okay.  And she indicated at that time that she did not want to remove the barbs because I believe they may have been bent or she was concerned they were too deep and she didn't want to hurt him.

Do you remember that?

A   Yes.  Yes.

Q   And that was a reasonable thing for her to do, want to avoid hurting Mr. James?

A   Indeed, yes.

Q   Okay.  And certainly, that would be consistent with her not -- not holding any malice or ill-will toward him and simply wanting to help him without hurting him?

A   In that respect, yes.

Q   Okay.  Now, you say in that paragraph, "Three of the officers, one with hands on the back of the head, one on the neck, and one on the left shoulder blade forced Mr. James into an extremely hunched over position, exposing two probes and darts still in his back."
Did I read that correctly?

A   Yes, uh-huh.

Q   What evidence do you have that he was forced into this position, according to what you have written there?

A   He was -- he was fighting with them to stay upright the entire time, and they had to force him down into the position.  They had to push him there.  They were using force.

Q   Okay.  And have you read their -- or the depositions of each of those correctional officers?

A   Well, all that I have listed.

Q   Okay.  And those officers have all indicated that, in fact, they were serving as a guide; they were not affirmatively placing pressure or weight upon them.  True?

MR. NAFFZIGER:  Object to foundation and form.  And you're not showing the witness the testimony.
But you can answer.

A   I don't believe all of them said that, but I think that somebody -- I do recall someone did say that.

BY MR. FRANCKOWIAK:

Q   Okay.  And obviously, we've already talked about this, but when you say "forced," you're not able to characterize or quantify the amount of force from a physics standpoint or even the amount of weight, if any, that was exerted at any time?

A   The objective force, no.

Q   Okay.  And I think as we've already talked about, you do not have any training and you are not an expert on the degree of use of force or on the trained technique for restraining an individual in

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

LEXITAS

a chair like this. True?

A   This is true.

Q   Okay. So whether or not in the maneuvers that the officers were doing on the video you watched, whether or not that was consistent with their training is not something you can speak to?

A   The -- are you talking -- did you say the amount of force? Are you -- say that one more time, please.

Q   No. Actually, in this case, I'm just asking, in terms of what you saw in that video, the positioning and the actions taken by the officers, you would not be able to indicate one way or another whether that -- those actions they were taking were consistent with their training on the use of force or the use of restraint positioning. True?

A   No. No.

Q   My statement is true, you can't comment on that?

A   That is true because I -- right, I did not review all of their training in that aspect. Yes.

Q   Okay. And likewise, you would not expect Nurse Kristiansen to be familiar or to be able to tell one way or another whether or not what was happening there or what they were doing was

consistent with their training as correctional officers in terms of the use of force or proper restraint positioning?

A   Right, not with --

MR. NAFFZIGER: Objection. Foundation.

Go ahead and answer.

A   I -- no reason to think that she did unless she had reviewed, you know, all their training information, which is doubtful.

BY MR. FRANCKOWIAK:

Q   Okay. Okay. You mentioned that all three of the officers continued to hold Mr. James in this extremely hunched over position.

When you say "extremely hunched over position," are you able to identify -- is there a specific name for that position in terms of, you know, restraint training, to your knowledge?

A   A specific name that you would call that?

Q   Yes.

A   No. I don't think that that is a specific -- well, I don't -- I don't know, but I find it very doubtful that that position would be an approved position that had an actual name in the restraint chair.

Do I know that for a fact? No, but I would find that extremely doubtful.

Q   Okay. And you yourself have never had occasion to restrain a -- an inmate in a chair of this nature?

A   No.

Q   Okay. You also mention there, "About all four of the officers forced him down further, but soon he forced his way back up straight in the restraint chair, breathing rapidly and heavily."

Did I read that correctly?

A   That is correct, yes.

Q   Okay. So in your review of the video -- or strike that. Let me ask you this: Were you provided a copy of the report authored by the Kenosha investigating detectives after Mr. James' death?

A   Yes.

Q   Okay. I'm thinking specifically of a report issued by a Detective Hasselbrink.

Does that name ring a bell?

A   Yes, that is correct.

Q   And Detective Hasselbrink also looked at the video, and he actually counted down to determine the time frames when Mr. James was actually in a face-forward, hip-flexed position versus when he was sitting up.

Do you recall reading that in his report?

A   I do, yes, uh-huh. Don't remember the exact specifics but yes, I do.

Q   So being -- I guess from your own review of the video, we can agree there was a short period of time where Mr. James was in a face-forward, hip-flexed position while the nurse was viewing the probes in his back, followed by a point in time when he sat up for a period of time fully straight. True?

A   Yes.

Q   Okay. And that's what you're talking about there when you say when he forced his way back up straight in the chair?

A   Yes.

Q   Okay. And then there was a second period of time then when he was once again in a face-forward, hip-flexed position for another short period of time after he sat up?

A   Right.

Q   And did you attempt to count the number of minutes in which he was in each of these positions?

A   You know, I do believe that I -- and I don't really recall exactly because I was trying to

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
California Firm Registration #179

LEXITAS

Case 2:22-cv-00044-PP   Filed 05/05/25   Page 55 of 82   Document #121-2

Page 221

count on the, you know, video that I have, but I wasn't sure if that was the right speed that it was going or -- but I do believe the Detective did so.

Q   Okay.  And, in fact, on Page 2742 of Hasselbrink's report, he does actually indicate the timing that he counted while watching the video, and taken from his deposition testimony, he stated that he was down in a face-forward, hip-flexed position for two minutes and 35 seconds before he came, sat up straight in the chair for one minute and 28 seconds, before then being placed once again in a facedown, hip-flexed position for three minutes and 11 seconds which ended in his showing signs of unconsciousness.

Do those -- does that timing sound reasonably familiar based upon what you reviewed?

A   It does, yes.

Q   Okay.  Now, when we go to that next paragraph on Page 7 of your report, it says, "After the second probe/dart was removed, Mr. James was forced to stay in the extremely hunched over position, compressing his diaphragm and ribcage for approximately 8 minutes and 28 seconds except when he forced his way straight up for approximately 2

Page 222

minutes and 27 seconds before being forced down again."

Did I read that correctly?

A   Right, yes.

Q   Okay.

A   And that was my intent in looking at the timing that was on there; however, you know, I think it was just run at the regular speed.  I didn't, like, speed it up or slow it down.

Q   Okay.  So when you state there that he was in a hunched over position for 8 minutes and 28 seconds, that's not really an accurate description because he was never in a face-forward, hip-flexed position for 8 minutes and 28 seconds, was he?

A   I was referring to the total time.  That's why I said "except" when he came back up, so...

Q   Okay.  The period of time that he was actually in a hip-flexed, facedown position was approximately 2 minutes and 35 seconds initially, and then the second time, 3 minutes and 11 seconds.  It was never more than that at any consecutive time.

A   Okay.

Q   Okay.  Now, you saw on the video, obviously, that after he was in a facedown, hip-flexed position for a period of approximately 2 minutes and 35

Page 223

seconds and then he sat back up again, he was alive and he was breathing.  True?

A   Yes.

Q   Okay.  And then he was obviously in that position at -- for about a minute and a half or so before he was once again in the facedown, hip-flexed position.

Do you know where or do you recall where Nurse Kristiansen was during the first period of time that he was in that facedown, hip-flexed position?

A   You're referring to when they were first trying to take out the barbs?

Q   Yes.

A   Because they called her over to try to get those barbs out, yes.

Q   Okay.  So she was standing with them looking at the barbs in his back, attempting to remove them during that first period of time when he was in the facedown position?

A   Right.

Q   Okay.  After he sat back up and he was breathing and he was alive, where, if anywhere, did she go?

A   I think -- from the video, I think that she went back towards the area where she was where that

Page 224

medication cart was.  I believe that's what I recall.

Q   Okay.  Based on your review of the video, was she visible at any point in the screen during this second period of time when -- for approximately 3 minutes and 11 seconds when Mr. James was facedown, hip-flexed.

A   I believe she was off to the -- right off to the right and in the area that I was referring to --

Q   Okay.

A   -- over by the area where the medication cart was.

Q   Okay.  Do you recall on the other end of this room where he was situated at the time there looked to be a mobile curtain or privacy screen?  Do you recall seeing that?

A   You know, from my view, I didn't see that, but I remember talk, you know, about the privacy screen that was over there.

Q   Okay.  And as you sit here today, you don't recall if the -- Nurse Kristiansen was, in fact, entirely obscured behind that screen for the entirety of the time that Mr. James was in a facedown, flexed-forward position for the second time after she had walked away?

A   No, I don't because I don't recall that as being

Case 2:22-cv-00544-FPT    Filed 03/03/26    Page 56 of 82    Document #121-2

LEXITAS

Page 225

completely behind there.

Q   Okay.  Is that something that would have been important to you to note in your -- in your -- in coming to your opinions and determining what Nurse Kristiansen saw, heard, or noted during this period of time?

A   That she was behind a privacy screen?

Q   Um-hmm.

A   I didn't see that in my video.

Q   Okay.  Is it your understanding, or in coming to your opinions, did you believe that she was fully aware and cognizant of everything that was going on during the 3 minutes and 11 seconds the second time he was in a face-forward, hip-flexed position?

A   Do I believe that she was aware of it the whole time?

Q   Yes.

A   I can't say for absolute sure, no.  I would think it would have been of great interest to her, though.

Q   Okay.  And were the officers eventually able to remove those barbs from Mr. James' back?

A   From the back, yes.  Apparently, he still had one in his stomach and leg, at least --

Page 226

Q   Okay.

A   -- later on, it was reported, but yes, uh-huh.

Q   And you've seen the anatomical place where those two barbs were in his back.  True?

A   Yes, uh-huh.

Q   And they were in his shoulder blade?

A   Well, there was one that was a little bit lower than the blade, yeah.

Q   And obviously, when he sat back in the chair, they would be pressing into his back if he were sitting back up against the back of that chair, anatomically anyway.

Would that be an accurate description?

A   Oh, that's correct.

Q   You wouldn't disagree that it was reasonable and appropriate for the corrections officers to want to remove those barbs from the back so that he could be comfortably and reasonably secured in that chair?

A   Of course.

Q   Okay.  And the only way, in fact, that anyone could reach those barbs would be as if they had access to his back and the bottom part of his shoulder blade.  True?

Page 227

A   Yes, but if you look at that video where those barbs were placed, it wasn't necessary to pull him all the way forward and to pull his head all the way down --

Q   Well --

A   -- to access those barbs where they were placed.

Q   Okay.  From the video that you watched, he was not being cooperative with those officers, was he?

A   That is correct.

Q   Okay.

A   That's why I used the term "force."  They forced him down.

Q   Okay.  And once again, when you use the term "force," you're not able to actually give me any objective or numbers or anything at all that you can quantify for me the level of force, the weight, anything at all that was applied to Mr. James or if, indeed, any was applied to Mr. James.  True?

MR. NAFFZIGER:  Objection.  Form.  Asked and answered.

You can answer.

A   All -- what I can say is one of the custody officers said he was -- I forget the exact quote, but stronger than anyone he had experienced

Page 228

before.  Something to that effect.  In other words, they were talking about how big he was and how strong he was, which probably coincides with, you know, thinking that they were trying to kill him, you know, per his statements.  So he was fighting for his life in his own mind, I would imagine.  But they had to use quite a bit of force to hold him down.  They did refer to that.  I'm sorry I don't have the actual quotes.  You know, I'd be able to look it up.

BY MR. FRANCKOWIAK:

Q   Your opinions in terms of, you know, whether he was, quote/unquote, forced or the amount of force that was utilized, you're drawing that from your review of the videotape.  True?

A   That is -- that is correct.

Q   There's no other source of information other than your view of that videotape?

A   Well, the other source, like I just repeated or I just stated, was that he was extremely strong, and they had a very difficult time with him, so that leads me to believe they had to use a lot of force to force him into the position.

Q   Well, that is obviously your speculation --

A   And he -- well, right, but he was fighting with

888-893-3767   Lexitas operates in all 50 states and is licensed where required   Nevada Registration #116F
www.lexitaslegal.com                                   California Firm Registration #179

LEXITAS

them, so, you know, "Get off me.  Get off me."

Q   Okay.

A   Anyway, it was quite the struggle.  That's readily apparent.

Q   Did you attempt to put in your written report all of the pertinent observations that you made while watching that video?

A   What are you referring to, sir?

Q   Well, I just want to make sure.

As you sit here today, did you leave anything that you believed would be pertinent to your review out of your description of that video that we're reading right now?

A   Not that I can think of immediately at this point in time.

Q   Nowhere in your report do you indicate that you ever heard him state at any time that he couldn't breathe or that he was having any type of difficulty breathing.  True?

A   Not in my report.  I know that the detective, in his report, said that he utilized earphones and turned the volume up very loud.  And he said in his report that he heard him say "I can't breathe" more than once.

Q   And you yourself --

A   I did not hear that myself.

Q   Okay.  And the version of the video that you looked at did have sound?

A   It did.

Q   Okay.  And you were not able from listening to that sound to hear him say any such thing?

A   I could not.  I wasn't utilizing headphones and --

Q   Okay.

A   No.

Q   Nor, in fact --

A   No.  So no, I did not hear that myself.

Q   Nor, in fact, were any of the -- was Nurse Kristiansen or any of the correctional officers utilizing headphones or enhancing equipment on the actual date of the event in order to listen as well either, were they?

MR. NAFFZIGER:  Objection.  Form. Foundation.

You can answer.

A   You mean in reviewing the event?

BY MR. FRANCKOWIAK:

Q   In any time, in any way.

A   I have no idea.

Q   Okay.  Okay.  You're not able, as you sit here today, to state that anyone present in that room

ever heard Mr. James make such a statement.  True?

MR. NAFFZIGER:  Objection.  Foundation.

You can answer.

A   I don't -- I don't have that information, no.  Of anybody in the -- in the room.

BY MR. FRANCKOWIAK:

Q   Okay.  Now, you describe in that paragraph what happens when Nurse Kristiansen reappears.  You state, "After the second probe dart was removed, one of the officers was heard to say 'is he okay' as they sat him back up.  The female officer calls Mr. James' name, and he does not respond.  The officers call for Medical, and Nurse Kristiansen walks over, places an ammonia cap under Mr. James' nose with her left hand and her right hand over his mouth."

Where was Nurse Kristiansen at the time that the officers called for Medical?

A   Once again, I thought that she was -- she was at the top of the screen, and it looked like she was close to that area where the -- what seemed to be a med cart.

Q   Okay.

A   And she said "just a minute" as she was -- she was in the med cart pulling out something.

Q   Okay.  And then you said she walked over and placed an ammonia cap under his nose.

Do you recall from her testimony in her deposition why she did that?

A   She did that because earlier in the day, or previously, she said that he was in a -- acting in a similar manner, and she used that ammonia capsule to, you know, bring him up because he was playing possum, so, you know, indicating that he was faking.

And so she made the comment that perhaps he was faking once again and to utilize that.

Q   She never used the term "faking," did she?

A   I don't -- I don't believe so.  She said "playing possum."

Q   Okay.  You're familiar with the concept of a differential diagnosis, I would assume?

A   Sure.

Q   Okay.  When a physician is diagnosing someone and seeing a patient for the first time, for example, in an emergency room, they'll develop a differential diagnosis with a number of things that are potential explanations for the problem in question, and then they'll try to eliminate things

Case 2:22-cv-00544-PP   Filed 05/05/25   Page 58 of 82   Document 121-2

Page 233

until they reach a conclusion or a reasonable conclusion as to what the actual problem is.

Is that a reasonable explanation of a differential diagnosis?

A Sure.

Q Okay. In this particular case, we have an individual, a very large, strong man who had been struggling fiercely for a period of time against some individuals who were trying their best to help him. And he suddenly stops responding to them, and the nurse is called to address this situation, this newly involved situation.

We can agree that she now has to try to figure out what's going on before she can figure out what the appropriate intervention would be; fair to state?

A Yes.

Q Okay. And there are some -- a number of potentials in this differential diagnosis which would be that one explanation could be that he is actually unconscious, one explanation could be that he is not unconscious and may actually be playing possum, as you said, or there might be something else going on. She doesn't know at that exact moment in time.

Page 234

Would that be a reasonable thing to state?

A At that initial point, yes.

Q Okay. And then the first thing she will attempt to do or the first thing she said she tried to do is to rule out one of those eventualities that he was, in fact, conscious and was playing possum. So she took a first intervention, was to attempt to rule out one of those potential explanations on the differential diagnosis.

Would that be an accurate -- a reasonable statement to make?

A Right, for that of playing possum.

Q Okay. So she uses the ammonia cap, and she does not get the same response from him that she got earlier, so she's now able to rule out the possibility he might be playing possum. Reasonable?

A Correct.

Q Okay. So it was -- in fact, we can agree it would be reasonable for her to start with the ammonia cap in an attempt to rule out one potential possibility for this new development that she is seeing?

A No problem with that.

Page 235

Q Okay. Now, you also mention that she then places her right hand under the spit mask and says he's swallowing.

Is that something you heard her say on the video?

A That is something I heard her say.

Q Okay.

A Which is rather perplexing. I'm not really sure what she is trying to do there. She should have reached under there for his carotid artery to see if he has a pulse. But she said "he is swallowing," so I have no idea what she's doing.

Is she feeling his thyroid cartilage to see if it's moving and if it -- it's perplexing. It's not something that you would normally do for someone that you suspect is in that condition now that did not, you know, become alert with the ammonia. Not to check for swallowing, that's not protocol, that's not nursing protocol.

Q Well, we can agree that she was there with her hands on him at the time and you were not. True?

A That's true. As I said, I don't know what she was doing underneath that spit, checking that he was swallowing. Like I say, your thyroid cartilage or

Page 236

Adams apple must have been moving to know that he was swallowing, so okay, that's what she said.

Q Not having been there, there's no way that you can, in fact, say that that's not, in fact, what he was doing. True?

A Well, what I am saying -- well, that's true, but what I am saying, that's not what you do, that's not what you check for swallowing. That's way out of line.

Q She never said she was checking for swallowing; she's making an observation that he is swallowing. True?

A That's true.

What was she checking for then?

Q Okay.

A I told you what she should have been checking for, his carotid artery. I would presume that when she reached under there, that's was she was doing, but instead, she just said, "oh, he's swallowing."

Q We can agree that an individual who is swallowing is -- or strike that.

We can agree that pulseless people generally do not swallow?

A Well, you know what? You could have a reflex. Even dead people do have reflexes after they've

Lexitas operates in all 50 states and is licensed where required Nevada Registration #118F
California Firm Registration #179

expired, so that is -- that is a possibility that there's still movement there and he was unconscious.

Q   And you're not able to state to a reasonable degree of nursing probability one way or another what was causing him to swallow, but he was, in fact, swallowing, according to what she said on the video?

A   That's what she said.

Q   Okay.  And you don't know what she was actually doing at the time she made that observation because she never said she was checking for swallowing, she just said she was observing swallowing?

A   Her report was, he was swallowing.  What you would expect is checked his carotid, he's got a pulse or he doesn't have a pulse.  That's what you would check for at that point in time.

Q   They use a pulse ox.

And you're familiar with a pulse ox, I would assume?

A   Yes.  And as you'll note, that she didn't initiate the pulse ox; it was one of the custody officers that suggested that she utilize that.

Q   She has a pulse ox, however, on her, and they

apply it to the finger, and she's not able to get a reading.  True?

A   Well, before she applied it, she had the custody officer apply it.

Q   Okay.  Because the custody officer was standing behind him where his fingers were?

A   Then she -- yes, and then she took it and she says, "is he handcuffed back there," and she put it on his finger, Nurse Kristiansen did.  And she made the statement, "I'm not getting a reading." I could see that it did light up.  I have no idea what it said.  It's just like the light was there. And, you know, of course that will read the amount of oxygen that's being carried in your blood, but also your pulse.  It reports both of those.

Q   Okay.  But you would expect --

A   She said, "I'm not getting any -- anything."

Q   Right.  And are there -- obviously, the pulse ox, there are certain things that can affect a reading on a pulse ox, whether or not you can get a workable reading on a pulse ox.  True?

A   Sure.

Q   And what are some of those things that can affect whether or not you get a good reading on a pulse ox?

A   Well, you know, the color of skin doesn't really have any great degree, but if he was handcuffed and the circulation was not moving, that would definitely affect the pulse reading itself, which apparently, you know, he was -- he was handcuffed, so...

Q   And, in fact, his hands were cuffed behind him, and when you see on the video, his wrists were in a situation where they were bent in the cuffs when they were putting that monitor on him; were they not?

A   That's true, but once again, she should have already checked his carotid pulse to determine if he had a pulse.  That's what you have to find out right away.  And --

Q   Yes.

A   -- it wasn't even her idea to use the pulse ox. But she said, okay, you know, she will -- she will do that.

Q   Right.  And the pulse ox was utilized, regardless of whose idea it was.  It was right there.  She had it.  It was applied.  She didn't get a good reading.

Can the presence of sweat or other substances on an individual's finger also cause a

reading not to register?

A   I'm sure to a small degree.

Q   Okay.  So there are a number of things that could have happened that would cause it not to register. And it does not register.

She couldn't tell one way or another from that pulse ox whether or not he had a pulse.  True?

A   This is true, but I'll reiterate, the way to find out if he had a pulse was to check his carotid.

Q   And she did, in fact, testify at her deposition that she did check his pulse and was unable to determine one way or another given his body habitus whether or not he had a pulse at that time.

Do you remember reading that?

A   Well, that was much later, and you can't see in the video where she is touching his neck.  And she said that she couldn't determine if he did because -- that he was so heavy, and she stated that, well, that doesn't mean that he didn't have one.  Which it's like whoa, whoa, whoa.

And I really find it unusual.  I've checked a carotid pulse on extremely heavy individuals and found them; however, if you

Lexitas operates in all 50 states and is licensed where required Nevada Registration# 116F
California Firm Registration #179

LEXITAS

Page 241

cannot -- if you think that really is your problem, all you do is you pull out your stethoscope and you put it on the -- you take an apical pulse on his chest on the left side between the fifth and the sixth ribs, counting down from the collarbone. And you will definitely hear it, or you won't hear it there. You can hear the heartbeat there.

So the carotid -- and maybe he still has one. You presume that he doesn't, but if you want to check for sure, that's what you check. And everyone -- I've always carried a stethoscope in my pocket when I was practicing. You should always have a stethoscope with you. I don't know if she did or not. But if that was the determination, that she can't tell because he's too heavy and she couldn't feel it, there's too much fat around his neck, that's what you do.

Q   Okay. So you see in the video -- and we're talking about the various things that you saw her do. We know that she noted he was swallowing. We know she tried the pulse oximeter. We know at some point she checked for a pulse.

A   Well, after she checked for that pulse, then she started doing sternal rub again, trying to bring

Page 242

him to.

Q   And that's correct, she also did a sternal rub. So these are all --

A   But there's not -- no, that is not fruitful. That is -- to start doing that again and presume that he has a pulse and he's just going to wake up when you can't determine that he had a pulse in any way, shape, or form before that --

Q   Okay. Nobody --

A   -- no. You know what? It was time to take him out of that chair, pronto, now, and start CPR.

Q   How many times did she perform a sternal rub?

A   I don't recall exactly.

Q   Okay.

A   The first time she performed a sternal rub, that also was suggested by the custody officers, you know, when she first came over trying to arouse him. And then I saw the second time when she was doing that after she checked his carotid, tried to determine if he had a pulse there.

Q   So all these things we've talked about are all things you saw her do at one point or another during that video. True?

A   Yes. Uh-huh.

Q   You disagree with the way she went about them, and

Page 243

you disagree with the order in which she took these actions. True?

A   That is correct, that is not -- that is not nursing protocol.

Q   You believe she was negligent?

MR. NAFFZIGER: You have to let him finish his answer. Jason, let him finish his answer.

BY MR. FRANCKOWIAK:

Q   Are you finished with your answer?

A   I was just saying that that is not nursing protocol. You have someone unresponsive and you --

Q   Okay.

A   It's -- it's just not even -- it's not even close. It's -- it's --

Q   You believe the way that she was attempting to determine what was wrong with him was not the correct way to do it according to nursing protocol?

A   That is correct.

Q   You believe that the actions she took -- the actions she took and the sequence of those actions was not consistent with the standard of care and that she was negligent?

Page 244

A   That is correct.

Q   Okay. At any point, did you see her or observe her refusing to offer care to Mr. James?

A   I'm sorry, you cut out for one minute there.

Q   Sure. Did you observe her at any point refusing to offer care to Mr. James?

A   I did not see her refuse. She initially walked over very slowly without any sense of urgency whatsoever, and when she got there, she took direction from the custody officers rather than to initiate her own assessment such as doing the sternal rub, the pulse ox, you know, even getting the AED. They told her, "You better get the AED later on." So she didn't initiate those.

Did she refuse?

No, I did not see her refuse treatment.

Q   You saw her attempt to make various -- or to do various things that were an attempt to figure out what the problem was and to get help for Mr. James, did you not?

A   Yes. Not their appropriateness --

Q   Right.

A   -- but I saw that, yes.

Q   You believe that she did not -- or she was


888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

Case 2:22-cv-00544-PP   Filed 06/09/25   Page 61 of 82   Document #121-2

Page 245

negligent in the way she went about rendering that care, but you observed that she was attempting to render that care and to help him. True?

A    She did render care.

Q    Okay. And, in fact, you mention in your report that after she was not able to get anything from the pulse ox, she said to one of the corrections officers, "We need to call 911." True?

A    Yes, she did.

Q    Okay. And you could hear her say that on the video?

A    Yes.

Q    So she is attempting to get help for Mr. James based upon her assessment of the situation at that point?

A    Well, the question is, why did she want to call 911 at that point in time?

Q    Okay.

A    What it seems like, as I recall, that was after she had checked his carotid and supposedly, you know, she didn't feel anything. So, okay, maybe we should call 911. Even though she stated herself, "well, that doesn't mean he didn't have a pulse," he may have had one.

Q    What you write here, Kristiansen asks, "Is he

Page 246

handcuffed back there?" The officers respond "yes."

A    That was previously, previous to --

Q    Right. And you -- that's right. But then you say Nurse Kristiansen states, "I'm not getting anything from him." She reaches under his mask again and says, "I think we need to call 911."
         When she says that from the video, one of the officers goes to call 911. True?

A    Okay. Uh-huh.

Q    Okay. The AED, one of the officers ends up getting the AED. You can see him bringing the AED over to where they are located. True?

A    This is true.

Q    Okay.

A    And way long before that, he should have been pulled out and laid down, and compressions should have been started.

Q    Okay. And we're certainly going to get to that.
         You mention that Kristiansen then began to do sternal rubs on Mr. James' chest after a custody officer suggested she do so. She said "he's making noises," and she continues the sternal rubs until the officer brings the AED.
         Do you understand or do you have

Page 247

any understanding as to what kind of noises he was making?

A    You know, I can hear -- it sounded like some type of -- sort of like a gurgle or something that I heard on the -- the -- you know, I don't -- something -- something to that effect. So I don't know exactly what that was.

Q    Okay. You recall hearing something yourself while looking at the video; he was making some sort of noise?

A    There was some sort of gurgle-type noise.

Q    Okay. And in her testimony in her deposition, she mentioned that this was something that suggested to her that perhaps he was breathing and did have a pulse?

A    That is not an indication.

Q    Okay. But she believed that, and that's what she testified to?

A    That's what she -- well, that's what she said that she believed. And, you know, I really find that kind of hard to understand because this is someone that has gone to nursing school, that has, you know, passed the NCLEX exam, that is an experienced -- you know, to make that statement that, well, he probably has a pulse because of

Page 248

that, or he may have a pulse because of that.
         It's perplexing.

Q    Well, she never indicated whether he did or not; she was just never able to indicate one way or another --

A    Well, she stated -- well, what she said in her depo is that it doesn't mean that he -- 'cause she couldn't feel it that he didn't have one. It was still -- she still had no idea if he had a pulse or not.
         That's the problem. That's what she stated, she doesn't know if he has a pulse or not.

Q    At that point in your report you say, "She mentions we will have to lay him down" -- well, "we have to lay him down."
         You heard him -- you heard her say that. True?

A    Yes.

Q    Okay. And the reason why you would lay him down is because you can't really do CPR or the AED while he's sitting up?

A    Exactly.

Q    Okay. And how much time had actually elapsed from the time she first came over until the time she

888-893-3767    Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
www.lexitaslegal.com                                    California Firm Registration #179

LEXITAS

said, "we have to lay him down"?

A You know what? I can't say for sure, but it's getting pretty late in the game here. Should have already been down, but hey.

Q Well, you can't tell me how long. Whether it's one minute, a minute and a half, two minutes, you can't tell me that, as you sit here today?

A I can't recall that exactly, no.

Q It takes a period of time to get him out of that chair because he's large and he's strapped into the chair, is it not?

A This is true.

Q And there's nothing that she could do as a nurse during that period of time while he's being unfastened from that chair because that's just what it takes to get him out of the chair?

A While they're trying to get him out, no.

Q And you have no reason to believe that they did not get him out of that chair as fast as they possibly could have?

A You know what? I don't know about their expertise. It certain -- the view certainly wasn't like changing tires on a road race, but it took them a little while to get him out.

Q And you've never unfastened someone from a chair, so you wouldn't be able to comment one way or another as to how long it takes to get someone unstrapped from a chair like that?

A No.

Q Okay. So if it takes a couple of minutes to get him on the floor, obviously, you have no criticisms as to -- as to whether anything should have been done during that time because it just takes that belong to get him out?

A Right, to get him down, yes, uh-huh.

Q Eventually, they do get him out, get him down on the floor, and they're able to apply the AED. True?

A This is true. But what I would expect is once he was on the floor that she would already start compressions, and then when the AED came, she could either ask everyone there that is trained in CPR and the AED to prepare the AED to put it on, or to take over compressions while she prepared the AED pads to place.

Q The AED was already --

A You got to start CPR just as soon -- as soon as you can.

Q The AED was already there by the time they got him

on the floor; was it not?

A No. It came just a little bit afterwards.

Q Okay. You believe, according to your recollection as you sit here today, that there was a gap in time between the time he was placed on the floor and the AED pads were placed?

A Before it was in her hands.

Q Okay.

A Yes.

Q You're not -- or strike that. The AED, once it's placed, will read a heart rhythm and determine whether or not there's a shockable heart rhythm?

A That is correct.

Q You are not allowed or supposed to touch that patient during the period of time when it's doing its calculations. True?

A Well, there's two types of AEDs, one in which it gives an automatic shock, and one in which it will tell you to give a shock by pushing a button. But while it is analyzing, then you stop the compressions and you wait because, for one thing, if you're jostling around, it's going to mess with the reading, and additionally, you don't want to be shocked yourself.

Apparently, this one was the automatic, and, of course, right after it gives the shock -- or it doesn't give the shock, you know, after it's analyzed, it says "start CPR." No one did --

Q You could hear --

A -- because there was no shock -- it did not give a shock. And then it says "you can start CPR if indicated," which is what you do.

Q And you could hear that it was giving a statement when it was applied, "Stand clear of the patient". "Stand clear of the patient." True?

A Yes, exactly. And like I said, that's what you do because you don't want to mess up with it taking the reading, nor do you want to be shocked if it gives an automatic shock as opposed to one where you push the button yourself.

Q As you sit here today, how much time was -- how much time was there for her to have applied CPR before the AED was available to place on him?

A I can't really tell you the exact timing.

Q Okay.

A But that's what you do, you respond immediately with CPR.

Q Okay. Have you been trained in CPR?

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

Page 253

A I used to teach CPR. I've been trained in CPR. I've performed CPR, both chest compressions and Ambu bag.

Q Okay. Do you do CPR on a patient that you cannot confirm whether or not he or she is breathing?

A If you don't have a pulse, then you start compressions. As a matter of fact, the American Heart Association -- it used to be ABC, which is airway, breathing, circulation -- they changed that a number of years ago to CAB. So you do compressions first and then the airway.

And the reason behind that, they even -- this is a number of years ago also. They determined if someone is untrained that doesn't know how to do the respirations, just do the compressions because there's a good chance that individual still has oxygen in their blood and that untrained individual can at least do those compressions. So compressions are key, first of all.

Q CPR or compressions are not generally done on an individual who has a pulse. True?

A Yeah, that's true.

Q Okay. So it's important to confirm that the individual does not have a pulse before beginning

Page 254

CPR or compressions?

A Well, as we noted before, supposedly, she couldn't tell by the carotid, and then she should have used her stethoscope for an apical pulse to determine that. That was not -- she says that she never determined if he had a pulse or not.

Q And again, you saw her attempting to try to figure that out, you just don't believe she used the correct method?

A It's not my belief; it's protocol, sir.

Q Okay. You believe she didn't use the correct protocol --

A That -- that is --

Q -- and she was negligent, not having done that?

A That is correct.

Q Okay. So once the AED decided that there was no shockable rhythm, what does that mean, or do you have an understanding what that means?

A That means that there are no electrical pulses going through. Usually, what the shock would give is a V-tach or V-fib. That's the ventricular tachycardia which would be, you know, technically over 100 beats per minute, but, you know, it would have to be quite a bit over.

And V-fib is just you still have

Page 255

electrical pulses going through the ventricle, but it doesn't beat. It's just like random pulses, just kind of like -- you know, so if it has one of those two, then it will give a shock to try to get it back to normal.

There is an incident where you can have pulseless electrical activity, which is rather unusual, but that would be -- they wouldn't give a shock there either because that would be there is some electrical activity but perhaps a complete loss of blood, so there's really nothing for the heart to pump.

Q Okay. You're not able to tell from the video precisely when, if at all, Mr. James first went pulseless. True?

A I cannot tell from the video. No, I cannot tell when.

Q You're familiar with the term "asystole"?

A Yes.

Q What does asystole mean?

A Heart's not beating at all. That's another -- where you would not get a shock by the -- there's no electrical activity, and it's not beating. So it's not going to give a shock either, the AED would not, at that point in time.

Page 256

Q You can't tell at what point, if any, he was in asystole. True?

A Oh, I can't tell, no.

Q Okay.

A It would have to be the reading of the AED.

Q It could have been at the time of the AED, it could have been even at the time that he first went nonresponsive. There's just no way to know that. True?

A Right, right.

Q And you're not able -- since you're not able to testify to causation, you're not able to determine whether or not or at what point the initiation of CPR would have been able to resuscitate him successfully. True?

A I could not tell you the exact point in time. You can't. But that's why it is always of paramount importance that you start and make that attempt as soon as you can to give to them an additional chance.

Q Okay. And it certainly would be speculation on your part, or, in fact, on the part of anyone to be able to say that at any point CPR was started, that it would have resulted to a reasonable degree of medical probability in a successful

Case 2:22-cv-00544-FP Filed 05/09/25 Page 64 of 82 Document#121-2

resuscitation.  True?

A    You can't say for sure.

Q    In fact, even if CPR had been started within seconds of him first going -- or going unconscious, you can't say that even then that would have resulted in a successful resuscitation.  True?

A    There's no guarantee.

Q    Okay.  In terms of your criticisms of Nurse Kristiansen and the timing of what she did and the various, you know, progressions of what she did trying to determine whether he was unconscious or not, you cannot say that had she acted any differently or had she got him on the floor quicker that that would have resulted in a successful resuscitation.  True?

A    I could not say that for sure either.  Just merely increase chances.

Q    Okay.  And the extent to which those chances could be increased, it would be speculation?

A    It would.

Q    Okay.  And you're not able to tell me what percentage of individuals who experience asystole or who experience any type of cardiac event are actually successfully resuscitated afterwards;

fair to state?

A    You know, I've heard and -- that -- well, I can't say for absolutely sure.

Q    Now, when we look at Page 8 of your report -- let's see -- you mentioned the autopsy protocol report by Dr. Lelinski, paragraph 2.
Do you see that?

A    Yes.

Q    Okay.  You were provided with the autopsy report?

A    Yes.

Q    Okay.  Obviously, you not being a pathologist would not be able to comment one way or another upon her conclusions in that report?

A    Well, I guess in that respect, I've read a number of autopsy reports throughout the years, but for the Court, no.

Q    Have you seen Dr. Lelinski's deposition transcript?

A    I did.

Q    Okay.  And were you aware, having read that, that she indicated that she was not able to determine that asphyxia was the cause of death based upon her autopsy, but instead had to rely upon her review of the video?

A    Right, that it was in combination.

Q    Okay.  Now, your opinion discussion, opinion section there, starts out as follows:  "The mental health and medical care that Mr. Malcolm James received during his incarceration in the Racine County Jail fell far below the standards for health services in jails as set forth by the National Commission on Correctional Health Care."
Did I read that correctly?

A    Yes, and that's the standards that I cite following that, of course.

Q    Okay.  And we've talked about that already, but you're not going to be offering standard of care opinions in this case on mental healthcare, as you've mentioned it.  True?

A    Yeah.

Q    Okay.  And we've also talked about the fact that the NCCHC does not set the standard of care, so whether or not the medical care rendered in this case fell below the standard for health services in jails set forth by the --

A    Well --

Q    -- NCCHC is not an indication of whether or not the standard of care was met.  True?

A    Well -- and here's -- here's the deal.  When you -- when we talked about this previously:

There are no other besides the other organization written standards of care in jails.  NCCHC is, as Dr. Leonard considered, them the gold standard that he wrote in his agreement.  He's actually certified by the NCCHC, as we spoke to earlier.  So these are the best standards that are available.  There are no other written standards for jails or prisons.

Q    Well, standards of care don't need to be written to be standards of care, do they?

A    Well, anybody can do anything they want and call it standard then, couldn't they, if there's governing body?

Q    Well, I mean, if the standard of care --

A    Versus our standard, this is -- (crosstalk) --
(Court reporter admonition.)

A    -- our standard, and no, this is our standard.

BY MR. FRANCKOWIAK:

Q    Okay.  Because the standard of care for any given provider is that which a reasonable provider of the same or similar circumstances would provide.
They don't have to be written, it's just what the reasonable provider would do under the same or similar circumstances.
Fair to state?

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

Case 2:22-cv-00544-PP   Filed 06/09/25   Page 65 of 82   Document 121-2

MR. NAFFZIGER: Object to form.

You can answer.

A Well, once again, if there is no official written or stated or agreed upon standards, like you're referring to a jail, many jails do things many -- differently. So if you don't have any type of written standard to refer to or even a verbal that's agreed upon by most parties as to be a standard, then what do you have? You really need to have written standards that you adhere to.

BY MR. FRANCKOWIAK:

Q Okay. Are you able to point me to any document or source or literature that would indicate or that would support your opinion that a jail facility or a correctional healthcare provider needs to have some sort of written standard of care?

A Do you mean per regulation?

Q Yeah. Per regulation, per anything, is there any literature you can cite me to?

A Well, you know what? It's really in their best interest to avoid situations such as this. I will say that.

Do they have to? No.

What happened in California is the prison system was so problematic, and all the

prisons were doing different -- different care issues, and that's when Title 22 was developed for the correctional treatment centers that we opened in those areas, which made all the regulations. And for quite some time, there was federal oversight over those prisons, you know, to institute because the care was so poor.

So you can't just -- is your standard poor care, you know, for all these prisons? It was at that time. But it had to be improved because it was so poor.

So that standard was not a good standard, or those standards were not good standards.

Q Okay. Does Wisconsin have a counterpart to Title 22 from California?

A I'm not sure.

Q Did you try to find that out or look in any of your opinions?

A No, I didn't.

Q Okay. Would that have been important to determine whether or not Wisconsin had a counterpart to Title 22?

A Well, it would be helpful to see if they had to adhere to a specific -- you know, a number of

specific regulations such as California does or when they developed that. And it's very, you know -- I mean, I'm talking about comprehensive -- you know, comprehensive care.

Q Okay. And in terms of whether or not Wisconsin has any type of either statute or administrative regulation that would talk about prisons or prison healthcare, you just don't know one way or another because you didn't look?

A Well, that's -- I did not look.

Q Okay. Now, you also state in that same paragraph, the last words in that paragraph that we just talked about, it says, "and the deviation from this standard of care contributed significantly to his death."

Do you see what I'm pointing to there?

A No. Where are you now? What page?

Q Yeah. I'm on Page 8 about halfway down under the discussion and opinion section. And it said that "The mental health and medical care that Malcolm James received during his incarceration in the Racine County Jail" --

A Oh, yes.

Q -- "fell far below the standards," right?

A Um-hmm.

Q "And the deviation from this standard of care contributed significantly to his death."

Did I read that correctly?

A Yes.

Q Okay. And just to make sure that we've already covered this, however, we've already discussed that you are not qualified to comment on the cause of death and will not be therefore offering any opinions to the effect that a deviation from the standard of care in this case did, in fact, contribute or cause Mr. James' death. True?

A Contribute.

Q Okay. Well, okay, you're not able to --

A 'Cause I can't -- so I should have just said "contributed."

Q Well, when we say "either caused or contributed," you're not able to make a determination or to offer an opinion as to cause of death, so you therefore are not qualified to testify that any alleged breach of any standard caused or contributed to the death of Mr. James. True?

A If you --

MR. NAFFZIGER: Objection. Form.

You can answer.

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

Case 2:22-cv-00944-PP Filed 05/09/25 Page 66 of 82 Document 121-2

THE STENOGRAPHER: Repeat your answer, please.

A If you say so, sir.

BY MR. FRANCKOWIAK:

Q Well, do you believe you have any qualifications that would allow you to testify on the cause of death?

A Not in this court --

Q Okay.

A -- that they would accept.

Q Okay. And you understand, of course -- I mean, the reason we are here is because of testimony that you will be purporting to give before a Court in a federal lawsuit. True?

A Right.

Q Okay. So what we're really trying to decide here is what you're able to speak to, to a reasonable degree of nursing certainty, and within your scope of your ability to testify. True?

A Okay.

Q Okay. And even as you mentioned as part of your -- the contract that you signed or the retainer agreement is that you will only agree to render opinions that you believe to be within the scope of your ability to offer those opinions

because that's a limitation on what you can offer. And you understand --

A And it was that I believe, yes.

Q Okay. Okay. Now, when we talk a little bit about at the very top of Page 9, I want to address something you -- you talk a little bit about the mental healthcare here. And the very bottom of Page 8 and then onto the top of Page 9, there's a sentence that reads as follows: "The next follow-up was listed as next clinic day."

And this is referring to that very first mental health visit on May 29th.

Do you see that?

A I don't see it, but I recall it.

Q Right. Well, at the top of the paragraph at the bottom of Page 8, it says, "On May 29th, 2021, while Mr. James was under suicide watch, Melissa Olsen conducted a mental health assessment."

And that was Exhibit 18, I think you and I --

A Right. Right.

Q Okay. The next follow-up was listed as "next clinic day," you write at the top of Page 9 of your report.

A Right. We went over that before, yes.

Q "There was no referral to an advanced practitioner for a diagnosis and obviously needed medication."

We can agree that you are not able to testify that any given psychotropic medication was appropriate or necessary or obviously needed for Mr. James on May 29th. True?

A Well, that's what the mental health individuals said, though, that he wanted to refer for medication --

Q Right. In terms of whether --

A -- on the second time around. I'm surprised they didn't do that the first time around. And, you know, even, though, you say, yes, I am not qualified, this is having surveyed many, you know, mental health facilities and, you know, state mental health facilities and private.

Q Well, what medication was obviously needed as of May 29th?

A Well, you know, I can't -- I can't prescribe specific medications, and he would have to have a diagnosis first.

Q Okay. Well, since his only diagnosis was depression, what obviously needed depression medication --

A He was never seen by a psychiatrist.

Q Okay.

A He never had a diagnoses.

Q So you're not able to tell me in your report --

A Even a medication to calm him down from whacking his head on the -- on the sides of his cells --

Q Okay.

A -- he received no medication whatsoever.

Q And what medication would have been appropriate?

A Oh, there are many.

Q Okay. And what medication have you yourself prescribed in order to calm someone down?

A As you know, sir, I cannot prescribe. We've already covered that.

Q I know. We've also covered that you can't diagnose whether someone obviously needs medication, but your report says that, so I have to address that.

A That's not a diagnoses, that's just merely an opinion.

Q Okay. Well, I'm here to discover your opinions and the opinions that you are going to tell the Court that you're capable of giving. And you've opined that he had obviously needed medications as of the 29th, so I need to determine how you determine that he obviously needed medication,

what medication he needed --

A   That would be -- that would be from my experience. Like, I -- this is -- I'm being rather redundant in surveying mental health facilities.  And the specific medication, there are a number of benzodiazepines, different things that could calm this individual.  Like you said, I can't prescribe, so I won't give specifics, but something of that nature.  It appeared to me that that would have been extremely helpful and possibly would have calmed him where he wasn't hitting his head constantly on the sides of the cell.

Q   Okay.  And what evidence did you have --

A   Like I say, that is -- that is just my opinion based upon my experience doing surveys.

Q   And what evidence did you have that Melissa Olsen, the mental healthcare provider, on May 29th, knew that he was hitting his head and thus needed some sort of medication to, as you say, calm him down?

A   Well, talk therapy wasn't very effective, was it?

Q   Well, but the question was, what evidence did you have that --

A   My question is, why didn't she refer him right then if we have -- we have a very serious

self-injurious event that he's repeating.

Q   Okay.  And what evidence --

(Crosstalk.)

A   So he would definitely benefit by seeing a psychiatrist, and in all likelihood, just as a second mental health individual referred him to someone that could get him medication.

BY MR. FRANCKOWIAK:

Q   And what evidence do you have that Melissa Olsen had any indication that he had attempted on multiple occasions as of May 29th to injure himself?

A   I don't have evidence of -- at that point in time for her, but I -- I don't know that -- because at that point in time, he was not hitting his head yet, but we know that he was suicidal and he did -- you know, he did mention to that, that he -- well, he really was.  He said he wasn't, but he was.

Q   You have no --

A   It seemed like -- it seems like, you know, psychiatric help was warranted.

Q   Okay.  And you have no basis to indicate that he obviously needed any type of medication on May 29th.  True?

A   Okay.  Perhaps.

Q   Okay.  When we look at the next paragraph there on Page 9, it says, "Prior to the next mental health assessment that was conducted by an MHP on June 1st, 2021, Mr. James had numerous episodes of head-banging, delusional thoughts, and verbalizations, and had been forced in and out of an emergency restraint chair repeatedly."

Did I read that correctly?

A   Right, um-hmm.

Q   So as of June 1st of 2021, what evidence do you have that any mental healthcare provider was aware of any episodes of head-banging?

A   Well, and that's problematic in itself because I referred to Custody not being -- informing Mental Health each time he was doing this where they had to forcibly extract him.

Q   Okay.

A   So, you know, that is problematic in that respect.

Q   Okay.  But the answer to that is that you have no information that mental healthcare provider on June 1st had any knowledge that there were any episodes of head-banging.  True?

A   He should have had that information, but there's no -- I don't know that he did, no.

Q   And you can't state, in fact, what was causing the episodes of head-banging, can you?

A   I cannot.

Q   Okay.  In fact, you also mention delusional thoughts and verbalizations.

Obviously, delusional thoughts, we can agree, would be a psychiatric diagnosis, and you would not be able to offer a --

A   As we referred to previously, we've already spoke to that --

Q   Um-hmm.

A   -- and that was his belief that office being raped and -- by Custody, and they were trying to kill him.

And so delusional, I will once again say "the belief."  That was his -- I believe those were his thoughts.

Q   And you draw that conclusion from the --

A   They were not factual.

Q   Okay.  And you draw that conclusion from a statement that he made that he was being sexually harassed and he won't lay down for anyone?

A   Among other things, yes.  Along with "get off me" when there was no one around him.  He was all by himself.

Case 2:22-cv-00544-RFB   Filed 05/05/25   Page 68 of 82   Document #121-2

Lexitas operates in all 50 states and is licensed where required Nevada Registration #11BF
California Firm Registration #179

LEXITAS

Page 273

Q   Okay.

A   He didn't mention that previously.

Q   Did he ever -- did you ever observe anywhere in the record him saying that he believed that the officers were going to rape him?

A   Well, I don't know who he was talking to when he said -- and made those statements, but he was making those statements when they were trying to extract him from the cell.

Q   Okay.

A   So I presume that he was thinking the officers were trying to rape him.

Q   Okay.

A   I'm not sure who else he thought was trying to do that.

Q   When we look at the bottom of that paragraph, you state, "This time the preprinted box for 'referred to medical provider for medication consideration' was given a checkmark. However, this referral did not occur, and the next follow-up was listed merely as next clinic day again."
          Did I read that correctly?

A   We've already read that.  Yes, we read it again.

Q   And we talked about that already because --

A   We did.

Page 274

Q   -- he ended up passing away that day, and thus never had a chance to see a medical provider. True?

A   Well, you know what?  You can always grab the phone and call the doc.

Q   Um-hmm.  You mention in the next paragraph, "It was apparent that the jail's mental health services department was not able to treat Mr. James' mental illness."
          Did I read that correctly?

A   Yes.

Q   Okay.  First of all, please identify for me what mental illness he had.

A   Well, we know it was undiagnosed.  There was no diagnoses.  We've already covered that.

Q   Okay.  So you believe he had an undiagnosed --

A   Well, obviously, he had mental health problems based upon all this behavior.
          I mean, do we need to repeat them all?

Q   Okay.  So he had some kind of undiagnosed mental illness that was not diagnosed by any provider who saw him in 27 years, nor the hospital, the Ascension hospital who saw him twice in the previous five days.  True?

Page 275

          MR. NAFFZIGER:  Objection.  Foundation.
          You can answer.

A   Well, you have to look at his current situation --

BY MR. FRANCKOWIAK:

Q   Okay.

A   -- not -- through, you know -- not previous -- you know, previous years --

Q   What is the basis --

A   -- where there was no diagnoses doesn't mean that he doesn't have one now.  We don't know because he was never seen.

Q   What is the basis for your statement that it was apparent that the jail's mental health services department was not able to treat Mr. James' mental illness?

A   Because he continued his self-injurious behavior, which someone who doesn't have mental health problems doesn't continue to do that.  It was not treated with mental health or medically, it was treated by the restraint chair, the emergency restraint chair, which, you know what, first time around, and if you calm down, that's one thing.  It was again and again.  So for his treatment was to Taser and spray and restraint chair repeatedly.  That was the treatment that he received.

Page 276

Q   Um-hmm.  For his undiagnosed mental illness?

A   Yeah.

Q   Okay.  And what is the training and background that would allow you to determine to a reasonable degree of medical probability that he, in fact, had an undiagnosed mental illness without speculating?

          MR. NAFFZIGER:  I'll object to form, and asked and answered.
          You can answer.

A   Sir, once again, that would only be from my experience serving mental health facilities, reading charts for specific patients, looking at their treatment programs, medications that they received, and doing those surveys.
          So can I diagnose myself?  We've already covered that.
          Do I have any experience in situations similar to this from surveying or doing complaint investigations?  Yes, I do.

BY MR. FRANCKOWIAK:

Q   When we look at the top of Page 10 of your report, you indicate there in the first full paragraph, "Mr. James was not a healthy individual, weighing 335 pounds and being hypertensive."

Case 2:22-cv-00944-PP   Filed 05/09/25   Page 69 of 82   Document 121-2

Did I read that correctly?

A   Absolutely.

Q   Okay.  Were those his only physical comorbidities at the time?

A   That's the only thing that was known at the time, I guess.  That's the only thing in documentation, and so I don't know beyond that.

Q   Okay.  So you don't -- as you sit here today, you don't have any indication that he was not a healthy individual other than the fact that he was 335 pounds and was hypertensive?

A   Right.  Yes, both of those.

Q   Okay.  And your next line says, "Additionally, the extreme bent over position he was held in compressed his diaphragm and ribcage, restricting his breathing way beyond that of just being held in a prone position."

Did I read that correctly?

A   We've already spoke to that also, yes.

Q   Yes.  Okay.

And I want to make sure one final time, do you have anything other than your review of that video that you can point me to as the basis for that statement that I just read?

MR. NAFFZIGER:  Objection that it's

asked and answered.

You can answer.

A   Sir, one more time, please.

BY MR. FRANCKOWIAK:

Q   Yes.  The statement that I read is as follows: "Additionally, the extreme bent-over position that he was held in compressed his diaphram and ribcage, restricting his breathing way beyond that of just being held in a prone position."

Are you able to point me to anything other than your review of the video that would support the statement that I just read?

A   That he was in that extreme bent-over position?

Q   And that he was held in a way in that -- which compressed his diaphragm and ribcage, which restricted his breathing way a beyond that being held in a prone position.

A   Well, we already approached that looking at the NIH study as a stepping stone and the anatomies of being in that position.

Q   Okay.

A   So --

Q   That's what I was asking.

A   -- so it's the same as before.

Q   And those are the things you rely upon as the

basis for that statement?

A   That is correct.

Q   Okay.

MR. NAFFZIGER:  Can we take a five-minute break?

MR. FRANCKOWIAK:  Sure.  I'm just about done with his report.  I'm going to be go on to his last two, and we'll be done shortly thereafter.

MR. NAFFZIGER:  All right.  I'm going to use the restroom.  I'll be right back.

(Brief recess taken from 4:17 p.m. to 4:25 p.m.)

BY MR. FRANCKOWIAK:

Q   Back on the record.

Mr. Biggs, I'd like to talk next about your second report, which is Exhibit No. 12, and this is the one that is dated November 11th, 2024.

Do you have that copy in front of you?

A   Yep.

Q   Okay.  This is the first addendum report, and the first thing that you mentioned there is -- looks like a reference to some testimony of Correctional

Officer Davalos, and you make mention that he was asked in his deposition whether he saw any urgency in terms of Crystal's actions when she responded as the custody staff's call, and Mr. Davalos stated that it didn't appear so.

Did I read that correctly?

A   Yes, uh-huh.

Q   Okay.  And what's the reason for relying on this statement from Mr. Davalos?

A   It's merely support.  That's what I saw in the video.  When she's called over, she says, "wait just a minute," and she slowly, slowly walks over to the area where they were.

Q   Okay.  And what, if any, medical training did the correctional officer have?

A   I don't believe he had medical training.  I'm not sure if you really need that to determine a sense of urgency.

Q   Okay.  Well, how do you define "urgency" and how did he define "urgency"?

A   I don't know his definition.  All I know is that what he said supports what I saw.

Q   Okay.

A   And I think most individuals that saw that video would agree that there's really no sense of

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179



Page 281

concern or, you know, urgency to come over there and take care of business. You know, everybody in a medical emergency needs to stay calm, but you work quickly. You can go to an ER and you see emergency nurses, yes, that are calm, but boy, they're moving, they're not playing around.

Q   Um-hmm. And are you taught as a nurse to try to remain calm?

A   You know, in nursing school, sure, yeah.

Q   Okay. Is there any medical value to hurrying through things?

A   Well, when time is of the essence, yes.

Q   And obviously --

A   When -- you know, this individual, they were called over because they were very concerned that he went limp.

Q   And then she, of course, was in a position where she had to determine what was going on, which is a position that luckily none of us are in, nor were you in, because you had all of the information years after the fact. True?

A   I saw that information after the fact, yes.

Q   Um-hmm.

A   I really don't need to reiterate the gyrations that she went through to try and determine if he

Page 282

had a pulse or if he didn't. We've already covered all of that.

Q   That's correct. That's correct.
    So you knew what the outcome was when you first looked at the case and you had the course of events already established, and you knew from the second you watched that video exactly what went down from the very beginning you began to look at this case. True?

A   Well, yes, I did. So it does give you the opportunity to, yes, look at things and critique them. It doesn't mean that they were appropriate or inappropriate. It just gives you that ability to do so.

Q   Um-hmm. Do you frequently rely on statements from nonexperts or people with no medical knowledge, or do you typically base your opinions on such statements?

A   No. The only reason that I added this is that it supports my opinion, and like I say, it's not necessarily a medical opinion that he needs to -- you know, I, mean anyone can see a sense of urgency is there or it is not, if someone's moving fast or they're moving very slowly.

Q   Okay. Let's talk about your conclusions on the

Page 283

last paragraphs of this.
    The first conclusion there says, "Registered nurse, Crystal Kristiansen, demonstrated a lack of urgency during Mr. James' medical emergency."
    Did I read that correctly?

A   Yes.

Q   All right. We've talked about that already.

A   We have.

Q   And she didn't know at the time that it was a medical emergency until she had a chance to take a look at the situation; fair to state?

A   Well, they did call her over when they screened the medical. That kind of indicates, hey, we need someone over here now.

Q   Yeah.

A   It wasn't like, Nurse Kristiansen, when you have a moment, can you come over?
    No, they just screamed "Medical."

Q   And they called Medical, too, initially to come over to help them with the barbs, too, correct?

A   Yes, um-hmm.

Q   And that wasn't a life-threatening situation there, was it?

A   That was not.

Page 284

Q   Okay. So when the word "Medical" is called out, obviously, that act alone does not mean that there necessarily connotes a medical emergency; we can agree with that?

A   Well, not necessarily, but you can listen to the tone of voice, and the volume, you know, seems a little bit more crucial, but yeah.

Q   You mention in Point No. 2, "Although Nurse Crystal Kristiansen was aware that CPR should be initiated immediately after respirations and heartbeat have ceased, she failed to start CPR at that moment or at any time thereafter."
    Did I read that correctly?

A   That is correct.

Q   Yeah. According to her testimony, she was not able to determine a specific point in time when respirations and heartbeat had ceased. True?

A   Well, we've already covered that, that she should have. She did not do that properly. And I know she was questioned in her deposition, you know, about checking an unresponsive patient. And she did respond appropriately, check heart rate, airway, initiate CPR if necessary, but she didn't do a proper assessment. She never determined that's what she said, that he was pulseless.

Case 2:22-cv-00544-FFF   Filed 05/05/25   Page 71 of 82   Document #121-2

Page 285

Q And I think you had told me that even you can't determine the point at which his respirations or heartbeat ceased. True?

A Well, not by video. If I was there, I certainly could, and that's what I was referring to --

Q Okay.

A -- like, in his carotid right away.

Q So you're expecting her to be able to determine something that you admittedly can't do in this case?

A Sir, if I was there and not on the video, I would palpate it myself to see if he had a pulse or not. On the video, being here looking at it, of course I can't determine when.

Q Okay. Your third opinion is, "Despite knowing that the custody staff present was CPR-certified, she did not direct any of them to CPR or assist her in performing it."

Did I read that correctly?

A That is correct.

Q And certainly, if she believed or did not believe that CPR was necessarily required for herself there would be no reason for her to direct someone else to do so?

A Well, this is when she already laid him down.

Page 286

They were laying him down. And someone ran for the AED, and CPR was not initiated. Like I said previously, she could have initiated compressions right away as soon as he was laid down to increase his possibilities of survival.

Q Uh-huh.

A And then when the AED came, you have the option -- all the COs are trained to apply that, and so is she, and they're also CPR-trained. So she could have them take over compressions while she's preparing the AED.

Q Okay. How long did it take for her to apply the pads from the AED?

A I didn't time it.

Q Okay. How long after he was finally laid on the floor were those AED pads placed?

A I didn't time that either.

Q Okay. Your last opinion there is "Nurse Crystal Kristiansen understood that pressure on the diaphragm or ribcage can restrict breathing and potentially cause asphyxiation but failed to intervene or inform the custody staff who were holding Mr. James in an extreme bent over position."

Did I read that correctly?

Page 287

A Yes, sir.

Q Okay. You address that a little bit in your report. You are referencing back to her deposition in which she was asked the following question: "Based on your training and experience as a nurse as of June 1st, 2021, you knew that if Mr. James' diaphragm and ribcage were compressed and restricted, breathing could thus -- or breathing -- this thus could cause asphyxiation, correct?"

And Nurse Kristiansen's response was, "Going by anatomy, yes."

You mention that in your report here. True?

A Yes, and that's what she said in her depo, "going by anatomy." Yes.

Q Okay. Was she asked in her deposition whether she believed his diaphragm and ribcage were actually being compressed or restricted in any way in this case?

A I would have to go back to the actual question there, but I'm -- obviously, that's what we're referring to when I -- when the question was posted, you know, to this particular incident.

Q Is there a difference between knowing that

Page 288

something can happen and believing that it actually is happening?

A Well, yes, obviously.

Q Okay. If I were to, for example, drop a thousand-pound stone on Mr. James' abdomen, that could certainly disrupt his diaphragm or compress his ribcage and restrict his breathing, but that didn't happen in this case, did it?

A No.

Q Just because, theoretically, dropping a thousand-pound stone on him could potentially compress his ribcage and diaphragm does not mean that is what happened in this case, nor does it believe [sic] that anyone believed that is what happened?

A Well, the thousand-pound stone was not dropped, but he was placed in that extreme bent-over position.

Q Um-hmm. And that's the position you're referencing when he was facedown, hip-flexed forward while the guards were attempting to remove the barbs from his back?

A Yes.

Q Okay. The position that was ultimately determined to be completely consistent with the appropriate

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

Case 2:22-cv-00544-PP   Filed 06/09/25   Page 72 of 82   Document 121-2



Page 289

use of force and the training of the guards?

A Is that --

MR. NAFFZIGER: Objection. Foundation. Form.

You can answer.

A That position was determined all the way down with pulling his -- whoa, no, no, no.

His shoulders and his head on his neck pulling all the way down?

That's an approved position. I never saw that.

BY MR. FRANCKOWIAK:

Q Okay. So you didn't actually review the -- Attorney Hanson's report from the DA's office?

A I did review that. I did not see anywhere where that is an approved position in a restraint chair to pull someone, especially someone that is so obese, all the way down into that extreme position.

Q Okay.

A I find that very odd that that would be an approved position. I would love to see that, actually.

Q Have you been provided any expert opinions from any other experts in this case?

Page 290

A No.

Q Okay. Have you seen anyone who has rendered an opinion that the restraint technique that was utilized on Mr. James was not, in fact, fully consistent with the training of the correctional officers on that date?

A I have not seen that either way.

Q Okay. And that obviously is something you can't comment upon because you're not a correctional officer and it's outside of your scope of training and education. True?

A And I never saw the training. I would be able to speak to that if I saw the entire training, of course.

Q I want to talk a little bit about then your next report, which is Exhibit No. 13. This is Report No. 3. This one is dated January 2nd of 2025.

Do you have that one in front of you?

A Yes. And like I said before, a lot of that is the same as the November reports because I included the same -- the same information with the materials that I didn't in that report. So almost all of that is the same except on Page 2 where -- let's see, one, two, three -- the fourth paragraph

Page 291

down where I refer to the policy that also was in violation.

Q I noticed that. It looks like that fourth paragraph on Page 2 appears to be the only part of Report No. 3 that is new or that is different from Report No. 2. And that is --

(Crosstalk.)

A That's correct. That's correct. And once again, the reason I did that, that I had the rest of No. 2 is I put all the materials reviewed.

Q Okay. What is it that caused you to put this particular paragraph, Paragraph No. 4, in this report at this point rather than just putting it in your second report?

A You know, to be honest with you, I am not sure that I had this -- I don't believe I had that policy at that point in time.

Q Okay. And that new opinion in that paragraph 4, states that "Crystal Kristiansen's failure to provide CPR to Mr. James also violated MEnD Correctional Care's policy entitled 'Emergency Management and Response,'" and then you have some quotes from that, that supposed policy, right underneath that.

Is that what I'm reading here?

Page 292

A Yes, uh-huh.

Q And are those, those quotes from the policy, are those supposedly the areas of the policy that you believe were violated?

A That particular portion, yes.

Q Okay.

A Where it says, "Registered nurse will promptly respond to patients and assess their condition and situation, improved the emergency care as indicated for their CPR and first aid training."

Q Okay. And can we agree based upon your review of the video that Crystal Kristiansen did, in fact, promptly respond to the patient and assess his condition when she was called to do so by the correctional officers?

A She didn't properly assess it. We've already covered that. And when it was determined that CPR was needed, it was not instituted, it was not initiated.

Q Of --

A It was not initiated until paramedics came, and they jumped in almost immediately and performed CPR.

Q Okay. Well, let me break that down a little bit because you said she did not promptly respond. In

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
California Firm Registration #179
Case 2:22-cv-00544-PP Filed 05/09/25 Page 73 of 82 Document 121-2



Page 293

fact, she did respond to the call for Medical, and then she performed a series of maneuvers which you understandably disagree with, and you believe she did not meet the standard of care in the way that she provided those maneuvers.

But she did, in fact, objectively respond to the situation and provide certain courses of conduct or care that was attempting to determine what was wrong with Mr. James; did she not?

A   She did respond.

Q   Okay.  You disagree with the response, but she did respond?

A   Yes.

Q   Okay.  And you also disagree that -- or you mention, "Providing emergency care as indicated per CPR and first aid training."

She did provide emergency care consistent with what she believed the situation to be at the time, according to her testimony, did she not?

A   According to her very unusual and -- assessment, that is not an actual nursing assessment that a nurse would perform.

Q   Okay.  And you disagree with that, but, obviously,

Page 294

from her point of view, she actually complied with this policy as stated in this section.  True?

A   Oh, did she?  I don't know.  Is that what she said?

Q   And do you know in Wisconsin if policies and procedures can constitute -- or do they constitute the standard of care, the policies and procedures of a private entity like MEnD?

MR. NAFFZIGER:  Object to form.

You can answer.

A   You know, I -- I don't know for sure, but, you know, it's certainly should be pertinent.  It is support.

BY MR. FRANCKOWIAK:

Q   Okay.  The last thing I have for you is the last report, which I received for the first time yesterday.

Can you just tell me -- I guess it was dated March 31st, 2025 -- what is the reason for the creation of this report at this late date?

A   And that was based upon additional information.  You can see 1 through 9 that I received.

Q   Okay.

A   And based upon that information, that's --

Q   Okay.  I am going to ask you some questions since

Page 295

this is my only chance to talk to you.  I'm going to ask you some questions about this report without prejudice to my intention and ability to move the Court to strike this report and these opinions as untimely, so let's talk a little bit about them just so I understand what you're saying.

This report seems to be aimed particularly and exclusively, from what I can tell, at a document created by Dr. Leonard, his mortality review, specifically.

Is that an accurate statement of what this report is focusing on?

A   I -- yes.  Yes, it is.

Q   Okay.  And at some point recently, you received a clinical mortality review?

A   Yes.

Q   That was written by him, by Dr. Leonard?

A   I believe in his depo he said he had a -- he recalls that he must have had a hand in it, but there may have been other individuals that were involved.  But he didn't sign it, but it does say it's typed, submitted by him as the president of MEnD Correctional Care.

Q   All right.  And it looks like you cite another

Page 296

standard from the NCCHC here which is a standard applicable to the procedure in the event of an inmate death.

A   That is correct.

Q   Okay.  And you have some criticisms of Dr. Leonard's compliance with that NCCHC standard, and those things are set forth on Page 2 of this report, it looks like.

A   Yes.

Q   Okay.  Now, you mention that "Review of this clinical mortality review revealed that the following NCCHC standard components were excluded," and then you have four things down there:  First of all, noting that it was concluded about 72 days after the death, rather than 30 days; an administrative review was not conducted; treating staff were not informed of the findings; and there was no mention of the cause or manner of death.

A   That is correct.

Q   What I want to -- I want to ask you, first of all, is, where did you obtain this information underlying these four things?

A   That is in reference to the procedure in the event of death in NCC -- NCCHC J-A-09 that's right above

888-893-3767
www.lexitaslegal.com                Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F   LEXITAS
                                     California Firm Registration #179

there. And if you read a little bit further, he has almost the same things in his own policy and procedure for MEnD, many of them; that he made the statement that he mirrors a number of theirs in his own procedures. So you'll find that those items there were missing, and also, when you read a little bit further in his own policy and procedure, which I mentioned, a lot of the same things are also missing that he says that he would utilize in his own policy.

Q    Okay. Where did you -- where did you find that there was no administrative review conducted or that treating staff were not informed of the findings?

A    It's nowhere in this report, and also, there are depositions -- I believe Nurse Kristiansen, if she was ever involved in anything, any review of any report, which she was not, and there was no evidence in here that there was any type of administrative review and that custody should also, you know, be apprised of the results.

Q    Okay. In the wake of Mr. James' death, what information did Dr. Leonard request to receive from the jail?

A    I'm not sure what he actually requested.

Q    Okay. In the wake of Mr. James' death, what information was he actually provided by the jail?

A    He doesn't list them separately on here. I do know that in the deposition he mentioned that he did not have the autopsy. He never saw it. And I believe he also said that he never requested it. I'm not sure about the requested, but I know he said he never saw the -- and it says at the bottom that there's no cause of death that he's aware of.

And there is no it critique of clinically occurrences as to what happened. The whole point of this review is merely it's a quality improvement procedure is what it is, so in the future, similar events will not affect another patient.

Q    Um-hmm.

A    That's the whole reason for this review.

Q    And the conclusion of this review is that there was no step that needed to be taken in order to -- to fix any issue based upon the information that was available to him at the time?

A    Well, this is -- this is merely -- what he goes through here, like I say, there's no clinical critique whatsoever. He's basically just getting the chronological events, you know, sharing what

happened, happened, happened, and then at the end just saying, "It's all good even though we don't know what the cause of death was, hey" --

Q    Was he provided a copy?

A    The whole purpose of doing that was never -- never came about. It was never critiqued, it was never -- there was never anything looked at to see if, yes, we did, we actually really did everything right, or no, we have some problems, or we could improve on this. And the whole purpose of it really, it -- it didn't accomplish.

Q    Was he ever provided a copy of the video?

A    I think he said he never viewed the video in his deposition.

Q    Okay. And would you have been able to come to any of your opinions in this case without looking at the video?

A    The video would have been quite helpful, I must say. Just as the pathologist, you know, based upon her autopsy also found the video very helpful in coming to her conclusion. So that would be. Why that wasn't reviewed is a good question. Why did he not -- that's key. As we all know, that is key to what occurred.

Q    Okay. And if he had requested that video, it was

never provided to him for whatever reason, the opinions set forth in this report would be different, would they not?

A    They would be different if it was supplied to him or not supplied?

One more time, sir.

Q    Yeah. If he requested the video, and it was not provided to him for whatever reason, and thus he never had a chance to see it, as you did, your opinions would be different, would they not?

MR. NAFFZIGER: Objection. Foundation.

You can answer.

A    My opinions of his report would be different.

Is that what you're asking?

BY MR. FRANCKOWIAK:

Q    Yeah. The opinions you set forth in this report that we're looking at, Exhibit No. 16, would be different?

A    If I had never seen the video?

Q    If he had requested to see it and it was never provided to him and thus he did not have the benefit of seeing the video as you did.

MR. NAFFZIGER: Same objection.

You can answer.

A    I must say, I still don't understand the question,

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
California Firm Registration #179

Page 301

that if he requested the video -- which I don't know that he did -- and didn't receive it, would my opinion be different?

BY MR. FRANCKOWIAK:

Q   Your opinion is that for some reason, his clinical mortality review was not consistent with the NCCHC standard that you cite?

A   Right.  And his own policy, that is correct.

Q   And that there were some things missing, assuming that he had information that he did not incorporate in his report.  If indeed he included every last piece of information to which he had access in that report, your opinion would be different, i.e., you would not have the criticisms that you are stating in this report.

Would you --

(Crosstalk.)

MR. NAFFZIGER:  Objection.  Foundation. Form.

You can answer.

A   I can't say that for sure.

BY MR. FRANCKOWIAK:

Q   Okay.  Do you know what information or documentation he asked for and what or was not provided to him?

Page 302

A   Oh, we don't know.

Q   If he were to -- if he were to state in his deposition or to testify at trial that he was never provided a copy of the video, do you have any reason to doubt that?

A   I don't have any.

MR. NAFFZIGER:  Objection.  Form. Foundation.

You can answer.

A   I don't know why I would -- why I would doubt that.  Why -- I don't really understand why you ask that question.

BY MR. FRANCKOWIAK:

Q   As you sit here today, do you believe that you would have been capable of coming to any of your opinions in this case if you never had any video to review?

A   Any of the opinions?

Some, but not a lot of them.

Q   What opinions do you believe you could have reached if you never had a chance to look at the video?

A   That would be merely from documentation, from the -- whatever documentation that the nurse had also.  Mental Health was not involved in the

Page 303

video.  The opinions that he was -- it's very helpful to see the position that he was held over into.

So I can't really -- I can't really say for sure, looking back at all of the documentation, the actual opinions that I would have and I would not have.

Q   Okay.  Is it fair for me to state that the criticism, the sole criticism in this fourth report is with regard to the clinical mortality review, or is there something else that I'm missing?

A   That is the crux of it, yes.

Q   Now, the clinical mortality review in compliance with this standard from the NCCHC, it would be done, by definition, after an individual had died. True?

A   Of course.

Q   All right.  Under no circumstances would it be done before the death because the death is the reason for the clinical mortality review?

A   This is true.

Q   Okay.  And in this case, we know that the clinical mortality review was, in fact, done after Mr. James' death.  In fact, you say it was 70-some

Page 304

days after his death, 72 days.

A   Yes, um-hmm.

Q   Okay.  We can agree, given that this clinical mortality review did not even need to be concluded before 30 days post death and was not concluded until 72 days post death, that whether or not any NCCHC standard was violated or complied with relative to the creation of this document that did not cause Mr. James' death.  True?

A   One more time on that one, sir.

Q   Let me break it down a little bit.

I will assume for the sake of assumption, Dr. Leonard's clinical mortality review did not comply with the NCCHC standard that you are referencing.

A   That is true.

Q   If I were to assume that, we can agree nonetheless that the fact that that clinical mortality review did not meet this NCCHC standard did not cause or contribute to Mr. James' death.  True?

A   That is correct.

Q   Okay.  And even if we say -- even if we say Dr. Leonard's post death assessment or investigation or the completion of his report, even if it was not up to any standard, if it was

888-893-3767        Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
www.lexitaslegal.com                        California Firm Registration #179                              LEXITAS

negligent, if it was not done correctly, even if we assume that, we can agree that none of that caused Mr. James' death. True?

A   Of course. That is not the purpose. The purpose, as I stated, is to do the review and to prevent similar incidents from -- you know, to improve care, similar incidents in the future.

Q   Right. And all I want to know, and I want to make that this is -- we have an understanding as we go to trial on this, that all of the -- all of the opinions you state in this reported, Exhibit No. 16, none of those criticisms, even if we assume they're all absolutely accurate, none of them impacted Mr. James or would have prevented his death if these reports had been done differently?

A   That is correct.

Q   Okay. The plaintiff would not have sustained any damages at all as a result of any failure to properly draft this post -- this mortality review in any other way than Dr. Leonard actually did. True?

A   True.

Q   Okay. Now, I just -- the last thing I want to talk about on this document is your paragraph, the

conclusion -- and that is you state the conclusions of the original opinion paper, and then you state the dates remain. "However, the above-mentioned failures" -- and I assume when you say "the above-mentioned failures," that is -- that's just the documents or the criticisms or the failures you're talking about in this fourth report, Exhibit 16, right?

A   Uh-huh.

Q   Is that accurate?

A   Yes.

Q   Okay. You state, "The above-mentioned failures demonstrates MEnD's intentional, purposeful, knowing, and/or reckless disregard to preventing death to its patients, including but not limited to a failure to train MEnD employees on properly assessing whether a patient requires medical care instead of assuming that a patient is faking their symptoms."

Please tell me every basis you have to conclude that the criticisms in this report yet somehow demonstrate MEnD's intentional, purposeful, knowing, and/or reckless disregard to preventing death to its patients.

A   Basically, because their -- this report, the

clinical mortality review is not acceptable. It does not perform the purpose of improving care. And do I know what he -- what he tried to -- materials missing, the video, the -- he never got the autopsy. It's -- this is just -- it's no improvement in care. Going through this thing, it doesn't present the purpose at all.

Q   And I think as we've agreed, absolutely nothing with reference to this document would have made any difference whatsoever to Mr. James, would it?

A   We're talking about future events.

Q   Okay.

A   We've already covered that. Not in Mr. James, but patients in the future to improve your clinical care.

Q   Okay. So you are not saying that these criticisms are evidence of MEnD's intentional, purposeful, knowing, and reckless disregard of Mr. James' rights, you are saying that it is proof of MEnD's intentional, purposeful, knowing, and reckless disregard of the rights of some unknown and inchoate future patient of MEnD's?

MR. NAFFZIGER: Objection. Form.

You can answer.

A   Yes. Future patients with similar issues, that

is -- once, to reiterate, that is the whole point of doing this review is for -- it's like quality assurance for improving your care for the future.

Did it affect Mr. James? No. Did it improve care for some in the future? No.

BY MR. FRANCKOWIAK:

Q   Okay. And the last question I have for you on this section is, I understand that you have problems with what was included in the report and the timing of the report and the conclusions of the report, but what is it about that report that leads you to believe that it is evidence of MEnD's intentional, purposeful, knowing, and reckless disregard towards any future patient rather than just being a negligently created report or just having failed to meet the standard imposed by the NCCHC?

A   That is because it does not do the intended purpose to improve the care for futures. It doesn't -- there was -- there's really -- you don't even need to do this. There was no point to it. It didn't improve anything. It was not any type of quality assurance. It was to either satisfy his own policy and procedure, which mirrors the National Commission on Correctional

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
California Firm Registration #179

Case 2:22-cv-00544-JPH   Filed 05/05/25   Page 77 of 82   Document #121-2

Page 309

Health Care standard, I suppose, just to try and satisfy that requirement. Other than that, I have no idea why he even did the report.

Q   Okay. And you're not able to tell me what it is that you saw that would demonstrate to you that Dr. Leonard had some intentional desire to avoid making care better for his future patients.

A   Beyond -- this is not even a valid report. There's no point to even doing this.

Q   Okay. I have a couple questions. I have a series of propositions I'm going to read to you. We're done with your reports, and this is the last thing I have for you. I have a series of --

MR. NAFFZIGER: One second, one second. We're at 5:05 p.m., and I think that Ms. -- I'm going to mispronounce your name.

Is it Pezze, Pezze?

THE STENOGRAPHER: Pezze. I can go to --

MR. NAFFZIGER: Close enough, right?

THE STENOGRAPHER: Yes. Yes. Do you want to just go off the record?

MR. NAFFZIGER: I just -- yeah, let's go off the record. I mean, we have a hard stop at 5:30, and I'm going to have questions. Steve

Page 310

hasn't asked any questions. And we're over -- even including the breaks, I think we're up right against seven hours.

So, Jason, how much more do you really have, man, because we're -- we're kind of at the end here, because I don't know how many minutes of questions Steve has. You probably covered most of it, but...

MR. FRANCKOWIAK: Tell you what. Let me finish up with maybe two more questions --

MR. NAFFZIGER: Okay.

MR. FRANCKOWIAK: -- and I'll short-circuit the process.

MR. NAFFZIGER: Okay.

MR. FRANCKOWIAK: All right.

MR. FRANCKOWIAK

Q   All right. Based upon your review of the records and the deposition testimony, sir, you're aware that Mr. James could have at any time requested the provision of either medical or mental healthcare, had he desired it.

Are you aware of that?

A   Sure.

MR. NAFFZIGER: Objection. Foundation.

Page 311

BY MR. FRANCKOWIAK:

Q   Okay. And you have no understanding and cannot offer any opinions or comments as to why if indeed Mr. James was in need of any mental health or medical care, why he did not request it when it was freely available to him?

A   I don't know why he did not request that, yes.

Q   Okay. The last thing I have for you is, would it be fair for me to state that there is nothing in the materials you reviewed that would suggest that Crystal Kristiansen bore any type of ill will toward Mr. James?

MR. NAFFZIGER: Objection. Foundation. Form.

You can answer.

A   Here's the -- here's the situation: She knew what should have been done that she mentioned in her depositions. She was knowledgeable, but she intentionally decided not to do what she had learned as a registered nurse. She did not perform the protocol that you would expect of a registered nurse in her treatment rendered to Mr. James.

BY MR. FRANCKOWIAK:

Q   Okay. With due respect, however, the question is

Page 312

much simpler than that.

Is there anything that you saw that you can point to that would suggest that she actually bore ill will toward him?

MR. NAFFZIGER: Objection. Asked and answered.

You can answer again.

A   Well, I would -- I would say definitely indifference.

BY MR. FRANCKOWIAK:

Q   Okay. Is there anything that you observed that would indicate to you that at any time she did not intend or desire to help or aid Mr. James on June 1st?

MR. NAFFZIGER: Objection. Form. Asked and answered.

You can answer again.

A   I think we've already discussed that she did render care that was not appropriate, so there was no total lack of any care.

BY MR. FRANCKOWIAK:

Q   And, of course, you are critical of the care that she rendered in terms of whether it met the standard of care. True?

A   Yes. For a registered nurse, absolutely.

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

MR. FRANCKOWIAK: That's all I have for you. I will pass you on.

MR. McGAVER: I'm not going to belabor the issues here, especially since Attorney Franckowiak did cover any and all -- really all topics that would have been germane to my client, so I have no questions for this witness.

MR. NAFFZIGER: I love you, Steve. I hope that's on the record.

I just have a few follow-up questions.

E X A M I N A T I O N

BY MR. NAFFZIGER:

Q   At the very beginning and very end of your deposition, Mr. Biggs, you had mentioned that Nurse Kristiansen intentionally did not act as a reasonable nurse, and then Mr. Franckowiak asked you to give your definition of "intent," and you said it's a decision that Nurse Kristiansen made, and there was an intent for her not to perform her duties.

So you had also testified late in your deposition that you saw negligence.

I mean, is your point that what Nurse Kristiansen did definitely was negligent but

that it's -- this is above and beyond that, that Nurse Kristiansen made, you know, purposeful, intentional decisions where she neglected to provide certain care when she knew that Mr. James needed such care?

MR. McGAVER: I'll object to the form of the question.

MR. FRANCKOWIAK: Objection. Form and leading.

You can answer.

A   Okay. Okay. First of all, she didn't initiate care. It was initiated by the COs. The COs had to tell her to perform -- or suggested, do a sternal rub; suggested, use the pulse ox; suggested to obtain the AED. She did these after that was their suggestion.

When she finally -- you know, of course, she knows how to check for a pulse. Come on. She -- she didn't do that initially. It was like we're checking supposedly for swallowing, or at least they said he swallowed. Why you -- that's -- when your hand's there, you check the carotid, you don't check for swallowing.

When she finally determined, in all likelihood when she couldn't feel a pulse, you

better be acting right there, but she thought, well, he was heavy, so maybe he did have a pulse after all.

No. At that point in time, right then, it's time to get him out of the chair, lay him down, and we got to start taking care of business. She -- she knows how to do CPR. She states it. She knows that going by anatomy that that will obstruct the breathing in his ribcage. She admits that, well, yes, by anatomy, yes, she knew all these things, but she did not -- she didn't -- didn't act on them.

BY MR. NAFFZIGER:

Q   So did Nurse Kristiansen make, in your view, a conscious, intentional decision not to perform CPR when she knew it should be performed?

MR. FRANCKOWIAK: Objection to form. Leading.

A   That is correct. She knew it should be performed then. As soon as he was laid down, that's the time.

BY MR. NAFFZIGER:

Q   And did, in your view, Nurse Kristiansen make a conscious, intentional decision not to tell the correctional officers that placing Mr. James in a

hunched down position could risk serious injury or death to him?

MR. FRANCKOWIAK: Objection --

A   That's correct, also. Yes, because --

(Crosstalk.)

MR. McGAVER: Hold on. Make sure that the objections are noted on the record, please.

THE STENOGRAPHER: I'm sorry, I'm sorry --

MR. McGAVER: Whoa, whoa. You're talking all over each other.

MR. FRANCKOWIAK: Objection. Form. Leading.

MR. McGAVER: Thanks.

Now answer the question, please.

A   I believe that she said that she knew that could lead to positional asphyxiation.

BY MR. NAFFZIGER:

Q   And if you could look at Exhibit 16, the supplemental report on the very last page, which is Page 4.

A   Yeah. Yes, sir.

Q   There's just three paragraphs that I believe Mr. Franckowiak did not ask you about, and the first one starts with "Related to an August 2018

Page 317

inmate death in which MEnD staff members failed to provide care to the inmate, mistakenly believing that he was faking his illness, Dr. Todd Leonard was disciplined by the Minnesota Medical Board."

What, if anything, was significant to you about the discipline that occurred to Dr. Leonard in August 2018?

MR. FRANCKOWIAK: Objection. Foundation. Relevance.

(Crosstalk.)

A   Well, the significant --

THE STENOGRAPHER: Wait. I'm sorry.

MR. NAFFZIGER: Let them object first. Sorry.

MR. FRANCKOWIAK: Objection. Foundation and relevance.

BY MR. NAFFZIGER:

Q   Okay. You can answer now that the objection has been made. Thank you.

A   Okay. You know, in that particular incidence, apparently, that inmate died because nurses that worked in his company thought he was faking. And subsequent to that, he never provided any additional training, you know, to nurses in this particular company about inmates faking or not

Page 318

faking, that you -- you can't make that presumption.

Q   And why was that significant to your opinion that's stated in bold at the end of your third report that we marked as Exhibit 16?

A   Well, you know, Nurse Kristiansen did think initially -- and this could have a lot to do with her slow response walking over -- you know, no big deal, you know, he's faking again. Because she did say that previously, you know, he had been in a similar state, and she did wake him up with the smelling salts with the ammonia. And she thought that there's a possibility that he was playing possum once again, which could have -- well, most likely affected her very slow response and lack of sense of urgency.

Q   Well, then in the -- in your bolded text here, it says, quote, "Such training should have been provided after Dr. Leonard was disciplined by the Minnesota Medical Board after MEnD employees failed to provide medical care to a patient they thought was faking who ultimately died due to lack of timely medical care."

If MEnD had instituted such training, could that have prevented some of the

Page 319

acts that you've identified by Nurse Kristiansen that you believe caused or contributed to Mr. James' death?

A   Very possibly. There --

MR. FRANCKOWIAK: Form. Speculation.

MR. McGAVER: Let them object.

MR. FRANCKOWIAK: Hold on.

MR. McGAVER: Let them object.

MR. FRANCKOWIAK: Form. Speculation.

MR. NAFFZIGER: You can answer.

A   Very, very possibly, there would be much quicker action and treatment.

BY MR. NAFFZIGER:

Q   The two medical journal -- actually, there was a medical journal abstract as well as some standards that you cited.

Are those materials that experts in your field reasonably rely upon in order to render opinions?

A   They do. I've used such, you know, documentation in my past as a health facility evaluator nurse in, you know, citations for civil money penalties or, you know, with hospitals, events.

Q   I know that you're not a mental health professional, but I know you've worked in

Page 320

facilities that deal with people with mental illness.

Is it reasonable to expect an inmate who is dealing with profound mental illness for them to be able to accurately describe their symptoms?

MR. FRANCKOWIAK: Objection. Form. Foundation. Vague and incomplete hypothetical.

MR. McGAVER: Also, outside the scope of this witness' credentials.

Go ahead.

A   Of course not.

BY MR. NAFFZIGER:

Q   Why is that?

MR. FRANCKOWIAK: Same objections.

MR. McGAVER: Join.

A   Well, it's related to their active mental illness.

BY MR. NAFFZIGER:

Q   And I know you had testified that a person with mental illness can tell staff if they need medical care.

If a person is dealing with a severe mental illness, would it surprise you if they are unable to articulate that they need mental health care?

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179

Case 2:22-cv-00544-PP   Filed 05/05/25   Page 80 of 82   Document #121-2

Page 321

Let them object before you answer.

MR. FRANCKOWIAK: Objection. Form. Foundation. Vague and speculation. Also outside the witness' expertise.

MR. McGAVER: Join in the objection.

A   And I'll say of course not.

BY MR. NAFFZIGER:

Q   Why is that?

Subject to their objections.

MR. McGAVER: Same objections. Go ahead.

A   Once again, it is related to that individual's current mental status. You know, when we look at his screening, you know, it said he has no problems, he's never had a problem. Obviously, that was not the case. And, you know, like you mentioned, his ability to request help, he didn't even know what type of help he needed.

BY MR. NAFFZIGER:

Q   In your view, would someone have to be a mental health professional to recognize that if a person is repeatedly banging their head against hard objects that they might be dealing with a mental illness?

MR. FRANCKOWIAK: Form. Foundation.

Page 322

Incomplete hypothetical.

MR. McGAVER: Join.

A   I think almost every individual could come to that conclusion whether they are medical or mental health or a complete layperson.

BY MR. NAFFZIGER:

Q   When you viewed the body-worn camera footage, did you ever see Nurse Kristiansen check Mr. James' carotid artery for a pulse?

A   To be honest with you, I don't know what she was doing the second time when his head was back. She was touching his throat. She didn't make any comment about what she was doing, what she felt. I couldn't identify that as checking his carotid from my angle. I really don't know what she was doing. Perhaps she was checking his swallowing again.

Q   When you mention in your report in your testimony at your deposition what the nursing protocol is, is that another way of you saying what the standard of care is for a registered nurse?

A   Of course. Yes, exactly.

Q   When you used the term of "willful indifference" in some of your reports, is that equivalent to intentional, purposeful, and knowing behavior?

Page 323

MR. FRANCKOWIAK: Objection to form. Vague. Calls for a legal conclusion.

A   Synonyms.

MR. NAFFZIGER: I have no further questions.

MR. FRANCKOWIAK: Nothing here.

MR. McGAVER: Okay.

MR. NAFFZIGER: Anything, Steve?

MR. McGAVER: No. Thank you.

MR. NAFFZIGER: Thank you. We'll reserve signature.

THE STENOGRAPHER: Okay.

MR. FRANCKOWIAK: All right.

THE WITNESS: Okay.

(Deposition concluded at 5:22 p.m.)

(Deposition Exhibit Nos. 1 through 19 electronically marked for identification.)

(Original exhibits attached to Original transcript; copies of exhibits are attached.)

Page 324

STATE OF WISCONSIN )
) SS:
MILWAUKEE COUNTY   )

I, Rosanne E. Pezze, RPR/CSR/CRR and Notary Public in and for the State of Wisconsin, do hereby certify that the deposition of LLOYD BIGGS, R.N. was recorded remotely by me and reduced to writing under my personal direction.

I further certify that said deposition was taken remotely from Denton, Texas, on the 1st day of April, 2025, commencing at 9:35 a.m.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

In witness whereof, I have hereunto set my hand and affixed my seal of office on this 9th day of April, 2025.

ROSANNE E. PEZZE, RPR/CSR/CRR
Notary Public
My commission expires January 10, 2026

888-893-3767   Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
www.lexitaslegal.com   California Firm Registration #179
LEXITAS

STATE OF WISCONSIN )

) SS:

MILWAUKEE COUNTY   )

I, LLOYD BIGGS, R.N., do hereby certify that I have read the foregoing transcript of proceedings taken April 1st, 2025, remotely from Denton, Texas and the same is true and correct except for the list of corrections noted on the annexed page.

Dated at _____

this _____ day of _____, 2025.

_____

LLOYD BIGGS, R.N.

Case 2:22-cv-00544-PP    Filed 05/05/25    Page 82 of 82    Document 121-2

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #176F
California Firm Registration #179

LEXITAS