SHERRY JAMES as Special Administrator
of the Estate of MALCOLM JAMES, deceased,

          Plaintiffs,                    Case No. 22-CV-344

v.

RACINE COUNTY SHERIFF'S
DEPARTMENT, SHERIFF
CHRISTOPHER SCHMALING,
SGT. JUSTIN BRANDS, SGT ERLINDA
RODRIGUEZ, OFFICER JONATHAN
KOSKI, OFFICER ADRIAN PAYNE,
OFFICER JOSUE DAVALOS-ALONSO
OFFICER MICHAEL SAULYS,
OFFICER CRISTAIN BRINDIS,
OFFICER JUSTIN GAUDES,
MEnD CORRECTIONAL CARE, PLLC, and
CRYSTAL KRISTAINSEN,

          Defendants.

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MEnD DEFENDANTS' MOTION TO BAR THE OPINION OF JESSICA LELINSKI, MD ON THE CAUSE OF DEATH

### INTRODUCTION

The Medical Defendants stake out a remarkable position in their *Daubert* motion to bar Jessica Lelinksi's opinions: that Dr. Jessica Lelinski, the board-certified forensic pathologist who performed Malcolm James's autopsy, is not qualified to opine on his cause of death. (Doc. 136.) Dr. Lelinski was not retained by any of the parties to this case. She was the forensic pathologist employed by the Milwaukee County Coroner to provide an independent, unbiased cause of death opinion. The Medical Defendants fail to cite even one case where a court (state or federal) decided that a forensic pathologist who performed an autopsy was unable to opine on the cause or manner

1

of death.  The reason for this lack of case law should be obvious.  The main current that runs throughout the Medical Defendants' motion is their claim that Dr. Lelinski could only reference her autopsy findings, and incorrectly referenced the body worn camera videos and other evidence in order to render her cause of death opinion.  This specious claim is belied by national forensic pathology standards, defense expert and forensic pathologist Dr. Frank Sheridan's testimony, case law, and Dr. Lelinski's testimony.  The Court should thus deny the Medical Defendants' motion.

**ARGUMENT**

1. **Dr. Jessica Lelinski's specialized knowledge as a forensic pathologist will assist the jury's understanding of how and why Malcolm James died.**

At the outset, it is important to correct the loose terminology used by the Medical Defendants.  They repeatedly refer to Dr. Lelinski as a "pathologist."  This is half true.  In fact, Dr. Lelinski is a board-certified *forensic* pathologist (in addition to being board-certified in anatomic topic pathology and clinical pathology).  (Doc. 138-2 at 11: 16-18.)  This is no minor quibble.  Forensic pathologists are specially trained to perform autopsies and determine cause and manner of death.  (*Id.* at 12: 6-11.)  Federal district courts have repeatedly acknowledged this.  As noted in *Joseph v. Doe*:

> The Court finds that Baden's opinions as to the manner of Decedent's death are supported by appropriate scientific methodology and reliable data. . . . "A forensic pathologist, by definition, specializes in determining causes of death."  Baden is a well-respected forensic pathologist, who stated in his report that he based his opinions on the autopsy report, toxicology reports, photographs, slides, Jefferson Parish forensic report, EMS report, death certificate, medical records, police department records, as well as the recorded circumstances surrounding Decedent's death. The materials reviewed by Baden are sufficient to provide the facts and data on which his report is based.

2021 U.S. Dist. LEXIS 107661, at *14 (E.D. La. 2021) (*internal citations omitted*), *quoting in part Padilla v. City of Alhambra*, 2007 U.S. Dist. LEXIS 104051, at *21-22 n.57 (C.D. Cal. 2007).  *See also Harris v. Clarke*, 2008 U.S. Dist. LEXIS 109602, at *8 (E.D. Wis. 2008) ("While Jackson

2

has expertise in psychiatry, he is not a pulmonologist or a forensic pathologist and therefore is not qualified to render an opinion on the development of the pulmonary embolism or the cause of Edward's death.")

Though the Medical Defendants make several arguments in their brief, all of them boil down to one faulty premise: that Dr. Lelinski somehow cannot opine that the cause of Malcolm James's death was positional asphyxiation because her autopsy findings were not enough to come to this conclusion. This assumes that a forensic pathologist solely examines the victim's body and then calls it a day. This argument ignores Dr. Lelinski's testimony that the autopsy findings are just one of the things that a forensic pathologist considers, and that other evidence must be considered to render a cause of death opinion given the autopsy findings. (Doc. 138-2 at 79: 22 -- 80: 3, 97: 13-24, 25: 13-24, 26: 3-4, 107: 2-7, 107: 15-18). The Medical Defendants' premise also ignores national standards that govern forensic pathologists' cause of death opinions. Finally, their premise even ignores defense expert and forensic pathologist, Dr. Frank Sheridan's, deposition testimony that confirmed a cause of death opinion cannot be rendered without performing investigation outside of the autopsy findings. (Doc. 139-2 at 199: 13-22).

As defense expert Dr. Sheridan acknowledged, the initial autopsy and report are typically "more important" than subsequent reviews—particularly in "a case like this." (Doc. 139-2 at 153: 16-21). Dr. Lelinski is the only expert with firsthand knowledge of Mr. James's condition at the time of autopsy. Dr. Sheridan never performed a second autopsy or even examined Mr. James's body. (*Id.* at 50: 5-9.) His opinions are based in part on the autopsy that Dr. Lelinski performed, which must have been reliable for Dr. Sheridan to rely upon the autopsy findings. (*Id.* at 201: 23 – 202: 4.) Dr. Lelinski is therefore uniquely positioned to explain both her findings and the analytical process she used to rule out alternative causes of death. *See Michaels v. Mr. Heater,*

3

*Inc.*, 411 F.Supp.2d 992, 997-99 (W.D. Wis. Dist. 2006) (*bracketed text supplied*) (admitting testimony of pathologist who conducted autopsy, reasoning that "even if [the expert's] testimony did reveal[] flaws in her autopsy procedures, those errors would be relevant to her credibility, not to the admissibility of her testimony. [The expert] is a highly experienced pathologist, trained and practiced in conducting autopsies. She personally performed [the decedent's] autopsy according to standard procedures. Her testimony is admissible."). During her physical examination of Mr. James, Dr. Lelinski considered and excluded numerous potential causes of death, including: (1) sickle cell, (2) drug or alcohol toxicity, (3) brain hemorrhage, (4) infection in the lungs, (5) heart attack, (6) natural disease, and (7) brain injury. (Doc. 138-2 at 79: 22 -- 80: 3, 97: 13-24, 25: 13-24, 26: 3-4, 107: 2-7, 107: 15-18). Taking a jury through each of these diagnoses that she ruled out before coming to the conclusion of asphyxia will be vitally important for the jury to fully understand the cause and manner of Mr. James' death. Defendants' attempt to downplay her role as merely "the pathologist who performed the autopsy" does not negate the primacy of her testimony. (Doc. 136, at 5).

To claim that Dr. Lelinski's opinion rested "almost exclusively upon her review of a jail video" stretches the meaning of "almost" too far. (Doc. 136 at 11). Dr. Lelinski's analysis—integrating physical findings, investigative reports, and video evidence—is consistent with accepted forensic practice and will directly assists the trier of fact in determining how and why Mr. James died while in custody. A jury would be unable to accurately assess cause of death without the aid of Dr. Lelinski's testimony explaining the process of arriving at a determination of asphyxia. Moreover, as a non-retained expert, she comes to the table as one of the only truly neutral experts in the case who has nothing to lose or gain from testifying in this case.

4

The Medical Defendants further claim that Dr. Lelinski's review of the BWC footage renders her akin to a "lay video analyst," and that her opinion is premised on materials "entirely unrelated to her role as a pathologist." (Doc. 136, at 7). The Medical Defendants fail to cite any case or expert testimony that supports this incredible claim. In fact, the forensic pathology expert retained by the County Defendants, Dr. Frank Sheridan, reviewed the BWC video and medical records in addition to the autopsy findings to render his opinions. (Doc. 139-2 at 166: 10-18.)

Moreover, the National Association of Medical Examiners ("NAME")—in which both Dr. Lelinski and Dr. Sheridan are members—provides clear guidance in its 2020 Forensic Autopsy Performance Standards: autopsy "[i]nterpretations and opinions must be formulated only after consideration of available information and only after reasonable attempts to obtain all necessary information have been exhausted." (*Forensic Autopsy Performance Standards*. National Association of Medical Examiners, 2020, at 10, attached as Exhibit A to Declaration of Jeffrey D. Naffziger; Jessica Lelinski, M.D. deposition, Doc. 138-2, at 10: 19-24; Frank Sheridan, M.D. *curriculum vitae*, Doc. 139-1, at 9). NAME specifies that autopsies "shall be performed" in four steps:

> B3.1 the forensic pathologist shall review and interpret all laboratory results they requested.
>
> B3.2 the forensic pathologist shall review all ancillary and consultative reports the forensic pathologist requested.
>
> B3.3 the forensic pathologist shall review the investigative reports, medical records, medications, and scene imagery that the forensic pathologist deems relevant in their professional opinion.
>
> B3.4 the forensic pathologist shall determine the cause of death.

(Ex. A at 10).

Dr. Lelinski followed each of these required steps. She first conducted the physical examination of Mr. James, took tissue samples, and reviewed laboratory reports. (Doc. 138-2 at 19: 23-25, 22: 2-20, 26:6-14). She then obtained and reviewed reports from staff who were present at the time of Mr. James's death, along with his medical history. (*Id.* at 26: 14-25, 35: 20 – 36: 25). Critically, she also requested and reviewed "scene imagery"—the body worn camera footage— that she deemed relevant to her professional opinion because the autopsy examination and laboratory findings were inconclusive. (*Id.* at 26: 23-25.) Only after reviewing the totality of these materials did she determine the cause of death.

This approach reflects routine practice. Dr. Lelinski testified that it is her department's policy in custodial death cases to obtain and carefully review any available video footage, and that she has done so in dozens of prior in-custody and police-related death investigations. (*Id.* at 27: 1-4, 91: 10-15). Dr. Sheridan likewise testified that Dr. Lelinski followed standard protocols in rendering her cause of death opinion. (Doc. 139-2 at 152: 3-8.) Indeed, Dr. Sheridan has criticized other pathologists "for not considering information other than the autopsy itself." (Doc. 139-2 at 199: 13 – 200: 10.) It is thus disingenuous for the Medical Defendants to claim that Dr. Lelinski's reliance in part on body worn camera evidence was somehow questionable such that her opinions would not assist the jury in its consideration of what caused Malcolm James's death.

**2. Dr. Lelinski's cause of death opinion is based on sufficient facts and data that meet Rule 702's reliability requirement.**

In the next section of the Medical Defendants' motion, they argue that Dr. Lelinski's cause of death opinion is not based on sufficient facts or data to be considered reliable under Rule 702. This is incorrect.

In *Gayton v. McCoy*, the Seventh Circuit held that, "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge,

skill, experience, or education with the subject matter of the witness's testimony." 593 F.3d 610, 616 (7th Cir. 2010), *quoting Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990). *Gayton* further explained that "a district court should only evaluate whether an expert's conclusion on causation was reasoned and based on a reliable methodology." *Id.* at 619.

Dr. Lelinski's knowledge, skill, expertise, and education centered on determining cause of death are directly related to her opinion on Mr. James' cause of death. As was established in Section 1 above, her methodology—using the physical autopsy and other evidence gathered concerning the circumstances surrounding a death—is well reasoned, reliable, and established within the field of forensic pathology.

Dr. Lelinski's conclusions were not only methodologically sound but also independently reviewed. She testified that, consistent with departmental policy in in-custody death cases, her findings were reviewed by two senior pathologists and the chief medical examiner—all of whom agreed with her determination. (Doc. 138-2 at 38: 20 - 39: 15, 41: 3-11).

Further underscoring the reliability of her methodology, Dr. Sheridan relied on Dr. Lelinski's autopsy report in part to reach his conclusion that Mr. James died of a heart attack. (Doc. 139-2 at 206: 15-21.) Most significantly, Dr. Sheridan testified that he had "enough information based on the body cams and the autopsy to give the opinion . . . that it's primarily a cardiac death." (*Id.* at 201: 23 – 202: 4.)[1] This testimony confirms what the record already demonstrates: the methodology employed here—review of autopsy findings in conjunction with contextual and video evidence—is not novel, speculative, or unreliable. It is standard practice within the field of forensic pathology, and thus reliable.

---

[1] Indeed, if for the sake of argument the foundation for Dr. Lelinski's cause of death opinion is unreliable, then Dr. Sheridan cannot rely on Dr. Lelinski's autopsy report, and his cause of death opinion should be excluded too.

7

The Medical Defendants take issue with the fact that Dr. Lelinski has not "researched or published" scholarship on the topic of asphyxiation. (Doc. 136 at 8.) However, they neglect to mention that asphyxiation is a topic that Dr. Lelinski covers when she gives lectures in an undergraduate course in death investigations, to pathology residents during their training, and to medical doctors who are fellows when they train at her office. (Doc.138-2 at 56: 16-24.) Having conducted over 3,000 autopsies by February 27, 2025, Dr. Lelinski is a career forensic pathologist, not a career expert or medical researcher—her testimony remains within the purview of her extensive experience in that role. (*Id.* at 9: 13-16.) Moreover, Dr. Lelinski's lack of published scholarship does not require her exclusion. *Hall v. Flannery*, 840 F.3d 922, 928-29 (7th Cir. 2016), *quoting Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 741, 761 (7th Cir. 2010), *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000), and *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar*, 345 F.3d 15, 24-25 (1st Cir. 2003) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data" "While extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 701 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." "The proffered expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline."). *Seifert v. Balink*, 372 Wis. 2d 525, 580 (Wis. 2017), *quoting Daubert*, 509 U.S. at 593 ("Publication (which is but one element of peer review) is not a sine qua non of admissibility; it does not necessarily correlate with reliability.").

The Medical Defendants also take issue with the fact that Dr. Lelinski is not a pulmonologist, but the "fact that an expert may not be a specialist in the field that concerns her opinion typically goes to the weight to be placed on that opinion, not its admissibility." *Hall v.*

8

*Flannery*, 840 F.3d 922, 929 (7th Cir. 2016). *See also Woodley v. PFG-Lester Broadline, Inc.*, 556 F. Supp. 2d 1300, 1309 (M.D. Ala. 2008) (rejecting argument that because forensic pathologist was not cardiologist, he could not render cause of death opinion). And while Dr. Lelinski has not done testing or research into spit masks, this goes to the weight of her opinions, not their admissibility.

As her opinion on cause of death is based on sufficient facts and data that meet Rule 702's reliability requirement, Dr. Lelinski's opinion testimony should therefore be admitted at trial.

**3. Dr. Lelinski has reliably applied recognized principles to the facts of the case.**

The Medical Defendants next claim that Dr. Lelinski does not reliably apply recognized principles to the facts of the case, but then essentially repeat their prior arguments. They principally claim that Dr. Lelinski did not utilize pulmonary science to substantiate her opinion that asphyxiation caused Malcolm James's death. This nitpicking is certainly suitable for cross-examination at trial but does not support her exclusion as an expert because Dr. Lelinski is a board-certified forensic pathologist who is well qualified to render cause of death opinions without having to specialize in every other specialty of medicine. A similar argument that a forensic pathologist was not qualified to render opinions on cause of death due to a lack of expertise in a medical specialty was rejected in *Thomsen v. Naphcare, Inc.*:

> Graham is a forensic pathologist. He is licensed to practice medicine and is certified in anatomic and clinical pathology, with a subspecialty in forensic pathology. (Graham Report at 2.) According to NaphCare, Graham is unqualified to opine that alcohol withdrawal caused Thomsen's death, because he "has no expertise in alcohol withdrawal." (NaphCare Mot. at 56-57). As a forensic pathologist, however, Graham's expertise is in identifying cause of death. Opining on Thomsen's cause of death is therefore "within the reasonable confines of his subject area." *Avila*, 633 F.3d at 839. NaphCare further argues that Graham's cause-of-death analysis must be excluded because forensic pathologists perform autopsies and autopsies do not reveal whether the deceased experienced alcohol withdrawal. (NaphCare Mot. at 31-32.) As Graham explained, however, forensic pathologists do not base their conclusions solely on autopsies: other data are considered in

9

analyzing autopsy results and in making cause-of-death determinations. (Graham Dep. at 13:18-14:1.) NaphCare's objections to Graham's qualifications go to the weight, not the admissibility, of his opinion.

*Thomsen*, 2023 U.S. Dist. LEXIS 223540, at *32-33 (D. Or. 2023), *quoting in part Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011).

*Thomsen*'s approach is the correct one, because otherwise no forensic pathologist could ever be qualified to render cause of death opinions since they cannot be board-certified in every subspecialty of medicine. After all, to assert, as the Medical Defendants do here, that Dr. Lelinski "cannot, and has not, reliably applied any recognized principles or methods," is wholly unsupported by standard autopsy protocol, as recognized by both NAME and the County Defendants' own pathology expert, Dr. Sheridan. (Doc. 136, at 12; Doc. 139-2 at 152: 3-8, 201: 23 – 202:4).

### 4. Dr. Lelinski fully accounted for alternative explanations for Malcolm James's death.

The Medical Defendants conclude by arguing that Dr. Lelinski did not consider alternative explanations for Malcolm James's death. This argument ignores Dr. Lelinski's deposition testimony where she discussed in detail how she considered and ultimately excluded potential alternative causes of Mr. James's death.

By way of background, Dr. Lelinski discussed the concept of diagnosis by exclusion at her deposition:

Q. What [*sic*] a diagnosis of exclusion?

A. It essentially refers to the fact that there are some types of death or causes of death that don't leave any physical findings in the body. So I can't make those diagnoses just based on looking at a body and doing an autopsy.

So the purpose of the autopsy is partly to look at any other possible cause of death, and then it's also very important in certain cases to review circumstantial information to know what was happening with the person

just prior to death to be able to come to a conclusion about the cause of death.

So it essentially means there are some things that I cannot diagnose or determine just based on an autopsy alone. I have to rule out everything else to come to that conclusion.

(138-2 at 87: 5-21.) Dr. Lelinski thus testified that where, as in this case, the cause of death does not leave physical findings on the body, she must analyze further evidence to determine the cause of death, and this analysis necessarily must consider *all* potential causes of death. Dr. Lelinski analogized the example of hypothermia, which often does not leave physical cues that can be seen at autopsy, but if the decedent is found outside in below-freezing weather, this circumstantial evidence might support the opinion of death due to hypothermia. (*Id.* at 88: 5-23.) However, Dr. Lelinski made clear that her opinion that Malcolm James died due to positional asphyxiation was only partially a diagnosis of exclusion given that the body worn camera videos she examined showed Mr. James's position at the time he died. (*Id.*) Dr. Lelinski testified that her examination of the body worn camera videos showed that the forcing down of Mr. James's head by the correctional officers restricted his breathing such that he was asphyxiated over the course of several minutes. (*Id.* at 44: 14 – 48: 11.) Dr. Lelinski came to this conclusion after using the autopsy to rule out other explanations for Mr. James's death. ("There are too many things for me to list right now that I was able to rule out based on the autopsy." *Id.* at 97: 19-21.)

As Dr. Sheridan pointed out, a cause of death determination is akin to a "jigsaw puzzle," where the physical examination is just one piece and the other evidence available comes together to create "a complete puzzle." (Doc. 139-2 at 197: 24 - 198: 12.) Dr. Lelinski considered other explanations for Malcolm James's death but ultimately rejected them in favor of her cause of death opinion. While the Medical Defendants theorize that Mr. James died not due to asphyxiation but due to an abnormal heart rhythm, Dr. Lelinski's rejection of that theory does not mean that she did

11

not consider alternative explanations. It is her right to reject alternative explanations that she excluded due to her autopsy and analysis of other evidence.

As the Supreme Court in *Daubert* noted, reliability depends "solely on principals and methodology, not the conclusions that they generate." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993). See, *Gayton*, 593 F.3d at 616 ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination."). Dr. Lelinski followed reliable methods to exclude alternative explanations for Malcolm James's death and thus her opinions are admissible under Rule 702.

## CONCLUSION

For the foregoing reasons, the Court should deny the Medical Defendants' *Daubert* motion to bar the opinion of Jessica Lelinski, M.D.

Respectfully Submitted,

O'CONNOR LAW FIRM, LTD.

*/s/ Jeffrey D. Naffziger*
Jeffrey D. Naffziger

O'CONNOR LAW FIRM, LTD.
E.D. Wis. Attorney No.: 6275581
100 South Wacker Drive, Suite 350
Chicago, Illinois 60606
P: (312) 906-7609 F: (312) 263-1913
jnaffziger@koconnorlaw.com
firm@koconnorlaw.com
*Attorneys for Plaintiff*